# STATE OF CONNECTICUT *v.* RICHARD REYNOLDS
## (SC 15258)

Borden, Katz, Palmer, Vertefeuille, Zarella, Lavery and Foti, Js.

2

4

6

8

(*One justice dissenting*)

Argued September 28, 2001—officially released June 3, 2003

*Kent Drager*, senior assistant public defender, for the appellant (defendant).

*William M. Bloss*, special public defender, for the appellant (defendant) on the proportionality review.

*Michael E. O'Hare*, assistant state's attorney, with whom were *John A. Connelly*, state's attorney, and *Harry Weller*, senior assistant state's attorney, and, on the brief, *Maureen E. Keegan* and *Susan C. Marks*,

supervisory assistant state's attorneys, *Mitchell S. Brody*, senior assistant state's attorney, *Marjorie Allen Dauster*, assistant state's attorney, and *Bruce R. Lockwood*, deputy assistant state's attorney, for the appellee (state).

*Harry Weller*, senior assistant state's attorney, for the appellee (state) on the proportionality review.

*Opinion*

## TABLE OF CONTENTS

I. THE FACTS . . . . . . . . . . . . . . . . . 18

II. GUILT PHASE ISSUES . . . . . . . . . . . 24
   A. Sufficiency of the Information . . . . 24
   B. The Defendant's Challenge to the Panel's Interpretation of § 53a-54b (1) 28
   C. Motion to Suppress Statements . . . 35
      1. The Search. . . . . . . . . . . . . 43
      2. The Arrest . . . . . . . . . . . . . 46
      3. *Miranda* Violation . . . . . . . . 50
      4. The Defendant's Claim of Involuntariness. . . . . . . . . . . . . . . . 53
   D. The Court's Limitation on the Defendant's Right of Cross-Examination . 57

III. PENALTY PHASE ISSUES . . . . . . . . 61
   A. Issues Concerning the Aggravating Factor Enumerated in § 53a-46a (h) (1) . . . . . . . . . . . . . . . . . . . . 61
      1. Facial Constitutionality of § 53a-46a (h) (1) . . . . . . . . . . . . . . 61
      2. The State's Burden of Satisfying the "Same Felony" Element of § 53a-46a (h) (1). . . . . . . . . . . 67
      3. The Right to a Jury Determination on the Existence of the Aggravating Factor Enumerated in § 53a-46a (h) (1) . . . . . . . . . . . . . . 83

4. The Sufficiency of Evidence of the Defendant's Attempt to Commit the Crime of Sale of a Narcotic Substance During the Course of Committing the Capital Felony . . . . . 87

B. Issues Concerning the Aggravating Factor Enumerated in § 53a-46a (h) (4) . . . . . . . . . . . . . . . . . . 89

1. Evidentiary Insufficiency. . . . . . 89

2. Denial of the Defendant's Prepenalty Phase Motion to Dismiss the Aggravating Factor Enumerated in § 53a-46a (h) (4). . . . . . . . . . 98

C. The Court's Instructions on Reasonable Doubt . . . . . . . . . . . . . . 103

D. Effect of the Jury's Invalid Finding as to the Existence of One Aggravating Factor on the Jury's Finding as to the Existence of Another Aggravating Factor . . . . . . . . . . . . . . . . . . 107

E. Three Judge Panel . . . . . . . . . . 110

F. Excusal of Juror for Cause . . . . . . 115

G. The Role of the Jury as Sentencer. . 120

H. The Right to a Bifurcated Penalty Phase Hearing . . . . . . . . . . . . . 129

I. Issues Regarding the Mitigating Factors and Evidence . . . . . . . . . . 131

1. Evidence Establishing the Existence of One or More Mitigating Factors . . . . . . . . . . . . . . . 131

2. Proof of Mitigating Value . . . . . 136

3. Special Verdict Form—Mitigation 137

4. The Cumulative Effect of the Mitigating Evidence as an Independent Mitigating Factor . . . . . . . . . 138

5. Catchall Mitigating Factors . . . . 141

14

      6. The Defendant's Request to Present as an Independent Mitigating Factor the Inappropriateness of the Death Penalty Under the Circumstances of the Case . . . . . . 143

      7. Mercy as a Mitigating Factor . . . 146

J.  Vagueness Challenge to § 53a-46a (d) 148

K.  State's Use of Evidence Purportedly Admissible During the Guilt Phase Only . . . . . . . . . . . . . . . . . . 152

L.  The Admissibility of Anthony Crawford's Testimony . . . . . . . . . . . 153

M.  Alleged Juror Misconduct . . . . . . 156

N.  Preliminary Determination of the Evidentiary Sufficiency of the Aggravating Factors . . . . . . . . . . . . . . 157

IV.  PROSECUTORIAL MISCONDUCT . . . . . 160

A.  References to Officer Williams' Family . . . . . . . . . . . . . . . . . . . . 166

B.  Inviting the Jury to Ignore the Law 176

C.  Expression of Personal Opinions and Beliefs During Closing Arguments . . 199

D.  Conclusion . . . . . . . . . . . . . . . 214

V.  MISCELLANEOUS ISSUES . . . . . . . . . 217

A.  Change of Venue . . . . . . . . . . . 217

B.  The Trial Court's Denial of the Defendant's Postverdict Motions for the Imposition of a Life Sentence and an Evidentiary Hearing in Connection Therewith . . . . . . . . . . . . . . . 226

C.  Mandatory Sentence Review . . . . . 234

VI.  THE CONSTITUTIONALITY OF CONNECTICUT'S DEATH PENALTY STATUTES . . . . . . . . . . . . . . . . . . . 235

VII.  PROPORTIONALITY REVIEW . . . . . . . 237

ADDENDUM . . . . . . . . . . . . . . . . . . 252B

PALMER, J. Officer Walter Williams of the Waterbury police department was on patrol in the vicinity of Orange and Ward Streets in Waterbury in the early morning hours of December 18, 1992, when he was fatally shot in the head at point blank range by the defendant, Richard Reynolds, whom Williams had stopped for questioning. The defendant fled but was apprehended and arrested shortly thereafter and charged with one count of capital felony in violation of General Statutes (Rev. to 1991) § 53a-54b (1)[1] and one count of murder in violation of General Statutes § 53a-54a (a).[2] A three judge panel (panel) consisting of *West, Fasano* and *Keller, Js.*, found the defendant guilty of both counts and, thereafter, the trial court, *Fasano, J.*,[3] conducted the penalty phase hearing before

[1] General Statutes (Rev. to 1991) § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (1) [m]urder of a member of the division of state police within the department of public safety or of any local police department, a chief inspector or inspector in the division of criminal justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an official of the department of correction authorized by the commissioner of correction to make arrests in a correctional institution or facility, or of any fireman . . . while such victim was acting within the scope of his duties . . . ."

All references to § 53a-54b throughout this opinion are to the 1991 revision unless otherwise indicated.

[2] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[3] We hereinafter refer to the trial court, *Fasano, J.*, as the trial court unless otherwise indicated. Judge Fasano, who served as the presiding judge of the three judge panel during the guilt phase of the proceedings, also presided over the penalty phase hearing.

a jury pursuant to General Statutes (Rev. to 1991) § 53a-46a.[4] At the conclusion of the penalty phase hearing, the jury returned a special verdict finding the existence

[4] General Statutes (Rev. to 1991) § 53a-46a provides: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). Such hearing shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (h) of this section exists or that one or more mitigating factors exist. Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause or, (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature,

of two aggravating factors and no mitigating factors. In accordance with the panel's finding of guilt and the jury's special verdict, the trial court rendered judgment

considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(f) If the jury or, if there is no jury, the court finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury or, if there is no jury, the court finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release.

"(g) The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(h) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict as provided in subsection (e) that (1) the defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person; or (3) the defendant committed

of guilty and sentenced the defendant to death.[5] On appeal to this court, the defendant raises a total of fifty-two challenges to the judgment of conviction and to the sentence of death. We affirm both the judgment of conviction and the death sentence.

I

THE FACTS

The panel reasonably could have found the following facts. In late 1992, the defendant, also known as "Kilt," resided with his girlfriend, Karen Smith, and her four children, in Smith's apartment on the second floor of 47 Wood Street in Waterbury. The defendant, a convicted drug dealer, was a member of a cocaine trafficking organization that used Smith's apartment to process and package crack cocaine (cocaine) for sale to street level dealers. Other members of the organization included its leader, Kneshon Carr, and Anthony Crawford, Robert Bryant and Terry Brown.

the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense; or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

The legislature made substantial amendments to § 53a-46a in 1995, which became effective on October 1 of that year. See Public Acts 1995, No. 95-19, § 1. Those amendments are inapplicable to the offenses with which the defendant was charged and ultimately convicted, however, because the offenses were committed in 1992, before the effective date of the amendments. Consequently, all references to § 53a-46a throughout this opinion are to the 1991 revision unless otherwise indicated.

[5] The legislature recently amended § 53a-46a to provide that the act of murdering a police officer to avoid arrest, to prevent detection of a criminal act, to hamper or to prevent the officer from carrying out his or her official duties, or to retaliate against the officer for the performance of his or her official duties, is, itself, an aggravating factor. Public Acts 2001, No. 01-151, § 1 (P.A. 01-151). That amendment is inapplicable, however, to the present case inasmuch as the conduct that formed the basis of the defendant's conviction of capital felony occurred before the effective date of P.A. 01-151, § 1.

The members of Carr's organization were together at Smith's apartment early in the morning of December 18, 1992, preparing cocaine for sale. The defendant and Crawford were each given approximately 175 bags of cocaine, worth about $3500, for sale to an individual located at an apartment on Locust Street. The two men left Smith's residence and headed for Locust Street shortly before 4 a.m. Before leaving Smith's apartment, however, Crawford loaded a .38 caliber semiautomatic pistol and handed it to the defendant, who put it in his right coat pocket. The defendant was carrying cocaine in his left coat pocket.

When the defendant and Crawford reached Orange Street on their way to Locust Street, they crossed paths with Margaret Powell, who previously had purchased cocaine from both the defendant and Crawford. Crawford offered to sell Powell some cocaine, but Powell declined because she had no money.

As the defendant and Crawford were approaching the intersection of Orange and Ward Streets, Officer Williams, who was on patrol alone in a marked police cruiser, turned onto Ward Street from Orange Street and parked near the intersection of those two streets. Williams was in uniform and wearing a bulletproof vest. Upon observing the defendant and Crawford, Williams exited his vehicle and ordered the two men to "[g]et up against" the cruiser. Crawford ignored Williams' command and kept walking. The defendant complied with Williams' order. Specifically, the defendant stopped and placed his left hand on the hood of the cruiser. The defendant, however, kept his right hand in his right coat pocket.

Williams, who was standing behind and slightly to the left of the defendant, repeatedly instructed the defendant to remove his right hand from his coat pocket. The defendant, however, refused to do so. Wil-

liams then took hold of the defendant's right arm in an effort to remove the defendant's hand from his coat pocket. Williams could not wrest the defendant's hand from the pocket, however, and, as Williams released his grip on the defendant, the defendant took his left hand off the hood of the cruiser and bumped his left elbow against Williams' chest, which was protected by a bulletproof vest. The defendant then withdrew the pistol that he was carrying from his right coat pocket, spun around, and shot Williams behind the left ear from a distance of between one and two feet. Williams fell to the ground, and Crawford and the defendant fled the scene, returning to Smith's apartment. As the defendant and Crawford ran, the defendant turned and fired between three and six additional gunshots in Williams' direction.[6] Upon arriving at Smith's apartment, the defendant told Bryant that he realized that he had to shoot Williams in the head when he bumped Williams' chest and learned that Williams was wearing a bullet-proof vest.[7]

Jesse Strohecker was driving north on Orange Street at about 4 a.m. the same day when he noticed a police cruiser parked at the intersection of Orange and Ward Streets.[8] As Strohecker drove through the intersection, he saw Williams lying in the road. Strohecker stopped,

---

[6] Crawford testified that he observed the defendant fire six additional gunshots. Powell testified that she had heard four or five gunshots. Joselyn Campos, who was in the vicinity at the time of the shooting, testified that she had heard three gunshots. Bryant, who had remained at Smith's apartment after the defendant and Crawford left, indicated that he had heard three to five gunshots. Because we review the evidence in the light most favorable to sustaining the verdict, we conclude that the panel reasonably could have resolved this conflicting testimony so as to find that the defendant had fired six additional gunshots.

[7] Crawford also testified that, in response to Crawford's question why he had shot Williams, the defendant stated: "[My] mother didn't name [me] 'Kilt' for nothing."

[8] Strohecker testified that he had decided to take a drive that morning because he was bored.

exited his car and approached Williams. Strohecker knelt down next to Williams and asked him if he was okay. Williams took a deep breath and said: "I've been hit. . . . I've been hit . . . ." Williams then started mumbling unintelligibly, and his body began to shake. Strohecker used the police radio in Williams' cruiser to request assistance for Williams.

Officers Timothy Jackson and John Perugini were riding together in a cruiser approximately two blocks from the shooting when they heard Strohecker's request for assistance on their radio. They arrived at the scene within one minute of receiving Strohecker's transmission. Jackson ran to Williams and knelt beside him. Williams grasped Jackson's shoulder for three to five seconds and attempted unsuccessfully to speak. Officer Joseph Flaherty arrived soon after Jackson and Perugini and observed that Williams' eyes were open and that he was moving his arms or head. Williams' lips also were moving, but it was impossible to discern what, if anything, he was saying. Flaherty and a second officer removed Williams' equipment belt with Williams' handgun still secured in its holster.

Moments later, an ambulance arrived and transported Williams, who, by that time, was unconscious, to Saint Mary's Hospital in Waterbury. Williams lapsed into a coma at approximately 5:30 a.m. and died at 7 p.m. from complications resulting from the gunshot wound to his head.

The defendant was apprehended and charged with one count of capital felony in violation of § 53a-54b (1) and one count of murder in violation of § 53a-54a (a). The court, *Murray*, *J.*, held a probable cause hearing in accordance with article first, § 8, of the state constitution, as amended by article seventeen of the amend-

ments,[9] and General Statutes § 54-46a,[10] at which the court, *Murray, J.*, found probable cause to believe that the defendant had committed the crimes with which he was charged. Thereafter, the state notified the defendant of three aggravating factors that it intended to prove at the defendant's penalty phase hearing, namely, that the defendant had committed the capital felony: (1) "during the . . . attempted commission of . . . a felony and he had previously been convicted of the same felony"; General Statutes (Rev. to 1991) § 53a-46a (h) (1); (2) in such a manner as "knowingly [to create] a grave risk of death to another person in addition to the victim of the offense"; General Statutes (Rev. to 1991) § 53a-46a (h) (3); and (3) "in an especially heinous, cruel or depraved manner . . . ." General Statutes (Rev. to 1991) § 53a-46a (h) (4). The defendant waived his right to a jury trial and elected to be tried by a three judge court in accordance with General Statutes § 53a-45.[11]

---

[9] Article first, § 8, of the constitution of Connecticut, as amended by article seventeen of the amendments, provides in relevant part: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . ."

Although article first, § 8, of the constitution of Connecticut, as amended by article seventeen of the amendments, was amended further by article twenty-nine of the amendments, article twenty-nine of the amendments did not amend the provision in article seventeen of the amendments securing the right to a probable cause hearing in cases involving crimes punishable by life imprisonment or death.

[10] General Statutes § 54-46a provides in relevant part: "(a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause. . . ."

[11] General Statutes § 53a-45 provides: "(a) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d.

"(b) If a person indicted for murder or held to answer for murder after

Prior to trial, the defendant filed a motion to suppress certain statements that he had made to the police during the investigation of the shooting of Williams. After an evidentiary hearing, the court, *Kulawiz, J.*, denied the defendant's motion to suppress. The defendant also filed a motion for a change of venue, which the trial court denied following an evidentiary hearing.

The trial then was held before the panel, which found the defendant guilty of both capital felony and murder. Thereafter, the defendant elected to have the penalty phase hearing held before a jury rather than the panel.[12] The jury returned a special verdict finding that the state had established two aggravating factors, namely, that the defendant had committed the capital felony during the attempted commission of a felony having previously been convicted of the same felony, and that the defendant had committed the capital felony in an especially heinous, cruel or depraved manner. General Statutes (Rev. to 1991) § 53a-46a (h) (1) and (4). The jury also found, however, that the state did not satisfy its burden of proving that the defendant had committed the capital felony in such a manner as knowingly to create a grave risk of death to another person in addition to Officer

a hearing conducted in accordance with the provisions of section 54-46a waives his right to a jury trial and elects to be tried by a court, the court shall be composed of three judges designated by the Chief Court Administrator or his designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly.

"(c) The court or jury before which any person indicted for murder or held to answer for murder after a hearing conducted in accordance with the provisions of section 54-46a is tried may find such person guilty of homicide in a lesser degree than that charged."

[12] The defendant filed a second motion for a change of venue in which he requested that the penalty phase hearing be held outside the judicial district of Waterbury, the judicial district in which the trial occurred. A majority of the panel agreed with the defendant, and the defendant's motion was granted. Accordingly, jury selection for the penalty phase hearing and the penalty phase hearing itself both were conducted in the judicial district of Middlesex.

Williams. General Statutes (Rev. to 1991) § 53a-46a (h) (3). Finally, the jury found that the defendant did not satisfy his burden of proving any mitigating factors. The trial court rendered judgment in accordance with the jury's special verdict, sentencing the defendant to death in connection with the defendant's conviction of capital felony.[13] This appeal followed.

## II

## GUILT PHASE ISSUES

### A

### Sufficiency of the Information

The defendant contends that he is entitled to a new probable cause hearing because the information, in which he was charged with the crime of capital felony in violation of § 53a-54b (1),[14] failed to allege an essential element of that offense, namely, that Officer Williams was "acting within the scope of his duties" at the time he was murdered. We disagree.[15]

On December 21, 1992, the state filed a short form information charging the defendant with the crime of capital felony in violation of § 53a-54b (1). On February 3, 1993, in response to the defendant's motion for a bill of particulars, the state filed a long form information charging the defendant with the crime of capital felony

---

[13] The trial court merged the conviction of murder with the conviction of capital felony, the former offense being a lesser included offense of the latter offense. The court thus did not impose a sentence in connection with the defendant's conviction of murder.

[14] See footnote 1 of this opinion for the relevant text of § 53a-54b (1).

[15] The defendant also argues that, in the event we conclude that he is entitled to a new probable cause hearing, and probable cause is found at that hearing, he then is entitled to a new trial to determine his guilt with respect to the capital felony charge. Although we agree with the defendant that, under the scenario he posits, he would be entitled to a new trial, his claim that he is entitled to a new trial fails in light of our conclusion that he is not entitled to a new probable cause hearing.

as well as the crime of murder in violation of § 53a-54a (a). The state alleged in the long form information that the defendant "did commit the crime of [murder] . . . in that on or about [December 18, 1992], at approximately 4:00 a.m., at or near the intersection of Orange and Ward Streets . . . the [defendant], with the intent to cause the death of another person, [namely, Officer Williams] a member of the Waterbury . . . [p]olice [d]epartment, caused the death of [Officer Williams] by shooting him in the head with a handgun." With respect to the capital felony count, the state alleged in relevant part that the defendant "did commit [murder] of a member of the local police department, [namely, Officer Williams] . . . ." After a hearing conducted in accordance with article first, § 8, of the Connecticut constitution, as amended by article seventeen of the amendments,[16] of the Connecticut constitution and § 54-46a,[17] the trial court, *Murray, J.*, found probable cause to try the defendant on the capital felony and murder charges.

The defendant claims for the first time on appeal that he is entitled to a new probable cause hearing because the information did not specify that Williams was "acting within the scope of his duties"; General Statutes (Rev. to 1991) § 53a-54b (1); when the defendant shot and killed him. The defendant further maintains that "a proper finding of probable cause . . . is a constitutional prerequisite to the exercise of trial jurisdiction over a person charged with [the] crime [of capital felony]," and, as a consequence of the "deficiency in the state's charging document, there was no such probable cause finding with respect to the acting within the scope of duties element [of] the capital felony charge . . . ."

[16] See footnote 9 of this opinion for the relevant text of article first, § 8, of the Connecticut constitution, as amended by article seventeen of the amendments.

[17] See footnote 10 of this opinion for the relevant text of § 54-46a.

(Internal quotation marks omitted.) According to the defendant, this alleged deficiency vitiated the finding of probable cause, thereby requiring a new probable cause hearing.

The defendant's argument is unavailing for two reasons. First, the defendant waived his claim inasmuch as he had failed to raise it in the trial court. "The defendant correctly asserts that a finding of probable cause is necessary to establish that a court has jurisdiction to try a suspect as to a certain charge. See *State* v. *Mitchell,* 200 Conn. 323, 332, 512 A.2d 140 (1986). As we stated in *State* v. *John,* 210 Conn. 652, 665 n.8, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989), however, our reference in *State* v. *Mitchell,* [supra, 330], to a determination of probable cause as a prerequisite to subsequent jurisdiction to hear the trial pertains, not to subject matter jurisdiction, but only to jurisdiction over the person of the defendant. General Statutes § 54-46a (a) expressly allows the waiver of a preliminary hearing to determine probable cause, so it obviously cannot be essential for subject matter jurisdiction. Accordingly, like other defects relating to jurisdiction of the person, any infirmity in the evidence presented at a probable cause hearing is deemed to be waived if not seasonably raised." (Internal quotation marks omitted.) *State* v. *Hafford,* 252 Conn. 274, 309–10, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). Having failed to raise a claim in the trial court that the evidence did not comport either with the charge or the allegations contained in the information, the defendant is barred from raising such a claim on appeal.

The defendant's claim fails for a second, more fundamental reason. The particular allegations contained in an information do not limit or otherwise define the scope of the trial court's responsibility to determine whether probable cause exists to proceed with the pros-

ecution of an accused charged with an offense punishable by death or life imprisonment. In other words, it is the responsibility of the court, pursuant to § 54-46a, to determine whether there is probable cause to believe that the defendant committed the offense with which he has been charged. In the present case, the state charged the defendant with committing, inter alia, the crime of capital felony. Consequently, the trial court was responsible for determining whether the evidence adduced at the probable cause hearing was sufficient to warrant the continued prosecution of the defendant on the capital felony charge, and the trial court properly upheld its responsibility.

Under the view advanced by the defendant, the probable cause hearing may be used as a vehicle to test the sufficiency of the allegations contained in the information. That simply is not a purpose of a probable cause hearing. The probable cause hearing is designed to safeguard an accused's rights by requiring the state to demonstrate, at an early stage of the prosecution, that the evidence of the defendant's guilt is sufficient to warrant a prosecution in connection with the particular charge.

Moreover, the defendant's argument regarding the variance between the "acting within the scope of his duties" language of § 53a-54b (1) and the allegations contained in the information, reflects a fundamental misperception of the purpose of the information. That purpose is not to set the parameters of the probable cause hearing but, rather, to "inform the defendant of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise and to make the charge definite enough to enable [the defendant] to plead his acquittal or conviction in bar of any future prosecution for the same offense . . . ." (Internal quotation marks omitted.) *State* v. *McMurray*, 217 Conn. 243, 249, 585 A.2d 677 (1991). Thus, contrary to the defendant's claim, there

is no substantial relation between the information, on the one hand, and the probable cause hearing, on the other. Inasmuch as the defendant's claim is predicated on the erroneous premise that such a relation exists, his claim must fail.[18]

## B

### The Defendant's Challenge to the Panel's Interpretation of § 53a-54b (1)

The defendant next claims that the panel improperly determined that, in order to satisfy the element of § 53a-54b (1) requiring proof that Officer Williams had been "acting within the scope of his duties" when he conducted a *Terry*[19] stop of the defendant,[20] the state was

[18] We note that the long form information that the state had filed prior to the probable cause hearing was the operative information for purposes of the guilt phase of the defendant's case. Indeed, after closing arguments during the guilt phase but before the panel had begun its deliberations, the state's attorney informed the panel that the information had failed to allege that Williams was acting within the scope of his duties as a police officer when he was murdered. The state's attorney also expressly acknowledged, however, that the state bore the burden of establishing that essential element of § 53a-54b (1) beyond a reasonable doubt. After observing that the defendant necessarily was aware of that statutory element because he had moved for a judgment of acquittal on the ground that the state had failed to meet its burden of proving that element beyond a reasonable doubt, the panel asked defense counsel whether he had seen the information and whether he had a "problem" with it. Defense counsel merely responded that he had seen the information; defense counsel did not raise any challenge in connection with the sufficiency of the allegations contained therein in response to the panel's inquiry. In light of this record, the defendant also makes no claim on appeal that the state was required to file a substitute information, prior to the panel's deliberations, containing the omitted language.

[19] *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[20] "Under the fourth amendment to the United States constitution, and under article first, [§§ 7 and 9], of the Connecticut constitution, a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. *Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State* v. *Oquendo*, 223 Conn. 635, 654, 613 A.2d 1300 (1992); *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990)." *State* v. *Trine*, 236 Conn. 216, 223, 673 A.2d 1098 (1996). The officer

required to prove merely that he was acting in the discharge of his official duties as a police officer at that time. The defendant claims that § 53a-54b (1) requires proof *both* that Williams was acting within the scope of his duties as a police officer when he was murdered *and* that his conduct was lawful. The defendant further claims that the state failed to satisfy its burden of proof in that respect because the evidence was insufficient to establish that Williams' investigative stop of the defendant comported with the dictates of the fourth amendment to the United States constitution. The defendant claims, therefore, that his conviction of the crime of capital felony should be dismissed. The defendant further maintains that, even if the evidence established that Williams' conduct was constitutionally permissible, the panel, in applying the wrong legal standard, failed to make such a finding and, consequently, the defendant is entitled to a new guilt phase hearing. We conclude that the state was required to prove only that Williams was acting in the good faith discharge of his official duties as a police officer when he stopped the defendant and attempted to subdue him.[21] Because

---

also may undertake a patdown search to discover weapons if he reasonably believes that the detained individual is armed and dangerous. *Terry* v. *Ohio*, supra, 27; *State* v. *Trine*, supra, 223–24.

[21] As the state acknowledges, proof that an officer was acting in good faith is essential inasmuch as an officer who is not acting in good faith cannot, by definition, be acting within the scope of his duties. See *State* v. *Casanova*, 255 Conn. 581, 592–93, 767 A.2d 1189 (2001) (police officer cannot be deemed to be acting in performance of his duties unless he carries out those duties in good faith); *State* v. *Privitera*, 1 Conn. App. 709, 722, 476 A.2d 605 (1984) (same). Although the defendant challenges our conclusion that a police officer who harbors a good faith but mistaken belief in the propriety of his conduct is "acting within the scope of his duties" for purposes of § 53a-54b (1), the defendant alternatively contends that he is entitled to a new guilt phase hearing under that standard. Specifically, he claims that a new guilt phase hearing is necessary because the panel made no finding that Williams believed, in *good faith*, that he was conducting a lawful *Terry* stop of the defendant. We reject the defendant's claim. The panel expressly found that Williams was "acting within the scope of his duties" when he was murdered. In the absence of any evidence to the contrary, "[j]udges are presumed to know the law . . . and to apply it correctly."

the evidence adduced at the guilt phase hearing satisfied this statutory requirement, we need not, and, therefore, do not, address the defendant's remaining two claims, both of which are predicated on an erroneous interpretation of § 53a-54b (1).

At the conclusion of its deliberations, the panel issued a memorandum of decision in which it found that Williams was acting within the scope of his duties as a member of the Waterbury police department when he was shot and killed by the defendant while investigating the activities of the defendant and Anthony Crawford. The panel also expressly stated, however, that it "makes no finding as to the legality of the stop [and] investigation, since it finds no authority for the defendant's claim that the state must prove as an element of the crime of capital felony, that the officer was acting in the *lawful* performance of his duties at the time and place of the incident." (Emphasis in original.) The defendant does not contest that Williams was on duty and acting in his capacity as a police officer when he stopped the defendant for investigative purposes. The defendant claims, rather, that § 53a-54b (1) applies only to law enforcement officers who, in the discharge of their official duties, act in accordance with constitutional requirements. We disagree.

(Internal quotation marks omitted.) *State* v. *Stern*, 65 Conn. App. 634, 648, 782 A.2d 1275, cert. denied, 258 Conn. 955, 785 A.2d 232 (2001). Moreover, although we do not believe that the panel's memorandum of decision is ambiguous with respect to the good faith belief requirement of § 53a-54b (1), even if it were, "we read an ambiguous record, in the absence of a motion for articulation, to support rather than to undermine the judgment. . . . Because the [defendant] did not seek the trial court's articulation in that regard, we must assume [that] the [panel] acted properly." (Citation omitted; internal quotation marks omitted.) *Abington Ltd. Partnership* v. *Heublein*, 257 Conn. 570, 586 n.29, 778 A.2d 885 (2001). We note, finally, that the record is devoid of any indication that Williams was not performing his duties in good faith when he stopped the defendant and Anthony Crawford in order to question them about their suspicious activities.

The defendant's claim raises an issue of statutory construction and, therefore, our review is plenary. E.g., *State* v. *Russo*, 259 Conn. 436, 447, 790 A.2d 1132 (2002). It is axiomatic that, in construing statutes, our fundamental task is to ascertain and give effect to the apparent intent of the legislature. Id. "As with all issues of statutory interpretation, we look first to the language of the statute." (Internal quotation marks omitted.) *Gipson* v. *Commissioner of Correction*, 257 Conn. 632, 639, 778 A.2d 121 (2001). On its face, the statutory language at issue, "acting within the scope of his duties"; General Statutes (Rev. to 1991) § 53a-54b (1); broadly encompasses any activity that falls within the officer's official duties, which, of course, include the investigation of suspected criminal conduct. The language contains no limitation on the nature of that activity as long as it involves the discharge of the officer's responsibilities as a sworn law enforcement officer. Thus, the wording of the statute strongly supports the conclusion that § 53a-54b (1) was intended to apply to circumstances such as those in the present case, in which the officer, acting in good faith, engages in an activity that falls within the officer's official responsibilities, regardless of whether the officer's conduct later may be found to have exceeded constitutional boundaries.

In interpreting statutes, we also look to the pertinent legislative history and circumstances surrounding the statute's enactment, to the legislative policy the statute was designed to promote and to its relationship to existing legislation governing the same or related subject matter. E.g., *State* v. *Vickers*, 260 Conn. 219, 223–24, 796 A.2d 502 (2002). These considerations also lead us to reject the defendant's construction of § 53a-54b (1) as unduly narrow.

It is clear from the legislative history of § 53a-54b (1) that a primary purpose of that provision is to deter violence against police officers and certain other law

enforcement officers while they are performing their official duties. For example, during the Senate debate on the legislation implementing the current capital felony statutory scheme; see Public Acts 1973, No. 73-137 (P.A. 73-137); Senator George C. Guidera, the Senate chairman of the judiciary committee and a sponsor of the legislation, stated that the drafters of the bill had "selected those crimes in which there is a deterrent value to impose the death penalty." 16 S. Proc., Pt. 4, 1973 Sess., p. 1871. In explaining that a principal purpose of the proposed legislation was to protect law enforcement officers, Guidera thereafter stated: "[W]e're trying to protect, in this [b]ill, those individuals who are out on the street day in and day out who are trying to protect our lives and property including the police[men], the deputy sheriffs, the constables . . . and the Judiciary Committee simply felt that they should receive the protection that they are really due." Id., pp. 1873–74.

Similarly, Representative James F. Bingham, also a member of the judiciary committee, explained during the debate on the proposed capital felony legislation in the House of Representatives that, "[i]t is the view of the judiciary committee that . . . the death penalty has deterrent value and that it may provide a measure of protection against incorrigible and dangerous individuals. The potential criminal will know that if his intended victims die, he may also die. The murderer of a member of the State Police . . . or a local police department . . . will know that [he] may have to pay with [his] own [life] for any lives that [he] take[s]." 16 H.R. Proc., Pt. 6, 1973 Sess., p. 2975. Bingham further explained: "[T]he reason for this particular law is that society must be protected. We have come to this stage in our history in the [s]tate of Connecticut that society itself is crying out for protection and that those people who commit heinous crimes, such as the murder of a

policeman during the [performance] of his duties . . . must know that if they commit those crimes, the state will exact . . . the highest penalty." Id., pp. 2976–77.

Our interpretation of the relevant statutory language of § 53a-54b (1) is consistent with the statute's underlying purpose; when a police officer carries out his official duties—irrespective of whether his conduct eventually may be deemed to be unlawful—he is particularly vulnerable to the kind of murderous assault that the legislature sought to deter in enacting § 53a-54b (1). By contrast, the statutory construction urged by the defendant would thwart this legislative purpose because there is no logical reason why the legislature would have intended to deprive a police officer of this protection when that officer, acting in the good faith discharge of his duties, mistakenly engages in conduct that ultimately is determined to transgress constitutional boundaries. "It is not our practice to construe a statute in a way to thwart its purpose or lead to absurd results . . . or in a way that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." (Citation omitted; internal quotation marks omitted.) *Colonial Penn Ins. Co.* v. *Bryant,* 245 Conn. 710, 725, 714 A.2d 1209 (1998).

Furthermore, our construction of the phrase "acting within the scope of his duties" contained in § 53a-54b (1) is guided by our interpretation of General Statutes § 53a-167c,[22] which categorizes an assault of a law enforcement officer "acting in the performance of his or her duties" as a class C felony. In explaining that phrase, we recently stated: "[A] police officer has the

[22] General Statutes § 53a-167c provides in relevant part: "(a) A person is guilty of assault of public safety . . . personnel when, with intent to prevent a reasonably identifiable peace officer . . . from performing his or her duties, and while such peace officer . . . is *acting in the performance of his or her duties,* (1) such person causes physical injury to such peace officer . . . ." (Emphasis added.)

duty to enforce the laws and to preserve the peace. Whether he is acting in the performance of his duty . . . must be determined in the light of that purpose and duty. *If he is acting under a good faith belief that he is carrying out that duty, and if his actions are reasonably designed to that end, he is acting in the performance of his duties.* . . . Although from time to time a police officer may have a duty to make an arrest, his duties are not coextensive with his power to arrest. [His] official duties may cover many functions which have nothing whatever to do with making arrests. . . . The phrase in the performance of his official duties means that the police officer is simply acting within the scope of what [he] is employed to do. *The test is whether the [police officer] is acting within that compass or is engaging in a personal frolic of his own.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Casanova,* 255 Conn. 581, 592–93, 767 A.2d 1189 (2001), quoting *State* v. *Privitera,* 1 Conn. App. 709, 722, 476 A.2d 605 (1984). Thus, § 53a-167c simply requires evidence establishing that the police officer had been performing his or her official duties in good faith when the officer was assaulted. Under § 53a-167c, the state need not prove that the officer had been performing his duties lawfully when the officer was assaulted. For purposes of the present case, we see no material difference between the phrase "acting within the scope of his duties" contained in § 53a-54b (1) and the phrase "acting in the performance of his or her duties" contained in § 53a-167c. Consequently, we see no reason to impute a requirement into the former phrase that is not contained in the latter.[23] Accordingly, we reject the

---

[23] The defendant contends that the phrase "acting within the scope of his duties" contained in § 53a-54b (1), when strictly construed, must be understood to require evidence establishing that the officer is acting lawfully when he or she is murdered. We disagree. First, we are not persuaded that a strict construction of that statutory wording leads to the interpretation that the defendant urges because, as we have explained, there simply is nothing explicit in the language to suggest such a requirement. Moreover, "although criminal statutes are strictly construed, it is equally fundamental

defendant's claim that the panel improperly dispensed with an essential element of § 53a-54b (1).

## C

### Motion to Suppress Statements

The defendant claims that the trial court, *Kulawiz, J.*,[24] improperly denied his motion to suppress incriminating statements that he had made at police headquarters in response to questioning by investigating officers. In particular, the defendant contends that the statements should have been suppressed because they were the product of his illegal arrest, which, the defendant maintains, itself, was the product of an illegal search of the apartment in which he resided. The defendant further contends that he did not make the challenged statements voluntarily, and that they were obtained in violation of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We reject the defendant's claim that the court improperly denied his motion to suppress.

that the rule of strict construction does not require an interpretation which frustrates an evident legislative intent." (Internal quotation marks omitted.) *State* v. *Cobb*, 251 Conn. 285, 387, 743 A.2d 1 (1999) (*Cobb II*), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

The defendant also argues that the rule of lenity applies to our analysis of his claim. See *State* v. *Hinton*, 227 Conn. 301, 317, 630 A.2d 593 (1993) (rule of lenity requires court to resolve "doubts in the enforcement of a penal code against the imposition of a harsher punishment" [internal quotation marks omitted]). We reject the defendant's contention. "[T]he touchstone of this rule of lenity is statutory ambiguity. . . . [W]e . . . [reserve] lenity for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." (Emphasis in original; internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 687 n.47, 735 A.2d 267 (1999). The rule of lenity is inapplicable to the present case because, contrary to the defendant's claim, the phrase "acting within the scope of his duties" contained in § 53a-54b (1) does not give rise to any ambiguity.

[24] All references to the trial court in part II C of this opinion are to the trial court, *Kulawiz, J.*, unless otherwise noted.

The essential facts relevant to the defendant's claim are set forth in the memorandum of decision of the court denying the defendant's motion to suppress. "At approximately 4 a.m. on December 18, 1992, Officer . . . Williams of the Waterbury police department was shot in the head at the intersection of Orange Street and Ward Street and later that morning died from said injuries. Upon learning that [Joselyn Campos] was a possible witness, officers spoke with . . . Campos, who told officers at the scene and thereafter at headquarters, that she had observed two black males walking on Orange Street at approximately 4 a.m. and that she then heard gunshots and saw the same two men running down Ward Street. She stated to police that she saw them run into one of three houses that she pointed out to [Detective Sergeant Neil] O'Leary. . . . O'Leary testified that he ordered police to seal off the area and search houses pointed out by Campos. [Investigating] [o]fficers checked buildings and reported [that] nobody [was] considered a suspect. A call was received by police at around 6:30 a.m. that someone at 227 Walnut Street in the third floor apartment might have some information concerning the shooting. . . . O'Leary, [Detective Peter] Keegan and others went to that address [where they] found . . . Lucinda Crawford, George Washington and Robert 'Po' Bryant. . . . Lucinda Crawford told . . . O'Leary that . . . Bryant had information about the shooting. . . . O'Leary talked with . . . Bryant who told him that he had been at Karen Smith's apartment on the second floor at Ward Street when [a man] he knew as Anthony Crawford and a guy he knew as 'Kilt' ran up the stairs to the apartment and said [that they had just shot a cop].

"At about 7:30 a.m. on December 18, 1992 . . . O'Leary . . . [Sergeant James] Griffin . . . Keegan [and two other police officers accompanied by Bryant] went to 47 Ward Street, one of the three buildings that

had been pointed out by Campos earlier. Officers had their guns drawn as they knocked on the door.[25] . . . Smith answered the door and O'Leary told her why the police were there and she allowed them to enter.[26] Directly in front of the door was a bed occupied by a black male. O'Leary told the male to get out of the bed. In response to the officer, he said his name was David Robinson . . . . [In fact, his real name was Richard Reynolds, the defendant.] Another black male was on the couch in the living room. This man gave his name as Jamal James. [In fact, his real name was Anthony Crawford.] [The] [p]olice [then] told Robinson to go into the living room. [The] [o]fficers no longer had guns drawn at this point. [The] [p]olice asked for identification and the men said they had none. The man identifying himself as Jamal James gave a date of birth of November 7, 1974, and stated that he was twenty years old.

"While O'Leary was asking [for the] identity of [the] men, Keegan summoned [O'Leary] into the next room where Smith had [informed the officers] that the men were Anthony Crawford and David Robinson, known as 'Kilt.' Both men denied knowledge of the shooting. [Investigating officers] asked them where they had been earlier and they stated that they both had been at the apartment all night. O'Leary informed them that a police officer had been shot and seriously injured. O'Leary asked them if they were willing to go to police headquarters. Both agreed to go. [The investigating] [o]fficers

---

[25] The record reflects that the investigating officers who knocked on Smith's door and obtained her permission to enter were not in uniform. These plainclothes officers were joined shortly thereafter by two other officers, at least one of whom was in uniform.

[26] According to testimony adduced at the suppression hearing, Smith opened the door and said, "[c]ome in." Smith, herself, did not testify at the suppression hearing. She did testify, however, at the penalty phase hearing and, in response to a question posed by the state's attorney as to what she did when the police knocked on her door, Smith responded, "I let them in."

asked them to put on shoes. The two men were not handcuffed and at no time [did they ask] to leave. [The] [o]fficers proceeded to take [both men] to separate cars to transport them to headquarters.

"Immediately after they had left the apartment and before they were transported to headquarters . . . Smith told . . . Keegan that at about [3:50 a.m.] she was in bed sleeping when 'Kilt' . . . jumped in her bed, his heart pounding and said [that he] 'shot a cop.' . . . Keegan stayed with . . . Smith at Ward Street until [Smith] had [made child care arrangements].

"At about 8 a.m., [the] defendant and [Anthony] Crawford arrived at headquarters and were taken in through the police entrance rather than the public entrance. [The] [d]efendant and Crawford were placed in separate interview rooms. At about 8:20 [a.m.] . . . Smith arrived at headquarters. The [m]ayor and various officials were at headquarters. Officers [James] Egan and [James Clary] interviewed Crawford. . . . Keegan and . . . Griffin interviewed . . . Smith . . . and [another officer] interviewed Bryant.

"From about 8 a.m. until 10 a.m., [the] defendant was in a room by himself in police headquarters. O'Leary asked him if he wanted a soda or coffee or to use the bathroom during that time.

"Between 8 and 10 a.m., statements were being taken from Crawford and Bryant. At about 10:15 [a.m.] O'Leary decided to interview [the] defendant after others had said that [the] defendant had shot [Williams]. Inspector John Maia in the presence of . . . O'Leary read [the] defendant his [*Miranda*][27] rights using as a guide a form entitled 'Voluntary Statement' normally used for written statements. Maia informed [the] defendant of his right to remain silent, that anything he said

---

[27] *Miranda* v. *Arizona*, supra, 384 U.S. 436.

could be used against him, that he had the right to an attorney and that if he could not afford one, an attorney would be appointed for him, that an attorney could be with him while he was being questioned, [and] that he had the right to stop answering and refuse to answer any questions. [The] [d]efendant was not asked to initial this form. O'Leary asked [the] defendant if he had been arrested before to which he responded [that he had]. He also asked [the defendant] if he understood the rights read and [the defendant] responded [that he did]. [O'Leary] asked [the] defendant if he would talk and [the] defendant said [that he would but denied any involvement in the crime].

"O'Leary then observed high ranking officers at his door and asked Maia to move [the] defendant out of his office to another room so that O'Leary could talk with the officers. Maia complied. [The] [d]efendant said [that] he didn't shoot the cop, Derrick did. Maia asked who Derrick was and [the] defendant said that Crawford would know. Maia went out and asked Crawford who said that there was no Derrick, 'just me . . . and Kilt did it.'

"[Keegan] told O'Leary at this point that . . . Smith had given a written statement that [the] defendant had shot . . . Williams. O'Leary told Keegan to go in and tell [the] defendant. Keegan went into the room with [the] defendant and Maia and asked Maia if [the] defendant had been advised of his rights. Maia replied affirmatively. Keegan then told [the] defendant that . . . Smith had told him that [the] defendant had told her that he had shot a cop. Maia said to [the] defendant, 'get it off your chest,' and Keegan told him to take responsibility. [The] defendant put his head down and said, 'I did it, I shot the cop.' [The] defendant [then] was asked if he would give a [written] statement and he said [that he would]. Keegan went out of the room and told O'Leary that [the] defendant 'went for it.' Kee-

gan went back into the room and asked about the weapon and [the] defendant said that it was in transit and nowhere to be found.

"[The] [d]efendant then said that he wanted an attorney. He was asked if he wanted a public defender or a private attorney to be called. No further questions were asked. State's Attorney [John A.] Connelly who was also at the police station was informed and [he] called Public Defender Alan McWhirter who arrived shortly thereafter. After speaking with [the] defendant . . . McWhirter stated that his client would make no statement. All questioning stopped when [the] defendant stated that he wanted an attorney. No audio or video recording had been taken of the interview . . . ."

In rejecting the defendant's claims, the court found that, with respect to the police entry into Smith's apartment, she voluntarily had allowed the officers in. The court emphasized that, although those officers had their guns drawn as they knocked on Smith's door, they returned their guns to their holsters after observing that the occupants of the apartment were not armed.[28]

[28] The court also found that the police had probable cause to enter Smith's apartment. Although the police did not have a warrant to enter Smith's apartment, the state maintains that the officers' warrantless entry into the apartment would have been constitutionally permissible, even without Smith's consent, under the exigent circumstances exception to the warrant requirement. See, e.g., *State* v. *Gant*, 231 Conn. 43, 63–64, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 13 L. Ed. 2d 291 (1995) (exigent circumstances exception to warrant requirement applies generally to those circumstances in which police are unable or unlikely to effectuate arrest, search or seizure, for which probable cause exists, unless they act swiftly, without seeking prior judicial authorization). The state asserts that the police had sound reason to believe that two armed and dangerous men involved in the murder of Williams had fled to, and were hiding in, an apartment in which Smith and her children resided. Thus, a powerful argument may be made that these circumstances were sufficiently exigent to justify a warrantless entry into the apartment even without Smith's consent. In view of the court's conclusion that Smith voluntarily allowed the police into the apartment, however, there was no need for the court to address the exigent circumstances exception and, in fact, the court did not do so. Consequently, that issue is not before us on appeal.

The court also found that the defendant, who never was handcuffed, voluntarily consented to be driven to police headquarters and, furthermore, that he was not in custody until he entered the police vehicle for the ride to police headquarters.[29] With respect to the existence of probable cause to arrest the defendant at that time, the court expressly credited the testimony adduced by the state that investigating officers previously had been told by Campos that she saw two men running into Smith's apartment building from the area where she had heard gunshots, and by Bryant that he was at Smith's apartment when he observed the defendant and Crawford run up the stairs, enter the apartment and exclaim, "[w]e just shot a cop." The court concluded that this information constituted probable cause to arrest the defendant and Crawford. The court further noted that, "as soon as the two men left the apartment on their way downstairs to the police cars . . . Smith informed . . . Keegan that [the] defendant . . . earlier that morning, had jumped into bed with her and, with his heart pounding, said, 'I just shot a cop.'" The court concluded that because the police had obtained this information immediately before the defendant was in custody, this information served to buttress the probable cause that the police already had to arrest the defendant.

Finally, the court found that the defendant's statements were not the product of police coercion or over-

[29] The state questions the propriety of the court's conclusion that the defendant was seized when he entered the police cruiser to be driven to police headquarters. According to the state, this conclusion does not follow logically from the established facts and from the court's other findings, which, according to the state, lead inexorably to the conclusion that the defendant was not in custody until sometime after he arrived at police headquarters. See, e.g., *State* v. *James*, 237 Conn. 390, 405, 678 A.2d 1338 (1996) (person not arrested or seized if he freely chooses to enter or continue encounter with police). The state does not otherwise challenge the court's conclusion, however, in light of the court's determination that the police had probable cause to arrest the defendant when he entered the police cruiser.

reaching, and that they were freely and voluntarily made. The court also found that the defendant was properly advised of his *Miranda* rights, that he fully understood those rights and that he knowingly and intelligently waived them.

Our review of the defendant's claim[30] is governed by well established principles. "Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. *Wong Sun* v. *United States*, [371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)]." (Internal quotation marks omitted.) *State* v. *Blackman*, 246 Conn. 547, 553, 716 A.2d 101 (1998).[31] Accordingly, we must determine whether the court properly concluded that the defendant's statements were not the product of any police illegality. On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . Whether the trial court properly found that the facts submitted were

---

[30] We note, preliminarily, that "[w]e may consider the testimony adduced both at the [defendant's] trial and at the [defendant's] suppression hearing when determining the propriety of the trial court's ruling on a motion to suppress a confession." (Internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 390 n.5, 736 A.2d 857 (1999).

[31] Of course, the connection between the fruits and the illegal search or seizure may be "sufficiently attenuated" so that the fruits are purged of their primary taint. *State* v. *Geisler*, 222 Conn. 672, 682, 610 A.2d 1225 (1992). Moreover, if the evidence is obtained independently of the illegal conduct, or inevitably would have been discovered irrespective of that conduct, then the evidence is not excluded. See, e.g., *State* v. *Cobb*, 251 Conn. 285, 337–39, 743 A.2d 1 (1999) (*Cobb II*), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). Because we conclude that the police engaged in no unlawful conduct, these principles are inapplicable to the present case.

enough to support a finding of probable cause is a question of law. . . . The trial court's determination on the issue, therefore, is subject to plenary review on appeal." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 279, 764 A.2d 1251 (2001). "Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Vivo*, 241 Conn. 665, 674–75, 697 A.2d 1130 (1997). "However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Clark*, supra, 280.

With these standards in mind, we now turn to the defendant's claim that his statements should have been suppressed: (1) as the product of an illegal search and illegal arrest; and (2) because they were involuntary and obtained in violation of his *Miranda* rights. We discuss, in turn, the search, the arrest and the police questioning that prompted the defendant's statements.

1

The Search

Under both the fourth amendment to the federal constitution[32] and article first, § 7, of the state constitu-

---

[32] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

tion,[33] a warrantless search of a home is presumptively unreasonable. E.g., *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Gant*, 231 Conn. 43, 63 and n.15, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). A search is not unreasonable, however, if a person with authority to do so has voluntarily consented to the search. E.g., *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 242–43, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State* v. *Cobb*, 251 Conn. 285, 314, 743 A.2d 1 (1999) (*Cobb II*), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Reagan*, 209 Conn. 1, 7, 546 A.2d 839 (1988). "The state bears the burden of proving that the consent was free and voluntary and that the person who purported to consent had the authority to do so." (Internal quotation marks omitted.) *State* v. *Reagan*, supra, 7. "The state must affirmatively establish that the consent was voluntary; mere acquiescence to a claim of lawful authority is not enough to meet the state's burden." *State* v. *Jones*, 193 Conn. 70, 79, 475 A.2d 1087 (1984). "The question [of] whether consent to a search has . . . been freely and voluntarily given, or was the product of coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances"; (internal quotation marks omitted) *State* v. *Reagan*, supra, 7–8; and, ultimately, requires a determination regarding the putative consenter's state of mind. *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 609, 711 A.2d 688 (1998).

There is no dispute that Smith, a resident and lessee of the apartment that the officers entered, had the authority to consent to the officers' request to enter

[33] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

the apartment. The sole issue, therefore, is whether Smith freely and voluntarily agreed to that request or whether her will was overborne by the officers. The defendant contends that the latter conclusion is the only one that reasonably may be drawn in light of what he characterizes as "a strong showing of armed police authority." We disagree.

"Although the presence of drawn weapons is certainly a factor in determining voluntariness . . . it is not dispositive." *State* v. *Boyd*, 57 Conn. App. 176, 181, 749 A.2d 637, cert. denied, 253 Conn. 912, 754 A.2d 162 (2000). Indeed, in the present case, the officers who requested permission to enter the apartment were not in uniform but, rather, in plainclothes. Furthermore, "the manner in which the police encountered the defendant minimized the potentially coercive effect of their brandished weapons. [In the present case], the armed officers did not rouse the defendant out of bed in the middle of the night; cf. *Harless* v. *Turner*, 456 F.2d 1337, 1338 (10th Cir. 1972); break down the door to the defendant's apartment in the early hours of the morning; cf. *United States* v. *Mapp*, 476 F.2d 67, 77–78 (2d Cir. 1973); or use threatening language. See *Ex parte Tucker*, 667 So. 2d 1339, 1344 (Ala.), cert. denied sub nom. *Alabama* v. *Tucker*, 516 U.S. 944, 116 S. Ct. 382, 133 L. Ed. 2d 305 (1995)." *State* v. *Boyd*, supra, 181–82. Rather, the officers arrived at Smith's apartment at approximately 7:30 a.m., knocked on the door and, when greeted by Smith, explained to her why they were there. It was at that point that they requested permission to enter. The record indicates that the officers did not use loud or threatening language, nor did they point their handguns at anyone in the apartment. Moreover, Smith already was aware that the police were in search of a suspect in a police shooting because officers had spoken to her briefly several hours earlier in connection with their canvass of the area. Finally, it is significant

that Smith, herself, never has suggested, during her trial testimony or otherwise, that her decision to let the officers into her apartment was anything but the product of her own free will.

We conclude that the evidence amply supports the court's finding that Smith voluntarily consented to the officers' request for permission to enter her apartment. We next must address the issue of whether the defendant's arrest properly was predicated upon probable cause.

## 2

### The Arrest

"A lawful warrantless felony arrest requires that the arrest be supported by probable cause. . . . Probable cause to arrest exists if (1) there is probable cause to believe a crime has been committed; and (2) there is probable cause to believe that the person to be arrested committed that crime. . . . Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a felony has been committed. . . . The probable cause test [therefore] is an objective one. . . .

"While probable cause requires more than mere suspicion . . . the line between mere suspicion and probable cause necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances. . . . The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Trine*, 236 Conn. 216, 236–37, 673 A.2d 1098 (1996). Indeed, proof of probable cause requires less than proof by a preponderance of

the evidence. *State* v. *Clark*, supra, 255 Conn. 293. Finally, "[i]n dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (Internal quotation marks omitted.) *State* v. *Trine*, supra, 237.

"In determining the threshold question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard. Under [article first, §§ 7[34] and 9[35] of] our state constitution, a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *State* v. *Oquendo*, [223 Conn. 635, 647, 613 A.2d 1300 (1992)]; see *United States* v. *Mendenhall*, [446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)]. Therefore, a seizure may take place under [our] state constitution even in a case [in which] there is no submission by the defendant to a show of authority or use of physical force by the police. *State* v. *Oquendo*, supra, 650–52." (Internal quotation marks omitted.) *State* v. *Greenfield*, 228 Conn. 62, 68, 634 A.2d 879 (1993). "Under the federal constitution, in contrast, a seizure occurs only if there is a show of physical force . . . or . . . submission to the assertion of authority. *California* v. *Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)." (Internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 404–405, 678 A.2d 1338 (1996).[36]

---

[34] See footnote 33 of this opinion for the text of article first, § 7, of the constitution of Connecticut.

[35] Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[36] Although the court's findings concerning the historical circumstances surrounding the defendant's interrogation are questions of fact that will not be overturned unless they are clearly erroneous, our review of the court's finding on the ultimate issue of custody is plenary. See *State* v. *Pinder*, 250 Conn. 385, 410–12, 736 A.2d 857 (1999).

The defendant contends, first, that he was seized when O'Leary ordered police to seal off the neighborhood, which included Smith's apartment building.[37] He further claims that, because the police lacked probable cause to arrest him at that time, the seizure was unlawful. Alternatively, the defendant argues that he was seized when the police entered Smith's apartment and told him to get out of bed; according to the defendant, the police lacked probable cause to arrest him at that point as well. Finally, the defendant claims that even if, as the court found, he was not seized until he left Smith's apartment with the police, the police still lacked probable cause to arrest him at that time. The defendant's claims require a two part analysis. First, we must determine when the defendant was seized. Second, we must determine whether the police had probable cause when the seizure occurred. E.g., id., 404.

The defendant's claims lack merit. With respect to his contention that he was seized when the police sealed off the general area in which Smith's apartment is located, there is nothing in the record to establish either that the defendant believed that he was not free to leave or that he submitted to a show of police force or authority. Indeed, the defendant was in bed at the time, and although he may have suspected that a police investigation of the shooting had commenced, there is no indication that he was aware of O'Leary's order to seal off the area.[38] In the absence of any such evidence, the

---

[37] As the court explained in its memorandum of decision, Campos informed O'Leary that she had observed two black males walking on Orange Street at approximately 4 a.m. After hearing gunshots, Campos saw the same two men running down Ward Street. Campos further reported that she had observed the men enter one of three buildings, which she pointed out to O'Leary. On the basis of the information provided by Campos, O'Leary ordered the police to seal off the area in the vicinity of those buildings.

[38] Smith did testify that the defendant had asked her to look out the window and report whether she observed any police officers. She did so and informed him that she saw several officers on the street. The mere fact that the defendant knew that police officers were in the vicinity, however,

defendant cannot prevail on his claim that he was seized upon execution of that order.

Nor can the defendant prevail on his claim that he was seized when the police told him to get out of bed and go into the living room. At that point, the police no longer had their guns drawn, and there is no evidence that they threatened or otherwise intimidated the defendant. He was not handcuffed or otherwise physically restrained in any way, and he gave no indication either that he wished to leave or that he wished to stop answering the questions asked of him by the investigating officers. Moreover, the police did not demand that the defendant go to headquarters with them; rather, they asked him if he would be willing to do so.

Even if we were to assume, arguendo, that, as the defendant claims, he was seized when the police entered Smith's apartment and told him to get out of bed, the police had probable cause to arrest the defendant at that time. Prior to arriving at Smith's apartment, O'Leary had been informed by Bryant that he was present at that apartment when the defendant and Crawford ran in and stated that they just shot a police officer.[39] This information was corroborated by Campos' report that the two men that she had observed on Orange Street just prior to the shooting ran down Ward Street moments after the shooting and disappeared into any one of three apartment buildings, one of

does not suffice to establish that he knew that they had taken measures to secure the area.

[39] At the suppression hearing, Bryant testified that he did not provide these details to the police until later in the morning, after the defendant had been taken to police headquarters and arrested. Bryant's testimony, however, is contrary to the testimony of O'Leary, who stated that he received the information from Bryant prior to traveling to Smith's apartment. As we have indicated, it is the function of the trial court to weigh the evidence and pass upon the credibility of witnesses. E.g., State v. Clark, supra, 255 Conn. 280. Inasmuch as the court reasonably credited O'Leary's version of the historical events, we do not second guess that fact-bound determination.

which was the building in which Smith resided. Because that information was sufficiently detailed and credible to give rise to a reasonable belief that the defendant and Crawford were involved in the shooting, the police had probable cause to arrest the defendant at that time. Consequently, the defendant's contention that his statements were the product of an illegal arrest is without merit.

3

*Miranda* Violation

The defendant next claims that the court improperly concluded that the defendant's waiver of his *Miranda* rights was knowing, voluntary and intelligent. We also reject this claim.

"To be valid, a waiver must be voluntary, knowing and intelligent. *Miranda* v. *Arizona*, [supra, 384 U.S. 475, 478]; *State* v. *Gonzalez*, 206 Conn. 213, 217, 537 A.2d 460 (1988); *State* v. *Boscarino*, 204 Conn. 714, 743, 529 A.2d 1260 (1987). The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights.[40] *State* v. *Hernandez*, 204 Conn. 377, 395, 528 A.2d 794 (1987); *State* v. *Chung*, 202 Conn. 39, 48, 519 A.2d 1175 (1987); *State* v. *Smith*, 200 Conn. 465, 481, 512 A.2d 189 (1986). Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. *North Carolina* v. *Butler*, 441 U.S. 369, 374–75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 2d

[40] Although the state bore the burden of proving a valid *Miranda* waiver by a preponderance of the evidence, the trial court found "beyond a reasonable doubt that the oral statement of [the] defendant . . . given to officers at . . . police headquarters on December 18, 1992, was voluntarily, knowingly and willingly given without coercion and with advisement and understanding of his constitutional rights."

1461 (1938); *State* v. *Boscarino*, supra [743]; *State* v. *Chung*, supra [48]." (Internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 686, 613 A.2d 788 (1992).

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation." (Citations omitted; internal quotation marks omitted.) *State* v. *Toste*, 198 Conn. 573, 580–81, 504 A.2d 1036 (1986). "Although the issue [of whether there has been a knowing and voluntary waiver] is . . . ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." *State* v. *Harris*, 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983).

The crux of the defendant's claim is that the state failed to adduce *substantial* evidence establishing a valid waiver of his *Miranda* rights. This claim is belied by the record. Maia testified without contradiction that he orally advised the defendant of his *Miranda* rights by reading from a preprinted waiver form. After informing the defendant of his rights, Maia asked the defendant: "Now, do you feel like talking to us freely and voluntarily?" The defendant answered "yes." Fur-

thermore, the defendant indicated that he previously had been arrested and that he understood his rights. O'Leary then asked the defendant once again: "Do you waive your rights?" The defendant replied: "Yes, but I had nothing to do with it." Shortly thereafter, the defendant was confronted with Smith's statement that the defendant told her that he had shot a police officer. Keegan then suggested to the defendant that he "get it off [his] chest . . . ." The defendant bowed his head and stated, "I did it. I shot the cop." After stating that the police would never find the gun used in the shooting, the defendant initially agreed to provide a written statement. Before a written statement could be taken, however, the defendant stated that he first wanted to speak to an attorney. Shortly thereafter, a public defender, Alan McWhirter, was permitted to consult with the defendant. After consulting with the defendant, McWhirter told the police that the defendant did not wish to speak to them.

The evidence clearly establishes, and the court found, that the defendant properly was advised of his *Miranda* rights, that he understood those rights and that he knowingly and intelligently waived them. "An express written or oral waiver is strong proof of the validity of the waiver." *State* v. *Negron*, 221 Conn. 315, 319 n.5, 603 A.2d 1138 (1992), citing *North Carolina* v. *Butler*, supra, 441 U.S. 373. Moreover, the record established that the defendant previously had been arrested and that, consequently, he already was familiar with the nature of the rights that he is afforded under *Miranda*. See, e.g., *State* v. *Stanley*, supra, 223 Conn. 687; *State* v. *Usry*, 205 Conn. 298, 305, 533 A.2d 212 (1987). Furthermore, after the defendant waived his rights and spoke with the police, he invoked his right to stop answering questions and to consult with counsel. "[W]e have held that the [invocation] of the right to remain silent after an initial willingness to speak with police

is a strong indication that the defendant understood his rights." (Internal quotation marks omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 78, 621 A.2d 728 (1993); accord *State* v. *Barrett*, 205 Conn. 437, 451, 534 A.2d 219 (1987). Finally, the defendant, who was twenty-four years old at the time of the offense and who is reasonably intelligent,[41] expressed no uncertainty regarding his rights; on the contrary, it is apparent that he fully understood them. There is nothing in the record to suggest that the defendant was under the influence of alcohol or any narcotic substance when he was advised of his rights, nor does the evidence indicate that he was suffering from any mental illness or defect that could have adversely affected his ability to comprehend fully his rights. Consequently, we conclude that there was substantial evidence to support the court's finding that the defendant knowingly, voluntarily and intelligently waived his *Miranda* rights. Accordingly, the defendant's claim of a *Miranda* violation is without merit.

4

The Defendant's Claim of Involuntariness

The defendant further contends that his postarrest statements were involuntary and, therefore, in contravention of the due process clause of the fourteenth amendment to the United States constitution.[42] This claim also is without merit.[43]

---

[41] A clinical psychologist performed certain tests on the defendant in connection with the present case, the results of which indicated that the defendant has an IQ in the average range. Furthermore, although the defendant did not complete high school, he has been characterized as a smart student and was able to obtain a general equivalency diploma (GED) while in prison.

[42] Section 1 of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[43] The defendant does not claim that he is entitled to any greater rights under the due process clause of article first, § 8, of the state constitution than he is under the analogous federal constitutional provision. Accordingly,

"Irrespective of *Miranda,* and the fifth amendment itself . . . any use in a criminal trial of an involuntary confession is a denial of due process of law." (Internal quotation marks omitted.) *State* v. *Hafford,* supra, 252 Conn. 298. "In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process. . . . The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it . . . including both the characteristics of the accused and the details of the interrogation." (Citations omitted; internal quotation marks omitted.) *State* v. *Correa,* 241 Conn. 322, 328, 696 A.2d 944 (1997).

"Under the due process clause of the fourteenth amendment, [however] in order for a confession to be deemed involuntary and thus inadmissible at trial, [t]here must be police conduct, or official coercion, causally related to the confession . . . ." (Internal quotation marks omitted.) *State* v. *Lapointe,* 237 Conn. 694, 728–29, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996); see also *Colorado* v. *Connelly,* 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). Because of this "essential link between coercive activity of the [s]tate, on the one hand, and a resulting confession by a defendant, on the other"; *Colorado* v. *Connelly,* supra, 165; "mere examination of the [defendant's] state of mind [although relevant to an assessment of the defendant's susceptibility to police coercion] can never conclude the due process inquiry." Id.

we limit our review of the defendant's claim to a federal constitutional analysis. See, e.g., *State* v. *Pinder,* 250 Conn. 385, 418 n.31, 736 A.2d 857 (1999).

"We have stated that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Schneckloth* v. *Bustamonte*, [supra, 412 U.S. 225]." (Internal quotation marks omitted.) *State* v. *Hafford,* supra, 252 Conn. 298–99.

"The trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . On the ultimate issue of voluntariness, however, we will conduct an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Correa,* supra, 241 Conn. 328–29.

In support of his claim, the defendant refers to the allegedly coercive nature of the police conduct that preceded his statements, specifically, the officers' entry into Smith's apartment, the ride to police headquarters and the two hours of questioning to which the defendant was subjected "in the context of the pandemonium created by all of the high city and police officials who had crowded into the detective bureau just to watch until this important case was solved."

Contrary to the defendant's claim, the court properly concluded that the police conduct was neither intimidating nor coercive, and certainly was not of such a nature as to overcome the defendant's will. With respect

to the search of Smith's apartment, the police did not threaten the defendant, and, although they initially had their guns drawn, they never pointed their guns at the defendant. Moreover, they holstered the guns as soon as they were assured that no occupant of the apartment was armed. In addition, the police merely asked the defendant if he would be willing to go to police headquarters to answer some additional questions. Although the defendant remained at police headquarters for approximately two hours before he confessed to the shooting, there simply is nothing in the record to suggest that he was subjected to any coercive police tactics.

In the absence of any evidence of improper coercion on the part of police officers, the mere fact that the defendant remained at police headquarters for two hours provides no support for the defendant's claim. Indeed, he never asked to leave and did not seek to have the police stop questioning him until after he had confessed to shooting Williams; when he eventually requested an attorney, one was provided immediately.[44] The record also is devoid of any suggestion that the presence of certain city officials at headquarters had any effect on the defendant; in fact, the evidence does not establish that he even was aware of the presence of those officials.[45] Finally, at the time of the events in question, the defendant, a reasonably bright adult, was not suffering from any physical or mental impairment that might have affected his ability to knowingly and voluntarily waive his right to remain silent. We therefore reject the defendant's claim that his statements were obtained in violation of the fourteenth amendment due process clause.

---

[44] We note, in addition, that O'Leary asked the defendant whether he wanted a beverage or needed to use a restroom.

[45] The record, moreover, does not bear out the defendant's description of police headquarters as "crowded" with high ranking officials, nor does it support his characterization of the activity there as resulting in "pandemonium . . . ."

## D

### The Court's Limitation on the Defendant's Right of Cross-Examination

The defendant next contends that his rights under the confrontation clause of the sixth amendment[46] were violated because the court, during the guilt phase hearing, improperly precluded him from asking Detective Keegan whether he knew "how the decision was made as to what charges to bring against Anthony Crawford . . . ."[47] We reject the defendant's claim.

The following additional facts are relevant to our disposition of the defendant's claim. During the guilt phase of the defendant's case, Crawford testified for the state that he and the defendant each possessed a substantial quantity of cocaine when they were stopped by Officer Williams and that he witnessed the defendant shoot Williams in the head when Williams attempted to subdue the defendant. Crawford further testified that he had been charged with the crime of hindering prosecution in connection with the police investigation of the shooting, and that he had been acquitted of that charge.

Defense counsel cross-examined Crawford extensively about his recollection of the events, focusing, in particular, on discrepancies between his statements to the police and his testimony on direct examination. Defense counsel also elicited testimony from Crawford that: (1) he is a convicted felon; (2) he was incarcerated at the time of the defendant's trial; (3) he was on parole

---

[46] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[47] The defendant also asserts that his constitutional right to present a defense was violated as a result of the alleged impropriety. The defendant, however, has failed to explain how, under the circumstances presented, that claim differs from his confrontation clause claim, and we cannot perceive any such distinction. We therefore limit our review to the defendant's claim under the confrontation clause.

at the time of the shooting; and (4) he had a pending escape charge for which he had not yet negotiated a plea bargain. Although Crawford had not been charged in connection with his possession of cocaine on December 18, 1992, defense counsel did not question Crawford about whether the state had promised him leniency in return for his testimony against the defendant. In addition, defense counsel did not question Crawford about whether he had received any other benefit from the state in connection with his cooperation in the state's case against the defendant.

Thereafter, Keegan testified for the state. On cross-examination, the defendant asked Keegan whether he was "responsible for deciding what criminal charges would be lodged against . . . Crawford." The state objected on relevancy grounds, to which defense counsel responded: "[I]t's clearly relevant to any question of bias or motive for testifying or for giving a statement that . . . Crawford may have had . . . with respect to the relative[ly] minor criminal charges that were immediately brought against him." The court then sustained the state's objection.

"Our analysis of the defendant's claim is guided by the familiar constitutional guidelines relevant to cross-examination by the defendant in a criminal trial. It is axiomatic that the defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation [for] testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defen-

dant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . .

"The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable. . . .

"The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . .

"The proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant." (Citations omitted; internal quotation marks omitted.) *State* v. *Beliveau*, 237 Conn. 576, 584–86, 678 A.2d 924 (1996).

The specific question that defense counsel asked of Keegan regarding what charges were to be filed against Crawford was, at most, only marginally relevant to the issue of Crawford's bias or motive. As the members of the three judge panel certainly knew, the ultimate responsibility of charging a person with the commission of a crime is vested with the office of the state's attor-

ney, not the police.[48] See General Statutes § 51-286a;[49] see also *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 575, 663 A.2d 317 (1995) ("Prosecutors have enormous discretion in deciding which citizens should be prosecuted and for what charges they are to be held accountable. . . . The prosecutor is also the one to decide whether to offer a certain plea or disposition." [Citations omitted.]). We need not decide, however, whether the question bore sufficient relevance to Crawford's motive or bias such that the court should have allowed it because, even if we assume, arguendo, that the ruling was improper, it was harmless beyond a reasonable doubt. Although the court prohibited the defendant from asking that one question, there is nothing in the record to suggest that the court would have precluded the defendant from making further, more direct inquiries of Keegan as to Crawford's possible bias or motive. Specifically, although defense counsel was not prohibited from questioning Keegan about whether he or anyone else had made any promises to Crawford in return for Crawford's cooperation, or from asking Keegan whether, to Keegan's knowledge, the state had afforded Crawford leniency as a consequence of Crawford's cooperation, defense counsel opted not to do so. Thus, although

---

[48] On appeal, the defendant claims that he also was unable to elicit from Keegan the fact that one of the investigating officers is related to Crawford. The defendant, however, never sought to elicit any such information from Keegan and, consequently, the court never had the opportunity to rule on the admissibility of such evidence. Moreover, there is no indication that the court would have prohibited the defendant from questioning Keegan about whether Crawford was related to an officer involved in the investigation. Consequently, the defendant cannot prevail on his unpreserved evidentiary claim.

[49] General Statutes § 51-286a provides in relevant part: "(a) Each state's attorney, assistant state's attorney and deputy assistant state's attorney shall diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court or in which the court may proceed, whether committed before or after his appointment to office. . . ."

defense counsel had failed to elicit any information from Keegan regarding Crawford's possible bias or motive, that failure cannot be attributed to the challenged evidentiary ruling but, rather, to defense counsel's decision not to ask Keegan any additional questions about that issue. Consequently, the defendant's claim of a constitutional violation is without merit.

## III

## PENALTY PHASE ISSUES

### A

#### Issues Concerning the Aggravating Factor Enumerated in § 53a-46a (h) (1)

The defendant claims that the finding of the jury regarding the existence of the aggravating factor enumerated in § 53a-46a (h) (1) cannot stand. Specifically, the defendant contends that: (1) the aggravating factor is facially unconstitutional; (2) the state failed to satisfy the "same felony" element of § 53a-46a (h) (1); (3) the trial court improperly deprived him of his right to a jury determination as to the existence of the aggravating factor; and (4) the evidence was insufficient to establish that he was attempting to commit the crime of sale of a narcotic substance during the commission of the capital felony. We reject each of these claims, which we address in turn.

#### 1

#### Facial Constitutionality of § 53a-46a (h) (1)

The defendant claims that § 53a-46a (h) (1), which requires proof that the defendant committed the capital felony during the commission or attempted commission of a felony and that the defendant previously had been convicted of the same felony, is unconstitutional on its face. Specifically, the defendant contends that because

§ 53a-46a (h) (1) requires only a temporal relationship between the capital felony and the felony committed during the commission of the capital felony, § 53a-46a (h) (1) violates the constitutional requirement that a capital sentencing scheme "meaningfully distinguish in a principled way [between] those . . . defendants who should receive the death penalty [and] those who should not." We disagree.

"The United States Supreme Court has held that if a [s]tate wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a [s]tate's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates standardless [sentencing] discretion. *Godfrey* v. *Georgia*, 446 U.S. 420, 428, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980). Thus, where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. *Gregg* v. *Georgia*, 428 U.S. 153, 189, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (opinion of Stewart, Powell and Stevens, Js.)." (Internal quotation marks omitted.) *State* v. *Breton*, 212 Conn. 258, 263–64, 562 A.2d 1060 (1989) (*Breton I*). Consequently, "[t]o avoid [a] constitutional flaw, an aggravating [factor] must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant* v. *Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983).

In *State* v. *Ross*, 230 Conn. 183, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), we considered and rejected a constitutional challenge to the facial validity of our capital sen-

tencing statutes. As we explained in *Ross*, "[i]n General Statutes §§ 53a-46a through 53a-46c, the legislature has established a three-tiered pyramid, in which each tier narrows the class of defendants that may be found eligible for the death penalty. At the first tier above the base of the pyramid, our statute separates capital felony homicides from other homicides, and authorizes bifurcated death penalty hearings only for those who have been found guilty of or have pleaded guilty to a capital felony. . . . At the second tier, the statute further limits the death penalty by requiring the sentencer to find, beyond a reasonable doubt, the existence of at least one statutorily delineated aggravating factor. . . . At the third and final tier, our statute separates, from all cases in which a penalty of death may be imposed, those cases in which it shall be imposed . . . by requiring a sentencer to find, by a preponderance of the evidence, whether a mitigating factor exists. . . .

"In their overall configuration, our death penalty statutes facially satisfy the constitutional requirements of the eighth and fourteenth amendments to the United States constitution. The multitiered pyramid meets the prerequisite of consistency and reliability by guiding the capital sentencer's discretion with clear and objective standards that narrow the class of defendants eligible for the death penalty and by providing a meaningful basis for distinguishing between those cases in which the death penalty is imposed and those in which it is not." (Citations omitted; internal quotation marks omitted.) Id., 236–38. Section 53a-46a (h) (1), as part of the second tier of our capital sentencing scheme, further narrows the group of persons who already have been convicted of a felony that, according to the legislature, warrants designation as a capital felony.

The defendant does not claim that § 53a-46a (h) (1) fails to reduce the *number* of defendants charged with a capital felony who are eligible to receive the death

penalty; certainly it does. Nor does he claim that it is too vague or indefinite, for certainly it is not. Rather, the defendant maintains that § 53a-46a (h) (1) does not narrow the category of death penalty eligible defendants in a *meaningful or principled* way because it requires only a temporal connection between the capital felony and the felony committed during the commission of the capital felony. In other words, the defendant contends that "it could be purely a matter of *coincidence* that the capital felony and the current felony [occur] at the same time, in which case the commission [of] the capital felony would have absolutely nothing to do with the commission of the current felony."[50] (Emphasis in original.) The defendant asserts that the

---

[50] The defendant offers the following hypothetical example to illustrate his point. "Suppose a person is the proprietor of a small store [and] engages on the side with a few needy customers in the pawnbroking business without a license, but is otherwise a law-abiding person (i.e., he does not fence stolen property, he does not charge usurious rates, etc.). Suppose also that our proprietor has previously been convicted of conducting a pawnbroking business without a license, which is a [class D] felony . . . . See [General Statutes] § 21-47 (a). Then one day, while conducting some unlicensed pawnbroking business with a customer who is trying to borrow a few dollars on his watch, two hated enemies of our proprietor come into the store, not knowing he is there and intending only to conduct legitimate business (i.e., to buy some sodas). The proprietor pulls out his gun and intentionally kills both of them, thereby committing a capital felony . . . . The fact that the proprietor was engaging in illegal pawnbroking at the time had absolutely nothing to do with the capital crime; it would have occurred even if the customer at the counter was buying soda rather than trying to get a loan on his watch. Indeed, consider a second proprietor who is in exactly the same situation as [the] first proprietor except that the customer at the counter at the time the [second] proprietor murdered his two enemies was in fact buying a soda. The second proprietor would not even be eligible for the death penalty, but because the first proprietor's customer was trying to borrow a few dollars against his watch, the first proprietor is eligible for the death penalty under the '(h) (1)' aggravating factor . . . ."

We note that, based on the facts of the defendant's hypothetical, the second proprietor could receive the death penalty; see General Statutes § 53a-54b (8) (murder of two or more persons at same time or in course of single transaction is capital felony for which accused may be sentenced to death); if the state were able to establish the existence of an aggravating factor other than that enumerated in § 53a-46a (h) (1).

imposition of the death penalty under such circumstances would be so lacking in justification as to violate the eighth amendment[51] to the United States constitution.[52]

It is well settled that, "[i]n the absence of weighty countervailing circumstances, it is improvident for the court to invalidate a statute on its face. . . . A judicial holding that a legislative [a]ct is unconstitutional is one of very grave concern. We ought not, and will not, declare a statute to be unconstitutional unless our judgment is formed in the light of this rule of our law: It is our duty to approach the question with caution, examine it with infinite care, make every presumption and intendment in its favor, and sustain the [a]ct unless its invalidity is, in our judgment, beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 320, 732 A.2d 144 (1999); accord *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 306–307, 695 A.2d 1051 (1997). Furthermore, "outside the context of the first amendment, in order to challenge successfully the facial validity of a statute, [the challenging] party [must] demonstrate as a threshold matter that the statute may not be applied constitu-

---

[51] The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The cruel and unusual punishments clause of the eighth amendment is made applicable to the states through the due process clause of the fourteenth amendment of the United States constitution. See, e.g., *Tuilaepa* v. *California*, 512 U.S. 967, 970, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994).

[52] The defendant concedes that § 53a-46a (h) (1) would pass constitutional muster if it expressly required more than a temporal nexus between the capital felony and the felony committed during the commission of the capital felony. Thus, the defendant acknowledges that § 53a-46a (h) (1) would be constitutional if, for example, it expressly required the state to establish that the defendant committed the capital felony " 'in furtherance of' " or "to prevent the discovery of" another felony and that the defendant previously had been convicted of that same felony.

tionally to the facts of his case." *Packer* v. *Board of Education*, 246 Conn. 89, 106, 717 A.2d 117 (1998).

The defendant cannot sustain his burden of demonstrating that § 53a-46a (h) (1) is facially unconstitutional because he cannot establish that it is unconstitutional as applied to him. In the present case, the state claimed, and the jury found during the penalty phase hearing, that the defendant shot and killed Officer Williams after being stopped by Williams and during the defendant's attempted commission of a narcotics felony. In such circumstances, the link between the capital murder and the narcotics felony was more than merely temporal or coincidental.

Indeed, the defendant acknowledges that the evidence adduced by the state indicates more than just a temporal connection between the capital felony and the drug felony committed by the defendant during the commission of the capital felony. The defendant asserts, however, that, because the court instructed the jury in accordance with the language of § 53a-46a (h) (1), the jury could have found the existence of that aggravating factor without also having found anything more than a temporal nexus between the capital felony and the narcotics offense. We disagree. On the basis of the specific facts that the state had presented and that the jury necessarily had found as reflected in its special verdict—i.e., that the defendant murdered an on-duty police officer while committing or attempting to commit a felony narcotics offense—a constitutionally sufficient nexus clearly existed between those two offenses.

Although, as the defendant asserts, it is possible to conjure up a situation in which there is only a coincidental relationship between the capital felony and the other felony committed during the course of the commission of the capital felony, the present case does not resemble

such a situation.[53] Accordingly, the defendant's constitutional claim is without merit.

2

### The State's Burden of Satisfying the "Same Felony" Element of § 53a-46a (h) (1)

The defendant claims that the trial court improperly concluded that the state had alleged and proven facts sufficient to establish the aggravating factor of § 53a-46a (h) (1). In particular, the defendant contends that the term "same felony" in § 53a-46a (h) (1) includes only Connecticut felonies and not out-of-state felonies. We disagree.

The following additional facts and procedural history are necessary to our resolution of this claim. At trial, the defendant stipulated to the fact that he had been convicted in 1989 of the criminal sale of a controlled substance in the fourth degree in violation of § 220.34 of the New York Penal Law.[54] Criminal sale of a controlled substance in the fourth degree was categorized as a class C felony when the defendant committed the acts

[53] We think it is highly unlikely that the state would seek to prove the existence of the aggravating factor of § 53a-46a (h) (1) if the nexus between the capital felony and the felony committed during the commission of the capital felony was only temporal or coincidental. Because the present case does not involve such a factual scenario, however, we need not consider the constitutionality of § 53a-46a (h) (1) under those facts.

[54] The defendant had been convicted of one count of criminal sale of a controlled substance in the fourth degree in violation of § 220.34 of the New York Penal Law, which provides in relevant part: "A person is guilty of criminal sale of a controlled substance in the fourth degree when he knowingly and unlawfully sells: 1. a narcotic preparation . . . ." N.Y. Penal Law § 220.34 (McKinney 1980). The undisputed facts underlying the defendant's conviction are as follows: "On July 5, 1988 in the County of Nassau in the town of Hempstead, New York, the defendant knew that he had in his possession an illegal drug (cocaine) and he intended to sell the illegal drug (cocaine) for money and did sell the illegal drug (cocaine) to an undercover officer for ten dollars."

that led to his conviction in 1989.[55] N.Y. Penal Law § 220.34 (McKinney 1980). In support of its claim regarding the existence of the aggravating factor enumerated in § 53a-46a (h) (1), the state alleged that the defendant had murdered Williams during the attempted commission of a felony, namely, the sale of a narcotic substance in violation of General Statutes § 21a-277 (a),[56] and that he previously had been convicted of the same felony, namely, the sale of a controlled substance in New York. The defendant filed a motion to dismiss the aggravating factor on the ground that, as a matter of law, the sale of a narcotic substance in violation of § 21a-277 (a) and the sale of a controlled substance in violation of N.Y. Penal Law § 220.34 do not constitute the "same felony" within the meaning of § 53a-46a (h) (1). The defendant's motion was denied.[57] On appeal, the defendant renews his claim that, for purposes of § 53a-46a (h) (1), the term "same felony" means the same *Connecticut* felony. Because the defendant previously has not been convicted of the sale of a narcotic substance in violation of § 21a-277 (a), he claims that he is entitled to dismissal

[55] In 1988, when the defendant committed the crime of criminal sale of a controlled substance in the fourth degree, which led to his conviction under N.Y. Penal Law § 220.34 in 1989, a person could receive up to fifteen years imprisonment for the commission of a nonviolent, class C felony. See N.Y. Penal Law § 70.00 (McKinney 1987).

[56] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

[57] A majority of the panel voted to deny the defendant's motion to dismiss.

of the aggravating factor enumerated in § 53a-46a (h) (1).

"The [defendant's] claim raises an issue of statutory construction over which our review is plenary. . . . Our resolution of [this claim] is governed by well established principles. [I]t is axiomatic that the process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *State* v. *Russo*, supra, 259 Conn. 447.

"When the statute in question is one of a criminal nature, we are guided by additional tenets of statutory construction. First . . . we must refrain from imposing criminal liability whe[n] the legislature has not expressly so intended. . . . Second, [c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . Finally, unless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 255 Conn. 782, 788–89, 772 A.2d 559 (2001). Moreover, "in this case we are construing [a death penalty] statute. The resolution of this issue could result in the imposition of the death penalty on this defendant and on other defendants charged with similar offenses. It is axiomatic that any statutory construction implicating the death penalty must be based on a conclusion that the legislature has clearly and unambiguously made its

intention known. . . . [Thus] [t]he rules of strict construction and lenity applicable to penal statutes generally are especially pertinent to a death penalty [provision] such as [§ 53a-46a (h) (1)]." (Citations omitted; internal quotation marks omitted.) *State* v. *Harrell*, 238 Conn. 828, 832–33, 681 A.2d 944 (1996).

"The rule of strict construction, however, does not require that the most narrow, technical and exact meaning be given to the language of a statute in frustration of an obvious legislative intent. . . . Common sense should be applied to the language of a penal statute, particularly if otherwise absurdity or frustration of the evident design of the legislature results." (Internal quotation marks omitted.) *State* v. *Albert*, 50 Conn. App. 715, 726, 719 A.2d 1183 (1998), aff'd, 252 Conn. 795, 750 A.2d 1037 (2000). "No rule of construction . . . requires that a penal statute be strained and distorted in order to exclude conduct clearly intended to be within its scope—nor does any rule require that the act be given the narrowest meaning. It is sufficient if the words are given their fair meaning in accord with the evident intent of [the legislature]. . . . The rule that terms in a statute are to be assigned their ordinary meaning, unless context dictates otherwise; General Statutes § 1-1 (a); *State* v. *Mattioli*, [210 Conn. 573, 579, 556 A.2d 584 (1989)]; also guides our interpretive inquiry." (Citation omitted; internal quotation marks omitted.) *State* v. *Scott*, 256 Conn. 517, 531–32, 779 A.2d 702 (2001).

As with all issues of statutory construction, our starting point is the relevant statutory language. General Statutes (Rev. to 1991) § 53a-46a (h) provides in relevant part: "If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury . . . finds by a special verdict . . . that (1) the defendant committed the [capital] offense during the commission or attempted commission of . . . a felony

and he had previously been convicted of the same felony
. . . ." The term "same felony" is not defined in § 53a-46a (h) or in any other provision of the General Statutes.

The term "felony," however, is defined by statute. General Statutes § 53a-25 (a)[58] defines the term "felony" as "[a]n offense for which a person may be sentenced to a term of imprisonment in excess of one year . . . ." General Statutes § 53a-24 (a),[59] in turn, provides in relevant part that "[t]he term 'offense' means any crime or violation which constitutes a breach of any law of this state *or any other state*, federal law or local law or ordinance of a political subdivision of this state, for which a sentence to a term of imprisonment or to a fine, or both, may be imposed . . . ." (Emphasis added.) Thus, under the pertinent statutory definitions, the term "felony" clearly encompasses out-of-state felonies. We, of course, "are bound to accept the legislative

---

[58] General Statutes § 53a-25 provides: "(a) An offense for which a person may be sentenced to a term of imprisonment in excess of one year is a felony.

"(b) Felonies are classified for the purposes of sentence as follows: (1) Class A, (2) class B, (3) class C, (4) class D, (5) unclassified and (6) capital felonies.

"(c) The particular classification of each felony defined in [chapter 952 of the General Statutes] is expressly designated in the section defining it. Any offense defined in any other section of the general statutes which, by virtue of an expressly specified sentence, is within the definition set forth in subsection (a) shall be deemed an unclassified felony."

[59] General Statutes § 53a-24 provides: "(a) The term 'offense' means any crime or violation which constitutes a breach of any law of this state or any other state, federal law or local law or ordinance of a political subdivision of this state, for which a sentence to a term of imprisonment or to a fine, or both, may be imposed, except one that defines a motor vehicle violation or is deemed to be an infraction. The term 'crime' comprises felonies and misdemeanors. Every offense which is not a 'crime' is a 'violation'. Conviction of a violation shall not give rise to any disability or legal disadvantage based on conviction of a criminal offense.

"(b) Notwithstanding the provisions of subsection (a) of this section, the provisions of sections 53a-28 to 53a-44, inclusive, shall apply to motor vehicle violations. Said provisions shall apply to convictions under section 21a-278 except that the execution of any mandatory minimum sentence imposed under the provisions of said section may not be suspended."

definition of terms in a statute . . . ." (Citation omitted; internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 653, 708 A.2d 202 (1998); accord *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 225, 602 A.2d 1019 (1992). Inasmuch as the defendant's conviction under N.Y. Penal Law § 220.34 carried the possibility of a term of imprisonment of more than one year; see footnote 55 of this opinion; the defendant's New York conviction constitutes a conviction of a "felony" as that term is defined in the General Statutes. See General Statutes § 53a-25 (a); see also General Statutes § 53a-24 (a). Consequently, we must determine whether the felony proscribed by N.Y. Penal Law § 220.34 is the "same felony" as the felony proscribed by § 21a-277 (a). If they constitute the same felony, then the defendant's prior conviction under N.Y. Penal Law § 220.34 falls squarely within the purview of § 53a-46a (h) (1).

Notwithstanding the clear import of the literal statutory language, the defendant contends that the context and legislative history of the relevant statutory provisions compel the conclusion that the legislature did not intend for out-of-state felonies to be included under § 53a-46a (h) (1). Before addressing the merits of the defendant's contention, we briefly review the pertinent legislative genealogy.

As the defendant notes, the legislature revised Connecticut's death penalty statutory scheme in 1973.[60] See

---

[60] In 1972, the United States Supreme Court, in a per curiam opinion, held that the imposition of the death penalty under the circumstances presented in the appeals that it was deciding constituted cruel and unusual punishment in violation of the eighth and fourteenth amendments to the United States constitution. *Furman* v. *Georgia*, 408 U.S. 238, 239–40, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). The court's decision effectively rendered many states' death penalty statutory schemes, including the death penalty statutory scheme of this state, constitutionally infirm. See *State* v. *Golino*, 201 Conn. 435, 439, 518 A.2d 57 (1986); *State* v. *McGann*, 199 Conn. 163, 174, 506 A.2d 109 (1986). In 1973, the legislature, in response to *Furman*, amended the death penalty statutory scheme in Connecticut. See generally P.A. 73-137.

generally P.A. 73-137. At that time, the definition of "felony" was virtually[61] the same as it is today, that is, "[a]ny offense for which a person may be sentenced to a term of imprisonment in excess of one year . . . ." General Statutes (Rev. to 1972) § 53a-25 (a). In 1973, however, the term "offense" had a materially different meaning than it does today. In 1973, General Statutes (Rev. to 1972) § 53a-24 (a) defined the term "offense" as "any crime or violation which constitutes a breach of any law *of this state or local law or ordinance of a political subdivision of this state,* for which a sentence to a term of imprisonment or to a fine, or both, may be imposed, except one that defines a motor vehicle violation." (Emphasis added.) Consequently, in 1973, when the legislature revised our death penalty statutory scheme; see P.A. 73-137; the term "felony" was limited to crimes in violation of the laws *of this state* for which a term of imprisonment of more than one year could be imposed. It therefore is evident that, in 1973, the term "same felony," as that term is used in § 53a-46a (h) (1)[62] *did not* include out-of-state felonies. Just two years later, in 1975, however, the legislature passed Substitute Senate Bill No. 1453, which was enacted as Public Acts 1975, No. 75-380 (P.A. 75-380). Section 15 of P.A. 75-380 amended General Statutes (Rev. to 1975) § 53a-24 (a) by enlarging the definition of the term "offense" to include out-of-state and federal crimes and violations. In so doing, the legislature also expanded the definition of the term "felony" under § 53a-25 (a)

The wording of § 53a-46a (h) (1), which was part of P.A. 73-137, § 4, and codified at General Statutes (Rev. to 1975) § 53a-46a (g) (1), has remained unchanged to date. See General Statutes § 53a-46a (i) (1).

[61] We note that the term "[a]ny offense" in General Statutes (Rev. to 1972) § 53a-25 (a) was changed to "[a]n offense" in 1992. Public Acts 1992, No. 92-260, § 9, codified at General Statutes § 53a-25. See footnote 58 of this opinion.

[62] The aggravating factor enumerated in General Statutes (Rev. to 1991) § 53a-46a (h) (1) initially was codified at General Statutes (Rev. to 1975) § 53a-46a (g) (1) after its passage in 1973 as a part of P.A. 73-137, § 4.

to include out-of-state and federal crimes carrying a possible prison term in excess of one year.

Because the conduct that led to the defendant's conviction of capital felony in the present case occurred in 1992, long after the legislature expanded the meaning of "felony" to include out-of-state felonies, a literal application of the relevant statutory language to the facts of this case compels the conclusion that the defendant's conviction for the criminal sale of a controlled substance pursuant to N.Y. Penal Law § 220.34 is a "felony" within the meaning of § 53a-46a (h) (1). Despite its facial applicability, however, the defendant maintains that the legislature did not intend for that expanded definition of the term "felony" to apply to § 53a-46a (h) (1). The defendant advances three arguments in support of his claim. First, the defendant claims that, because the legislature made express reference to out-of-state felony convictions in subdivision (2) of § 53a-46a (h),[63] its failure to do so in subdivision (1) of § 53a-46a (h) indicates that the legislature intended to exclude out-of-state felonies from subdivision (1). Second, the defendant claims that the primary purpose of the legislation that enlarged the definition of the term "felony," namely, P.A. 75-380, entitled "An Act Concerning the Offenses with Firearms," was to create enhanced mandatory minimum penalties for certain designated offenses when those offenses are committed with a firearm,[64] and that there is nothing in the

---

[63] See footnote 4 of this opinion for the text of § 53a-46a (h).

[64] Public Act 75-380 consists of fifteen sections. Section 1 of P.A. 75-380 amended General Statutes (Rev. to 1975) § 53a-3 by adding the definition of the terms "machine gun," "rifle," "shotgun," "pistol" and "firearm" to the other definitions contained in § 53a-3. Section 2 of P.A. 75-380 provides that it shall be an affirmative defense to the offenses enumerated in §§ 3 through 12, inclusive, of P.A. 75-380 if the firearm used in the commission of the offense was not a weapon from which a shot could be discharged. Sections 3 through 12, inclusive, of the act established enhanced mandatory minimum penalties for certain offenses when those offenses are committed with a firearm. Section 13 of P.A. 75-380 provides that it shall be an affirmative defense to the offenses enumerated in §§ 3 through 12, inclusive, of the act

text of P.A. 75-380 to suggest that it was intended to enlarge the scope of the death penalty in any way. Third, the defendant claims that legislative amendments to our death penalty statutory scheme invariably are accompanied by considerable legislative debate, and because the legislative history of P.A. 75-380 contains no such debate,[65] we cannot conclude that the legislature intended to change the definition of the term "felony" as that term is used in § 53a-46a (h) (1). None of these arguments provides persuasive support for the interpretation advanced by the defendant.

The defendant first claims that if the legislature had intended for the "same felony" requirement of § 53a-46a (h) (1) to apply to convictions for out-of-state felonies, the legislature would have used the language that it used in § 53a-46a (h) (2), which requires proof that the defendant, prior to committing the capital felony, had been convicted of a certain number and kind of "federal" or "state" offenses "for . . . which a penalty of more than one year imprisonment may be imposed . . . ." General Statutes (Rev. to 1991) § 53a-46a (h) (2). We agree with the defendant that the legislature evidently *did* intend to exclude out-of-state felony convictions from the coverage of § 53a-46a (h) (1) *when that provision first was enacted in 1973* as part of P.A. 73-173, § 4, and codified at General Statutes (Rev.

if the defendant was not the only participant in the offense, he was not armed with a firearm and had no reasonable ground to believe that any other participant was armed with a firearm. Section 14 of P.A. 75-380 amended General Statutes § 53a-35 to require a mandatory minimum sentence for the offenses contained in §§ 3 through 12, inclusive, of the act. Finally, § 15 of P.A. 75-380 amended General Statutes (Rev. to 1975) § 53a-24 by changing the definition of the term "offense" to include crimes or violations of federal law and the laws of other states.

[65] The relatively brief legislative history of P.A. 75-380 relates only to the sentencing provisions of the act; see 18 H.R. Proc., Pt. 10, 1975 Sess., pp. 4852–62; 18 S. Proc., Pt. 5, 1975 Sess., pp. 2291–98; and is silent as to the modification of the definition of the term "offense" in General Statutes (Rev. to 1975) § 53a-24.

to 1975) § 53a-46a (g) (1), because, as we have explained, *at that time*, the statutory definition of the term "felony" included felonies committed in this state only. See General Statutes (Rev. to 1975) § 53a-24 (a). We must presume, therefore, that, in 1973, the legislature used the term "same felony" in subdivision (1), rather than the language that it used in subdivision (2), because it intended for the aggravating factor of subdivision (1), in contrast to the aggravating factor of subdivision (2), to apply *only* to prior *Connecticut* felony convictions.

That the legislature apparently intended to limit the scope of the term "same felony" when P.A. 73-173, § 4, was enacted in 1973, however, provides no support for the defendant's argument. As we have explained, the legislature enlarged the definition of "felony" in 1975 to include out-of-state felonies; P.A. 75-380, § 15, codified at General Statutes (Rev. to 1977) § 53a-24 (a); see also General Statutes § 53a-25 (a) (defining term "felony" as "[a]n offense [as defined in § 53a-24 (a)] for which a person may be sentenced to a term of imprisonment in excess of one year"); and there is nothing in the relevant statutory language or history to suggest that the expanded definition of "felony" is not applicable to § 53a-46a (h) (1). Indeed, it makes perfect sense that the legislature, having decided to include out-of-state and federal felonies in the group of felonies qualifying under § 53a-46a (h) (2), also would have chosen to include out-of-state and federal felonies in the group of felonies qualifying under § 53a-46a (h) (1). We therefore reject the defendant's argument predicated on the language of § 53a-46a (h) (2).

The defendant next contends that because the legislature, in enacting P.A. 75-380, primarily was concerned with setting mandatory minimum penalties for certain offenses involving the use of firearms, it could not have intended for that act to bear upon the death penalty.

We disagree. We note, first, that there is absolutely nothing in P.A. 75-380 to indicate that the legislature intended to limit the definition of "offense," and thus the definition of "felony," to the offenses established *by the act*. Indeed, the defendant makes no such claim. Rather, the defendant apparently argues that § 53a-46a (h) (1) is the *only* provision of our Penal Code to which the expanded definition of "offense" does *not apply*. There simply is no reason to presume, however, that the legislature intended for that definition to apply in all but *one* instance. In fact, General Statutes § 53a-2[66] dictates the *opposite* conclusion. General Statutes § 53a-2 provides in relevant part that "[t]he provisions of [title 53a of the General Statutes] shall apply to *any offense defined in [title 53a] of the general statutes,* unless otherwise expressly provided or unless the context otherwise requires . . . ." (Emphasis added.) Sections 53a-24, 53a-25 and 53a-46a all fall within title 53a of the General Statutes.[67] There is nothing either express or implied in any provision of our statutes to indicate that §§ 53a-24 and 53a-25 do not apply to § 53a-46a (h) (1), and there is no contextual support for the defendant's contention. Consequently, § 53a-2 renders the defendant's argument unavailing.

The defendant's argument would fail even in the absence of § 53a-2, moreover, because it flies in the face of well established principles of statutory construction. "In interpreting statutes . . . [w]e presume that laws are enacted in view of existing relevant statutes . . . and that [s]tatutes are to be interpreted with regard to other relevant statutes because the legislature

---

[66] General Statutes § 53a-2 provides: "The provisions of [title 53a of the General Statutes] shall apply to any offense defined in [that] title or the general statutes, unless otherwise expressly provided or unless the context otherwise requires, and committed on or after October 1, 1971, and to any defense to prosecution for such an offense."

[67] Title 53a of the General Statutes comprises the Connecticut Penal Code. General Statutes § 53a-1.

is presumed to have created a consistent body of law."
(Internal quotation marks omitted.) *State* v. *Miranda*,
260 Conn. 93, 131, 794 A.2d 506, cert. denied, 537 U.S.
902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002). "An identical
term used in [statutory provisions] pertaining to the
same subject matter should not be read to have differing
meanings unless there is some indication from the legis-
lature that it intended such a result." (Internal quotation
marks omitted.) *Nancy G.* v. *Dept. of Children & Fami-
lies*, 248 Conn. 672, 686, 733 A.2d 136 (1999). These
presumptions apply with particular force to the present
case because §§ 53a-24 and 53a-25 are definitional pro-
visions of *general applicability.* Consequently, the pos-
sibility that the legislature intended for those statutory
provisions to be applied selectively rather than univer-
sally is especially remote.

Finally, the legislature had completed its post-*Fur-
man*[68] revision of our death penalty statutes just two
years prior to amending § 53a-24 in 1975. In light of the
brief interval between the revisions to Connecticut's
death penalty statutory scheme in 1973 and the amend-
ment to § 53a-24 (a) in 1975, it is difficult to imagine
that the legislature would have declined to exclude
§ 53a-46a (h) (1) from the purview of General Statutes
(Rev. to 1975) § 53a-24 (a), as amended by P.A. 75-380,
§ 15, if the legislature had intended to limit the scope
of § 53a-24 (a) in that manner.

The defendant's last argument also is unpersuasive.
Although it undoubtedly is true that modifications to
our death penalty statutory scheme generally are
accompanied by spirited legislative debate, we simply
cannot place on the absence of such debate the conclu-
sive weight that the defendant's argument would
require. In light of the clarity of the language of the

[68] See footnote 60 of this opinion.

statute, the fact that our death penalty legislation is as much a part of our Penal Code as any other part, and the fact that the application of the language yields reasonable results in keeping with the general purposes of our death penalty statutes, we cannot conclude that the absence of debate trumps all other factors ordinarily applied in the process of statutory construction. In sum, we cannot conclude that the legislature did not mean what its language plainly appears to mean simply because of the absence of legislative history affirming that meaning. Of course, this court frequently reviews statutory history as an aid in determining the meaning of particular statutory language. This court, however, never has suggested that a statute may be interpreted as the defendant would have us construe § 53a-46a (h) (1), that is, in complete disregard of its clear, unambiguous and reasonable import *due solely to the absence of any legislative history substantiating that clear and rational meaning.* Thus, we recently have reiterated that "[r]eliance on legislative silence is misplaced. It is a basic tenet of statutory construction that we rely on the intent of the legislature as that intent has been expressed." (Internal quotation marks omitted.) *Spears* v. *Garcia*, 263 Conn. 22, 34, 818 A.2d 37 (2003), quoting *Dept. of Social Services* v. *Saunders*, 247 Conn. 686, 706, 724 A.2d 1093 (1999). Indeed, to rely on the absence of legislative history, as the defendant proposes we do in the present case, would turn the process of statutory construction on its head. More importantly, we would be exceeding our constitutional limitations by infringing on the prerogative of the legislature to set public policy through its statutory enactments.

Finally, there is compelling reason to reject the statutory construction advanced by the defendant, namely, that the state's contrary interpretation furthers the fundamental purpose of § 53a-46a (h) (1), whereas the defendant's construction is inconsistent with that pur-

pose. It is apparent that § 53a-46a (h) (1) comprises part of our capital sentencing scheme because the legislature believed that a person who has been convicted of a noncapital felony, and who then commits a capital felony while committing the same noncapital felony for which he already has been convicted, falls within a small class of especially culpable recidivists who deserve to be eligible for the death penalty.[69] The fact that a defendant may have been convicted of the same felony in federal court or the court of another state does not detract from the seriousness of that defendant's conduct because, by definition, that prior felony is no different from the felony that the defendant committed or attempted to commit in this state during the commission of the capital felony. In other words, the legislative purpose behind the aggravating factor enumerated in § 53a-46a (h) (1) is promoted to the same extent regardless of whether the defendant's prior felony was successfully prosecuted in Connecticut, another state or under federal law. By contrast, the statutory interpretation proposed by the defendant undermines the objective behind § 53a-46a (h) (1) by eliminating from its coverage a class of defendants with prior, out-of-state felony convictions, who are equally as culpable, for purposes of the aggravating factor, as those defendants with the same prior in-state felony convictions. In our view, it would be untenable for us to distinguish between these two classes of defendants in the absence of legislative intent to the contrary. We construe statutes so as not to thwart their intended purpose; e.g.,

---

[69] As the panel explained, § 53a-46a (h) (1) "was designed to penalize a defendant with the possible imposition of the death penalty, [for committing] murder while in the process of committing the same serious offense for which he had previously been punished. [That is, the defendant] persists in the same conduct unaffected by any prior adjudication, but this time takes a life in the process . . . . [In the legislature's view, such conduct constitutes] the ultimate defiance of the criminal justice system, worthy of the ultimate penalty."

*BEC Corp.* v. *Dept. of Environmental Protection,* 256 Conn. 602, 622, 775 A.2d 928 (2001); and in a manner that will not lead to bizarre or irrational consequences. E.g., *Modern Cigarette, Inc.* v. *Orange,* 256 Conn. 105, 120, 774 A.2d 969 (2001). We therefore reject the defendant's contention that an out-of-state felony cannot satisfy the "same felony" element of § 53a-46a (h) (1).

This conclusion does not end our inquiry, however, for we still must determine whether, for purposes of § 53a-46a (h) (1), the felony that the defendant committed during the commission of the capital felony, namely, sale of a narcotic substance, is the same as the New York felony for which he was convicted in 1989. We conclude that it is.

Again, our inquiry is one of statutory construction. Because the term "same" is not statutorily defined, we look to the commonly approved meaning of the word as defined in the dictionary. See, e.g., *Perodeau* v. *Hartford,* 259 Conn. 729, 736, 792 A.2d 752 (2002). The word "same" is defined as "resembling in every way: not different in relevant essentials at one time . . . conforming in every respect . . . corresponding so closely as to be indistinguishable: closely similar: comparable . . . ." Webster's Third New International Dictionary.

Having determined that the term "same felony" in § 53a-46a (h) (1) encompasses out-of-state felonies, we conclude that our legislature likely did not intend to impose a requirement that the title and wording of the out-of-state provision under which the defendant previously had been convicted be *identical* to the title and wording of the Connecticut statutory provision that embraces the felony that the defendant is alleged to have committed or to have attempted to commit during the commission of the capital felony. The legislature

undoubtedly was aware that the penal statutes of other states generally are not precisely the same as the analogous statutory provisions of this state. More importantly, however, those linguistic differences frequently will have no bearing on whether a particular out-of-state felony reasonably may be considered the "same felony" within the meaning and purpose of § 53a-46a (h) (1). In other words, when viewed in context, the word "same" cannot mean *exactly* the same in all respects, whether the difference in the language of the statutes is material or immaterial.

We therefore conclude that, for purposes of § 53a-46a (h) (1), the term "same felony" means a felony that is the same in all material respects as the felony that is committed in this state during the commission of the capital felony. That requirement is fully satisfied only if the two felonies share the same essential elements.[70] Inasmuch as the trial court properly concluded that the essential elements of the offense of sale of a narcotic substance in violation of § 21a-277 (a) are the same as the essential elements of the offense of criminal sale of a controlled substance in the fourth degree in violation of N.Y. Penal Law § 220.34 (McKinney 1980),[71] we reject the defendant's claim that those two offenses are not the "same felony" within the meaning of § 53a-46a (h) (1).

[70] This interpretation both comports with the common meaning of the word "same" and furthers the purpose of § 53a-46a (h) (1) by assuring that the aggravating factor enumerated therein applies to *only* those capital defendants—no more and no less—who, after having been convicted of a serious crime, commit that same serious crime again during the commission of a capital felony.

[71] The essential elements of § 21a-277 (a) and N.Y. Penal Law § 220.34 are (1) the intentional or knowing (2) sale or distribution (3) of a narcotic substance, including but not limited to cocaine. See footnotes 54 and 56 of this opinion.

3

## The Right to a Jury Determination on the Existence of the Aggravating Factor Enumerated in § 53a-46a (h) (1)

The defendant claims that the trial court improperly deprived him of his right to have the jury decide all of the factual issues relating to the existence of the aggravating factor of § 53a-46a (h) (1) and, in so doing, also improperly relieved the state of its burden of proving all of the elements of that aggravating factor beyond a reasonable doubt. We disagree.

With respect to the requirement of § 53a-46a (h) (1) that the defendant previously have been convicted of the "same felony" that he committed or attempted to commit during the commission of the capital felony, the state relied on the defendant's stipulation that he has a prior felony conviction in New York for the sale of a controlled substance.[72] Although the defendant did not dispute his conviction under N.Y. Penal Law § 220.34, he did not agree that the offense enumerated therein and the offense that the state alleged he was attempting to commit when he shot and killed Williams, were the "same felony" within the meaning of § 53a-46a (h) (1).[73] See part III A 2 of this opinion.

[72] In accordance with this stipulation, the trial court informed the jury that it was to accept as proven the following facts regarding the defendant's prior conviction: "The name of the charge was criminal sale of a controlled substance in the fourth degree. The statute from the penal code of the state of New York was [N.Y. Penal Law §] 220.34. Jurisdiction was Nassau county in New York. [The [d]ate of [the defendant's] plea was December 20, 1988. The date of the sentence was February 17, 1989. The underlying facts [are as follows]. On July 5, 1988, in the county of Nassau in the town of Hempstead, New York, the defendant knew that he had in his possession an illegal drug, cocaine, and [that] he intend[ed] to sell the illegal drug, cocaine, for money and did sell the illegal drug, cocaine, to an undercover police officer for ten dollars. The sentence was an indeterminate sentence of imprisonment. The minimum term [was] one year . . . and you may take this as a proven fact—that such a conviction constitutes a felony."

[73] Prior to the penalty phase hearing, the defendant filed a motion to dismiss, inter alia, the aggravating factor enumerated § 53a-46a (h) (1). The

At the conclusion of the penalty phase hearing, the court charged the jury on the elements of § 53a-46a (h) (1) as follows: "The first statutory aggravant alleged is that the defendant committed the offense of capital felony during an attempt to commit a felony, specifically, a violation of § 21a-277 (a) of the General Statutes, in that the defendant was attempting to sell to another person a narcotic substance, cocaine, specifically in this case crack cocaine, and [that] he had been previously convicted of the same felony. The state has the burden of proving each and every element of [the] aggrava[ting] [factor] beyond a reasonable doubt."

The court next instructed the jury on the crime of sale of a narcotic substance in violation of § 21a-277 (a)[74] and explained that, if the state had satisfied its burden of proving that the defendant had committed or had attempted to commit that felony, then the jury also was required to determine whether the evidence established that the defendant had murdered Williams during the commission of that felony. The court then informed the jury: "[T]o find that the defendant commit-

defendant claimed that the two felonies were not the same within the meaning of § 53a-46a (h) (1) because the conduct underlying the defendant's conviction of the sale of a controlled substance in New York was factually dissimilar to the defendant's conduct in attempting to sell a narcotic substance during the commission of the capital felony. According to the defendant, the New York offense, in contrast to the Connecticut offense, involved the actual hand-to-hand sale of cocaine. See footnote 72 of this opinion. On appeal, the defendant does not renew his claim that § 53a-46a (h) (1) requires the state to prove that the conduct underlying the two offenses is *factually* identical. Rather, he claims that the state must establish that the *elements* of the two offenses are identical in every respect. For the reasons that we set forth in part III A 2 of this opinion, we reject the defendant's claim that the sale of a narcotic substance in violation of Connecticut law and the sale of a controlled substance in violation of New York law are not the "same felony" within the meaning of § 53a-46a (h) (1).

[74] Although the defendant claims that the state presented insufficient evidence to prove that the defendant violated § 21a-277 (a)—a claim that we reject; see part III A 4 of this opinion—he does not challenge the trial court's instructions on the elements of § 21a-277 (a).

ted this [§ 53a-46a (h) (1)] aggravant, you would first have to find that, at some point in time prior to the commission of the above stated attempt to commit a violation of § 21a-277 (a), the defendant had previously been charged with and convicted of the same felony which he allegedly attempted in this instance. As you recall, the parties have agreed and stipulated that the defendant had previously been convicted in New York of the crime of sale of a controlled substance in the fourth degree and that that crime is a felony. I charge you further that, for the purpose of this matter, the essential elements of [the] sale of a controlled substance in the fourth degree and § 21a-277 (a) of our General Statutes, inasmuch as they relate to the sale of narcotics, are the same. *Thus, for your purpose, the two felonies are the same. So if you find the prior elements of that aggravant proven beyond a reasonable doubt, as I've explained them to you, you may consider this final element proven also, that is, that the defendant was previously convicted of the same felony attempt in this matter.*"[75] (Emphasis added.)

The defendant contends that he was entitled to have the jury, rather than the court, decide whether the criminal sale of a controlled substance in the fourth degree,

---

[75] Thereafter, the court reiterated its instructions as follows: "I should note . . . that during the course of the court's charge, I indicated with respect to the first aggravant that the felony § 21a-277 (a) of our General Statutes is the same as the felony for which the parties agree the defendant had previously been convicted, that being the sale of a controlled substance in the fourth degree. In so doing, the court takes judicial notice of § 220.34 of the New York Penal [Law] with respect to the elements of the crime of criminal sale of [a] controlled substance in the fourth degree. Those elements include the knowing and unlawful sale of a narcotic preparation. In comparing that to § 21a-277 (a) of our General Statutes, which involve[s] the sale of any narcotic substance . . . [and] which under our law requires proof that such a sale be knowingly and unlawful[ly] done, the court found that the elements of the two felonies were, in fact, the same as a matter of law and, therefore, are charged accordingly in conjunction with the [§ 53a-46a (h) (1)] aggravant alleged by the state."

of which the defendant was convicted in 1989, and the felony that the jury found he was attempting to commit when he fatally shot Williams, were the "same felony" within the meaning of § 53a-46a (h) (1). Although the defendant acknowledges that it is the province of the trial court to ascertain the elements of the two offenses and to instruct the jury on those elements,[76] he claims that the issue of whether the two sets of elements are the same for purposes of § 53a-46a (h) (1) is a factual one for the jury. In other words, the defendant contends that the jury, not the trial court, should have compared the elements of the two offenses to determine whether the state had satisfied the "same felony" element of § 53a-46a (h) (1).

We agree with the trial court that the issue of whether the two narcotics offenses constitute the "same felony" for purposes of § 53a-46a (h) (1) is an issue to be resolved by the court, not the jury. The process of statutory interpretation in no way implicates the fact-finding function of the jury but, rather, presents a pure question of law. Consequently, it is a matter within the sole province of the court. The process of comparing statutory provisions to determine whether they are the "same" within the meaning of a third statute is no more a fact-based inquiry than determining the elements of the offenses enumerated therein.[77] We therefore reject

[76] As we repeatedly have observed, statutory interpretation is a matter of law. E.g., *Wallerstein* v. *Stew Leonard's Dairy*, 258 Conn. 299, 302, 780 A.2d 916 (2001). Moreover, General Statutes § 52-163a expressly authorizes the courts of this state to determine the law of any jurisdiction outside this state. General Statutes § 52-163a provides: "(a) In determining the law of any jurisdiction or governmental unit thereof outside this state, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the rules of evidence.

"(b) The court, not the jury, shall determine the law of any jurisdiction or governmental unit thereof outside this state. Its determination is subject to review on appeal as a ruling on a question of law."

[77] We note that permitting a jury to decide whether the elements of two criminal statutes are the same conceivably could result in two different juries coming to different conclusions. Such an untenable result would be

the defendant's contention that the trial court improperly concluded that the court, not the jury, was responsible for determining whether the two offenses constituted the "same felony" within the meaning of § 53a-46a (h) (1).*

4

The Sufficiency of Evidence of the Defendant's
Attempt to Commit the Crime of Sale of a
Narcotic Substance During the Course
of Committing the Capital Felony

The defendant next claims that the evidence was insufficient to support the jury's finding that the state had proven the elements of § 53a-46a (h) (1) beyond a reasonable doubt. Specifically, the defendant claims that, at most, the evidence supported a finding that he was committing "the felony of attempted possession of cocaine with the intent to sell" when he was stopped by Williams, and not that he was attempting to sell cocaine. This claim also is without merit.

"[B]ecause of the seriousness of any death penalty determination, we will subject a finding of an aggravating factor to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession . . . or the seizure of a defendant." (Citations omitted.) *State* v. *Ross,* supra, 230 Conn. 259. "However, [e]ven with the heightened appellate scrutiny appropriate for a death penalty case, the defendant's challenge to the sufficiency of the evidence of aggravating circumstances must be reviewed, in the final analysis, by considering the evidence presented at the defendant's penalty hearing in the light most favorable to sustaining the facts impliedly found

particularly unacceptable in circumstances, such as those in the present case, in which the resolution of that issue can potentially determine whether the defendant is sentenced to death.

* See addendum to this opinion.

by the jury. . . . Furthermore, [i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with [the existence of the aggravating factor] and is not required to draw only those inferences consistent with [its nonexistence]. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citation omitted; internal quotation marks omitted.) *State* v. *Johnson*, 253 Conn. 1, 64, 751 A.2d 298 (2000).

On the basis of the evidence adduced by the state at the penalty phase hearing, the jury reasonably could have found that, in the early morning hours of December 18, 1992, both the defendant and Crawford, members of the same drug trafficking organization, were each in possession of approximately 175 bags of cocaine, worth about $3500, for sale to a person who resided on Locust Street in Waterbury. The defendant also was carrying a loaded .38 caliber semiautomatic pistol in his right coat pocket. The two men were walking to the Locust Street address to consummate the drug sale when they were approached by Williams, who ordered them to stop and place their hands on his cruiser. Crawford ignored Williams' command and walked away. The defendant stopped and placed his left hand on the cruiser, but refused to take his right hand out of his coat pocket, where his gun was concealed. When Williams forcibly tried to remove the defendant's right hand from the defendant's pocket, the defendant turned and shot Williams in the head to avoid the discovery of the weapon and the cocaine. These facts amply support the jury's determination that the defendant shot and killed Williams while he and Crawford were involved in an attempt to sell a narcotic substance, namely, cocaine.

We agree with the defendant insofar as he claims that the evidence was sufficient to warrant a finding that the capital felony occurred during the defendant's commission of the crime of possession of cocaine with intent to sell. See *State* v. *Robinson*, 227 Conn. 711, 743, 631 A.2d 288 (1993) (single act may violate elements of more than one criminal statute). The fact that the evidence was sufficient to establish that the defendant was committing the felony of possession of a narcotic substance with intent to sell when he committed the capital felony does not militate against a finding of the existence of the aggravating factor enumerated in § 53a-46a (h) (1), however, in view of the fact that the jury properly determined that the defendant also was committing the felony of attempted sale of a narcotic substance when he committed the capital felony and previously had been convicted of that same felony. We therefore reject the defendant's evidentiary sufficiency claim.

B

Issues Concerning the Aggravating Factor
Enumerated in § 53a-46a (h) (4)

1

Evidentiary Insufficiency

The defendant contends that the evidence was insufficient to establish beyond a reasonable doubt that he murdered Officer Williams in an "especially heinous, cruel or depraved manner," as required under § 53a-46a (h) (4). Specifically, the defendant claims that the jury reasonably could not have concluded that he had the intent necessary to satisfy that aggravating factor. We agree with the defendant.[78]

[78] The defendant also claims, with respect to the aggravating factor enumerated in § 53a-46a (h) (4), that the trial court improperly: (1) declined to require the state to provide the defendant with a bill of particulars setting forth the facts underlying that aggravating factor; (2) instructed the jury that it could find that that aggravating factor was satisfied upon proof of

"Before we review the evidence adduced by the state [in the present case], we again define the standard by which it is to be measured. As we acknowledged in [*Breton I*, supra, 212 Conn. 265], the phrase 'in an especially heinous, cruel or depraved manner' from § 53a-46a (h) (4) contains an arguably subjective standard that runs the risk of being unconstitutionally vague. Therefore, to avoid constitutional jeopardy [in connection with] this aggravating factor, we adopted a limiting construction of that statutory language. Focusing on the meaning of 'especially cruel,' we concluded that an acceptable core construction of this term 'must include the intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing.' " *State* v. *Johnson*, supra, 253 Conn. 65, quoting *Breton I*, supra, 270. This extreme, additional pain or torture can be physical or, as the state alleged and the jury found in the present case, psychological.[79] E.g., *State* v. *Ross*, supra, 230 Conn. 262. Thus, "in reviewing the sufficiency of the evidence to support

the intentional infliction of extreme *psychological* pain or torture beyond that necessarily accompanying the killing; (3) instructed the jury in such a manner as to suggest that the state need not establish that the defendant has the specific intent to cause such pain or torture; (4) used the term "heinous, cruel or depraved" in its jury instructions concerning the aggravating factor; (5) failed to instruct the jury regarding the state's burden of proving beyond a reasonable doubt that Officer Williams was conscious when the defendant allegedly had caused him extreme pain or torture beyond that necessarily accompanying the killing; and (6) failed to instruct the jury that, to establish the aggravating factor enumerated in § 53a-46a (h) (4), the state was required to prove conduct by the defendant that is distinct from the conduct that caused Williams' death. In light of our conclusion regarding the evidentiary insufficiency of the aggravating factor enumerated in § 53a-46a (h) (4), we need not reach the defendant's additional claims.

[79] The state also alleged that the defendant intended to inflict, and Williams suffered, extreme *physical* pain or torture beyond that necessarily accompanying the underlying killing. At the conclusion of the state's case at the penalty phase hearing, however, the trial court determined that the state had failed to adduce evidence from which the jury reasonably could find that Williams had suffered such extreme physical pain or torture. Accordingly, the trial court did not submit that claim to the jury, and it is not an issue on appeal.

the jury's finding of [the] aggravating factor [of] § 53a-46a (h) (4), [we must determine] whether the state has proved, beyond a reasonable doubt, that the defendant engaged in intentional conduct that inflicted extreme . . . psychological pain or torture on [Williams] above and beyond that necessarily accompanying the underlying killing, *and* that the defendant specifically intended to inflict such extreme pain and torture."[80] (Emphasis in original.) *State* v. *Johnson,* supra, 66.

The defendant contends that the state failed to establish beyond a reasonable doubt that he intended to inflict extreme psychological pain or torture on Williams above and beyond that necessarily accompanying the murder.[81] The state counters that the jury was entitled to make such a finding on the basis of evidence establishing that the defendant, after shooting Williams in the head from close range, continued to fire six additional gunshots at Williams as the defendant fled the crime scene. The state maintains that the evidence of intent, although circumstantial, was sufficient to establish beyond a reasonable doubt that the defendant had fired the additional gunshots not with an intent to kill Williams but, rather, with an intent to terrorize him for the purpose of torturing him psychologically.

---

[80] In *Cobb II,* supra, 251 Conn. 285, which was decided after the penalty phase hearing in the present case, we stated that the aggravating factor of § 53a-46a (h) (4) also could be satisfied by proof that "the defendant was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim." Id., 445. The trial court did not instruct the jury in accordance with this alternate application of § 53a-46a (h) (4), and, consequently, we do not consider it in reviewing the defendant's claim of evidentiary insufficiency.

[81] The defendant also claims that the evidence was insufficient to warrant a finding that Williams had suffered extreme psychological pain or torture as a result of the additional gunshots that the defendant fired at Williams as the defendant was fleeing the scene. Because we conclude that the evidence did not support the jury's finding that the defendant intended to inflict such extreme psychological pain or torture on Williams, we need not and, therefore, do not reach this claim.

"In reviewing a claim that the evidence fail[ed] to support the finding of an aggravating factor specified in [§ 53a-46a (h)]; General Statutes (Rev. to 1991) § 53a-46b (b) (2) [as amended by Public Acts 1992, No. 92-260, § 23];[82] we subject that finding to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession; *State* v. *Medina*, 228 Conn. 281, 294, 636 A.2d 351 (1994); *State* v. *Smith*, [supra, 200 Conn. 478]; or the seizure of a defendant. *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993); *State* v. *Northrop*, 213 Conn. 405, 414, 568 A.2d 439 (1990). *State* v. *Ross*, [supra, 230 Conn. 259]." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 253 Conn. 64. In such circumstances, we are required to determine whether the factual findings are supported by substantial evidence. E.g., *State* v. *Medina*, supra, 294; *State* v. *Smith*, supra, 478.

"Even with the heightened appellate scrutiny appropriate for a death penalty case, the defendant's challenge to the sufficiency of the evidence of aggravating circumstances must be reviewed, in the final analysis, [first] by considering the evidence presented at the defendant's penalty hearing in the light most favorable to sustaining the facts impliedly found by the jury." *State* v. *Ross*, supra, 230 Conn. 264. "Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established [the existence of the aggravating factor] beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that

---

[82] General Statutes (Rev. to 1991) § 53a-46b (b), as amended by Public Acts 1992, No. 92-260, § 23, provides in relevant part: "The supreme court shall affirm the sentence of death unless it determines that . . . (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a . . . ."

of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 732, 759 A.2d 995 (2000).

"Furthermore, [i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with [the existence of the aggravating factor] and is not required to draw only those inferences consistent with [its nonexistence]. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 253 Conn. 64.

"Because [t]he only kind of an inference recognized by the law is a reasonable one [however] . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Citations omitted; internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 338–39, 746 A.2d 761 (2000); accord *State* v. *Niemeyer*, 258 Conn. 510, 518, 782 A.2d 658 (2001).

"[Finally], [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes [the existence of an aggravating factor] in a case involving substantial circumstantial evidence. . . . Indeed, direct evidence of the [defendant's] state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citation omitted; internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239–40, 745 A.2d 800 (2000); accord *State* v. *Niemeyer*, supra, 258 Conn. 517–18. Guided by these principles, we turn to the merits of the defendant's claim.

Viewed in the light most favorable to the state, the evidence that the state adduced at the penalty phase hearing established that, while Williams was attempting to subdue the defendant, the defendant bumped Williams in the chest to determine whether Williams was wearing a bulletproof vest. Upon ascertaining that, in fact, Williams was wearing a protective vest, the defendant removed a .38 caliber semiautomatic pistol from his pocket, turned and shot Williams in the head from a distance of one to two feet. The defendant immediately fled and, as he was running away, fired six additional gunshots in Williams' direction.[83] The defendant

---

[83] There was no testimony either as to the precise period of time between the first shot at close range and the additional gunshots, or the length of time that it had taken the defendant to discharge those gunshots as he was fleeing. Because the defendant fled immediately after firing the first shot, and because there is nothing in the record to suggest that the defendant stopped or paused as he was running and shooting, it is reasonable to conclude that all of the additional gunshots were fired within a matter of seconds. This conclusion is supported by the state's characterization of the evidence, set forth in its brief submitted to this court, as establishing that the defendant "chose to flee immediately, firing wildly at [Williams] as he did so."

ran to Karen Smith's apartment and, upon arrival, told Robert Bryant that he had shot Williams in the head when he realized that Williams was wearing a bullet-proof vest. When Anthony Crawford asked the defendant why he shot Williams, the defendant responded: "[M]y mother didn't name [me] 'Kilt' for nothing."

The state claims that, in view of the fact that the defendant shot Williams in the head from such close range, it was reasonable for the jury to conclude that, as the defendant fled, he knew that Williams lay helpless in the street, dying. The state further contends that, because the jury reasonably could have found that the defendant was aware that Williams had been fatally wounded, it also was proper for the jury to infer that the defendant fired the additional gunshots with an intent to torture Williams psychologically and not with an intent to kill him. The state points to no other evidence in support of its claim.

There can be no doubt that the evidence supported a finding that the defendant shot Williams in the head with the intent to kill him.[84] It also would have been reasonable for the jury to conclude that the defendant probably concluded that Williams was grievously wounded when the defendant turned and fired the additional gunshots in Williams' direction. Under the circumstances, however, we are not persuaded that the facts warrant a reasonable inference that the defendant fired those additional gunshots with the specific intent of psychologically torturing Williams. In other words, we are not convinced that the correlation between the facts and the conclusion that the defendant had intended to torture Williams psychologically is sufficient to support that inference with the requisite degree of certainty.

[84] Indeed, the panel made this finding at the conclusion of the guilt phase of the trial.

The only logical inference to be drawn from the evidence is that the defendant ran from the scene in fear that he would be seen or apprehended, and that he turned and fired toward Williams because he could not be sure that he had killed Williams, or even that he had fully disabled him. Because the defendant fled immediately after seeing Williams fall to the ground, the only reasonable inference is that the defendant did not know for sure whether Williams was too seriously wounded either to unholster his weapon and fire at the defendant as he fled or to seek assistance in apprehending the defendant via radio or by hailing a passerby. Moreover, because the defendant fled so quickly after shooting Williams in the head, the defendant could not be positive that Williams' wound, though grave, necessarily was fatal. In view of the fact that Williams, if he survived, potentially could have identified the defendant as his assailant, it is very likely that the defendant continued to fire as he ran in hopes that one or more of those gunshots would strike and kill Williams in the event that Williams was not already mortally wounded.

Contrary to the state's claim, the evidence does not reasonably support the conclusion that the defendant continued to fire at Williams with the intent to torture him psychologically. To reach such a conclusion, it would be necessary for a fact finder to infer, on the basis of the defendant's conduct, that the defendant's state of mind changed from an intent to kill to an intent to torture in the brief interval between the point at which the defendant shot Williams in the head and the point at which the defendant fired the additional gunshots in Williams' direction while fleeing the crime scene.[85] In light of the extraordinarily exigent circum-

[85] The state does not claim that the defendant's intent changed after he already had begun firing the additional gunshots in Williams' direction as he was fleeing. The seminal time period, therefore, is the brief interval after the defendant had shot Williams at close range and before he had fired the additional gunshots while fleeing the crime scene.

stances that the defendant had created for himself and the exceedingly short time frame during which he could react to those circumstances, the inference that the defendant intended to torture Williams simply is not reasonable even when the evidence is viewed most favorably toward the state's case.

Of course, "[p]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference." (Internal quotation marks omitted.) *State* v. *Niemeyer*, supra, 258 Conn. 518–19. As we have indicated, however, we are not persuaded that the evidence in the present case is *reasonably* susceptible of an inference that the defendant intended to torture Williams.

We acknowledge that it probably would not have been *impossible* for the defendant to have formulated the intent to torture Williams in the extremely brief period of time between the firing of the first shot and the firing of the additional gunshots. An inference is not legally supportable, however, merely because the scenario that it contemplates is remotely possible under the facts. To permit such a standard would be to sanction fact-finding predicated on mere conjecture or guesswork. Proof by inference is sufficient, rather, only "if the evidence produces in the mind of the trier a *reasonable belief in the probability of the existence* of the material fact." (Emphasis added; internal quotation marks omitted.) Id., 519. Under the circumstances of the present case, the likelihood that the defendant had changed his intent in the brief interval that separated the first shot from the remaining gunshots simply is

too remote to be reasonable. We therefore agree with the defendant that the evidence was insufficient to establish the existence of the aggravating factor enumerated in § 53a-46a (h) (4).[86]

2

### Denial of the Defendant's Prepenalty Phase Motion to Dismiss the Aggravating Factor Enumerated in § 53a-46a (h) (4)

The defendant next claims that the panel improperly denied his prepenalty phase motion to dismiss the aggravating factor enumerated in § 53a-46a (h) (4)[87] on the ground of evidentiary insufficiency. We disagree.

---

[86] In support of its contrary contention, the state relies on two capital felony cases, *State* v. *Rhines,* 548 N.W.2d 415, 452 (S.D.), cert. denied, 519 U.S. 1013, 117 S. Ct. 522, 136 L. Ed. 2d 410 (1996), and *State* v. *Zagorski,* 701 S.W.2d 808, 814 (Tenn. 1985), cert. denied, 478 U.S. 1010, 106 S. Ct. 3309, 92 L. Ed. 2d 722 (1986), in which the evidence was deemed sufficient to establish that the defendants had tortured their respective victims. Because those cases bear no factual similarity to the present case, they provide no support for the state's contention. In *Rhines,* the defendant was burglarizing a donut shop when the victim unexpectedly entered the premises. *State* v. *Rhines,* supra, 451. After stabbing the victim in the abdomen and again in the back, the defendant forced the victim into a storage room, where he ignored the victim's pleas for mercy and medical attention. Id. Although the victim remained passive in apparent acknowledgment of his impending death, the defendant seated the victim on a pallet, bound his hands tightly behind his back, placed his head between his knees and proceeded to thrust a knife into the base of his skull. Id. The evidence also indicated that the victim had endured certain wounds that were "caused or exacerbated by [the victim's] agonized struggle before his death." Id., 452. In *Zagorski,* the defendant shot his two victims and then also "slit their throats, leaving them to bleed to death in the woods." *State* v. *Zagorski,* supra, 814. The court concluded that, although the victims ultimately died of the gunshot wounds, "[the] [d]efendant's actions were an infliction of gratuitous violence, and needless mutilation of [the] victims who were already helpless from fatal wounds . . . ." Id. In contrast to the present case, the prosecuting authorities adduced ample evidence in *Rhines* and *Zagorski* from which the juries could find, without resort to speculation or conjecture, that the defendants intended to torture their respective victims.

[87] See footnote 4 of this opinion for the text of § 53a-46a (h) (4).

The following facts and procedural history are relevant to our disposition of the defendant's claim. Prior to the penalty phase hearing, the defendant moved to dismiss, inter alia, the aggravating factor enumerated in § 53a-46a (h) (4) on the ground that the "[e]vidence adduced at [his] trial and at other relevant court proceedings as well as discovery provided by the [s]tate" demonstrated that the state could not establish that the defendant had intentionally inflicted *physical* pain and torture upon Williams above and beyond that necessarily accompanying the killing. The panel denied the defendant's motion.[88] During the ensuing penalty phase hearing, the state sought to introduce into evidence a number of autopsy photographs for the purpose of assisting the jury in understanding the nature of the gunshot wound that Williams had sustained and the pain and suffering that he had endured. The trial court permitted the state to introduce some of the autopsy photographs but sustained the defendant's objections to several other photographs.[89] Among the photographs admitted into evidence was a particularly graphic photograph that depicted Williams' head with his scalp peeled back to expose his skull.

In view of the gruesome nature of the autopsy photographs, the trial court cautioned the jury in relevant part as follows: "[P]art of the evidence consists of . . . slides of the deceased. I would just point out these slides are not offered for their emotional impact but the nature and the extent and the severity of injuries suffered by [Williams]. Emotional impact of the photos should have absolutely no effect on your consideration now and your consideration during deliberation. Cer-

[88] The defendant moved to dismiss all of the aggravating factors alleged by the state. The panel denied the motion in its entirety.

[89] The defendant objected to the introduction of the autopsy photographs on the ground that the prejudicial effect of the photographs outweighed their probative value.

tainly, you don't see photos of this nature every day. You don't see a deceased party in various medical intervention that takes place, so it certainly will have an effect and that's normal. What I'm saying is it should play no part whatsoever in your deliberations and I think you all understand that. And, in fact, the state doesn't offer them for any other purpose other than issues in this case, not for emotional impact."

At the conclusion of the state's evidence on the aggravating factors, the defendant renewed his motion to dismiss the aggravating factor enumerated in § 53a-46a (h) (4). The trial court granted the defendant's motion limited to the state's claim regarding the defendant's alleged intentional infliction of extreme *physical* pain or torture. Accordingly, the court thereafter instructed the jury that "there is no claim by the state that there exists evidence in this case of the intentional infliction of extreme physical pain beyond that necessarily accompanying the underlying killing." The court then instructed the jury on the law applicable to the state's claim concerning the existence of the aggravating factor enumerated in § 53a-46a (h) (4) by virtue of the defendant's allegedly intentional infliction of extreme *psychological* pain or torture beyond that necessary to accomplish the killing.

On appeal, the defendant contends that the panel improperly declined to dismiss, *in advance of the penalty phase hearing,* the aggravating factor enumerated in § 53a-46a (h) (4), on the ground that the evidence was insufficient to establish that the defendant intentionally inflicted extreme physical pain or torture beyond that necessary to accomplish the killing. The defendant further claims that he was prejudiced by the panel's denial of his motion in advance of the penalty phase hearing because the autopsy photographs that were admitted at that hearing were both prejudicial and irrelevant to any other issue in the case.

Contrary to the defendant's claim, we are aware of no authority, and the defendant has presented us with none, in support of his assertion that he was entitled to have the panel engage in a prepenalty phase evaluation of the evidentiary sufficiency of one or more of the aggravating factors alleged by the state. Indeed, as a general rule, a capital defendant is not entitled to any such prepenalty phase determination with respect to the evidentiary sufficiency of the aggravating factors alleged by the state. Cf. *State* v. *Solek*, 242 Conn. 409, 431, 699 A.2d 931 (1997) ("[there is] no authority aside from the constitutionally required hearing in probable cause . . . that entitles a defendant to a pretrial judicial determination of ineligibility for the death penalty" [citation omitted]).

Moreover, the photographs were relevant to the state's claim that the defendant had intentionally inflicted extreme *psychological* pain or torture on Williams beyond that necessary to accomplish the killing. In order to prove the existence of the aggravating factor enumerated in § 53a-46a (h) (4), the state sought to establish that Williams was conscious and, consequently, was able to experience the terror of hearing six additional gunshots[90] being fired at him as he lay critically wounded in the street. In order to show that Williams had suffered extreme psychological torture, the state also had to prove that Williams, despite having been shot at from close range, nevertheless retained the capacity to hear those additional gunshots. To establish that fact, the state adduced testimony from several expert witnesses regarding the precise nature of Williams' injury and the effect that his wound likely would have had on his ability to hear and to understand what was going on around him immediately after suffering the gunshot wound to his head. Inasmuch as the autopsy photographs revealed the location and extent of Wil-

[90] See footnote 6 of this opinion and accompanying text.

liams' gunshot wound, they were particularly relevant to the jury's consideration of the expert testimony and generally relevant to the issue of Williams' psychological suffering. Although there exists a heightened concern for the potential prejudice that may arise from the use of inflammatory photographs in capital cases; see *State* v. *Ross*, supra, 230 Conn. 277; "even gruesome photographs are admissible if they would prove or disprove a material fact in issue, or illuminate a material inquiry."[91] Id.

Finally, the trial court strongly cautioned the jurors about the graphic nature of the photographs of Williams and emphasized that they should take particular care to guard against any unduly emotional reaction. Such an instruction likely reduced any possible prejudice to the defendant that might have arisen from the state's use of the photographs.[92] We conclude, therefore, that

[91] We have concluded that the evidence adduced by the state was insufficient to support the jury's determination that the defendant had intentionally inflicted extreme *psychological* pain or torture on Williams beyond that necessary to accomplish the killing. See part III B 1 of this opinion. The defendant does not contend, however, that the panel improperly denied his motion to dismiss the aggravating factor enumerated in § 53a-46a (h) (4) *in advance of the penalty phase hearing* on the ground of evidentiary insufficiency with respect to the state's claim that the defendant intentionally caused Williams extreme psychological pain or torture beyond that necessary to accomplish the killing.

[92] As we have indicated, the defendant sought to preclude the state from introducing the autopsy photographs into evidence at the penalty phase hearing on the ground that they were unduly prejudicial. The thrust of the defendant's claim on appeal, however, is that the state would not have been able to introduce those photographs if the panel had granted the defendant's motion to dismiss the aggravating factor enumerated in § 53a-46a (h) (4) prior to the penalty phase hearing. The defendant does assert on appeal, however, that any probative value of the autopsy photograph depicting Williams' head with his scalp peeled back is outweighed by the photograph's prejudicial effect. The defendant is not entitled to review of this claim, however, because he has not adequately briefed it. See, e.g., *Abington Ltd. Partnership* v. *Heublein*, 257 Conn. 570, 586–87 n.29, 778 A.2d 885 (2001). Moreover, the defendant cannot prevail on the merits of his claim. "This court . . . has held that photographic evidence is admissible where the photograph has a reasonable tendency to prove or disprove a material fact

the defendant cannot prevail on his claim that he was entitled to the prepenalty phase dismissal of the aggravating factor enumerated in § 53a-46a (h) (4) on the ground that the evidence was insufficient to establish that the defendant had intentionally inflicted extreme physical pain or torture beyond that necessary to accomplish the murder.

C

The Court's Instructions on Reasonable Doubt

The defendant claims that the trial court's instructions on reasonable doubt[93] improperly diluted the

in issue or shed some light upon some material inquiry. . . . Therefore, it is not necessary to show that the photographic evidence is essential to the case in order for it to be admissible. . . . In determining whether photographic evidence is admissible, the appropriate test is relevancy, not necessity. . . . In addition, this court consistently has stated that even potentially inflammatory photographic evidence may be admitted if, in its discretion, the trial court determines that the probative value of the evidence outweighs its prejudicial effect." (Citations omitted; internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 64–65, 770 A.2d 908 (2001). "The test for determining whether [such] evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . [T]he trial court's discretionary determination that the probative value of [the] evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 141–42, 763 A.2d 1 (2000). We cannot say that the trial court abused its broad discretion in permitting the state to use several of the autopsy photographs, including the photograph that graphically depicted Williams' scalp. Although that particular photograph is indeed gruesome, we conclude that the jury, which properly was cautioned by the trial court regarding the nature and purpose of the photograph, was capable of viewing the photograph with dispassion and in accordance with the trial court's instructions.

[93] The trial court instructed the jury on reasonable doubt as follows: "Now, the phrase 'reasonable doubt' has no technical or unusual meaning. You can arrive at the real meaning of it by emphasizing the word 'reasonable.' A reasonable doubt is a doubt for which there exists a reasonable basis arising out of evidence or the lack of evidence. It is a doubt which is more than a guess or surmise. It's not a conjecture or a fanciful doubt. A reasonable

state's burden of proving the existence of the aggravating factors in violation of his federal constitutional right to a fair trial. Specifically, the defendant challenges the following portions of the trial court's charge on the meaning of reasonable doubt: (1) "[a] reasonable doubt is not a doubt . . . suggested by the ingenuity of counsel"; (2) "[a reasonable doubt] is a doubt for which you can in your own mind conscientiously give a reason"; (3) "[a] [r]easonable doubt . . . is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or the lack of evidence"; and (4) "[a reasonable doubt is] the kind of doubt which in the serious affairs which concern you in everyday life you would pay heed to and attention to." The defendant's claim is meritless.[94]

doubt is not a doubt which is raised by someone simply for the sake of raising doubts nor is it a doubt suggested by the ingenuity of counsel or any of the jurors which is not justified by the evidence or the lack of evidence. A reasonable doubt is a doubt based on reason and not on the mere possibility of innocence. It is a doubt for which you can in your own mind conscientiously give a reason. Reasonable doubt, in other words, is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or the lack of evidence. It's the kind of doubt which in the serious affairs which concern you in everyday life you would pay heed to and attention to.

"Now, of course, absolute certainty in the affairs of life is never attainable and the law does not require absolute certainty on the part of a jury before you return a verdict finding an aggravant. The state does not have to prove a factor beyond all doubt or to a mathematical or absolute certainty. What the law does require, however, is that, after hearing all of the evidence, if there is something in that evidence or lack of evidence which leaves in the minds of a jury as reasonable men and women a reasonable doubt about the aggravating factor, then the accused must be given the benefit of doubt and found not to have committed that factor. Any conclusion reasonably to be drawn from the evidence which is consistent with the accused not having committed the aggravating factor must prevail. If there is no reasonable doubt, then the jury must find that the accused committed the aggravant. The test is one of reasonable doubt, a doubt based on reason and common sense."

[94] Because the defendant did not object at trial to the portions of the jury charge that he now challenges on appeal, he seeks to prevail on his claim of instructional impropriety under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), in which we held that a defendant can prevail on an unpreserved constitutional claim "only if *all* of the following conditions are met: (1) the

"It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . . The [reasonable doubt concept] provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . [Id.], 363. At the same time, by impressing upon the [fact finder] the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Jackson* v. *Virginia*, [443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)]. [Consequently] [t]he defendants in a criminal case are entitled to a clear and unequivocal charge by the court that the guilt of the defendants must be proved beyond a reasonable doubt. . . .

"In determining whether a trial court's charge satisfies constitutional requirements, however, individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper

record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. Although the record is adequate for our review of the defendant's constitutional claim, he cannot prevail because, as we explain hereinafter, he has not demonstrated that the challenged portions of the trial court's charge were constitutionally infirm.

verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Griffin*, 253 Conn. 195, 205–206, 749 A.2d 1192 (2000).

As the defendant acknowledges, this court previously has applied this standard of review in rejecting claims identical in all material respects to those advanced by the defendant. E.g., *State* v. *Velasco*, 253 Conn. 210, 249, 751 A.2d 800 (2000) (rejecting constitutional challenge to instruction that reasonable doubt is "a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence" [internal quotation marks omitted]); *State* v. *Griffin*, supra, 253 Conn. 205 (rejecting constitutional challenge to instruction that reasonable doubt is "such a doubt, as in serious affairs that concern you, you would heed, that is, such a doubt as would cause reasonable men and women to hesitate to act in matters of importance" [internal quotation marks omitted]); *State* v. *Lewis*, 245 Conn. 779, 816, 717 A.2d 1140 (1998) (rejecting constitutional challenge to instruction that reasonable doubt is doubt "for which you can in your own mind conscientiously give a reason" [internal quotation marks omitted]); *State* v. *Taylor*, 239 Conn. 481, 504, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997) (rejecting constitutional challenge to instruction that reasonable doubt "is [not] a doubt suggested by the ingenuity of counsel" [internal quotation marks omitted]).[95] The defendant has presented no persuasive rea-

---

[95] In *State* v. *Delvalle*, 250 Conn. 466, 475, 736 A.2d 125 (1999), this court again rejected a constitutional challenge to the "ingenuity of counsel" language. We observed, however, that, when viewed in isolation, the phrase "conceivably could misdirect the jury's attention . . . ." (Internal quotation marks omitted.) Id., quoting *State* v. *Taylor*, supra, 239 Conn. 504. To avoid any possibility of juror confusion in the future, we directed our trial courts,

son why the challenged language, when viewed in the broader context of the court's otherwise proper charge on reasonable doubt, dilutes the state's burden of proving the existence of the aggravating factors. We therefore reject the defendant's claim of instructional impropriety.

## D

### Effect of the Jury's Invalid Finding as to the Existence of One Aggravating Factor on the Jury's Finding as to the Existence of Another Aggravating Factor

The defendant next claims that he is entitled to a new penalty phase hearing on the existence of the aggravating factor enumerated in § 53a-46a (h) (1)[96] in light of our determination that the evidence was insufficient to support the jury's finding that the state had proven the existence of the aggravating factor of § 53a-46a (h) (4) beyond a reasonable doubt. In essence, the defendant contends that the jury's finding with respect to the aggravating factor of § 53a-46a (h) (1) necessarily was tainted by its unsupported finding of the existence of the aggravating factor of § 53a-46a (h) (4). We disagree.

In *State* v. *Webb*, 238 Conn. 389, 479–83, 680 A.2d 147 (1996) (*Webb I*), we addressed an issue virtually identical to the issue raised by the defendant's claim[97]

pursuant to our supervisory authority over the administration of justice, to refrain from using the "ingenuity of counsel" language in subsequent cases. *State* v. *Delvalle*, supra, 475–76. Because our decision in *Delvalle* was not released until after the penalty phase hearing in the present case, our admonition in *Delvalle* regarding the "ingenuity of counsel" language is inapplicable for purposes of our analysis.

[96] See footnote 4 of this opinion for the text of § 53a-46a (h) (1).

[97] In *Webb I*, supra, 238 Conn. 389, we concluded that the jury's finding of the existence of the aggravating factor enumerated in § 53a-46a (h) (4) was predicated upon an improper instruction regarding that aggravating factor. See id., 475. In the present case, by contrast, we have concluded that the jury improperly found the existence of that aggravating factor on the basis of insufficient evidence.

and concluded that harmless error analysis applies in circumstances, such as those in the present case, in which the jury's finding of the existence of one aggravating factor is invalid and the jury's finding of the existence of another aggravating factor is not otherwise invalid. We concluded in *Webb* that the determination of whether the impropriety surrounding the invalid aggravating factor improperly affected the jury's finding with respect to the existence of the valid aggravating factor is to be made on a case-by-case basis. Id., 483 n.63.

Contrary to the defendant's claim, the state has demonstrated beyond a reasonable doubt that the jury's finding concerning the existence of the aggravating factor of § 53a-46a (h) (4) did not improperly affect its finding concerning the existence of the aggravating factor of § 53a-46a (h) (1). Our reasoning in *Webb* is equally applicable in the present case. First, "the two aggravants are logically and factually distinct, and the trial court's instructions properly presented the aggravants as separate matters for the jury's consideration. In this connection . . . the trial court expressly instructed the jury that the state was required to prove only one aggravating factor . . . . Moreover, the trial court gave separate instructions concerning each aggravant and marshaled the evidence related to each aggravant separately." Id., 482. Furthermore, "overwhelming evidence supported the jury's finding of the aggravating factor set forth in § 53a-46a (h) (1). To find this factor, the jury was required to conclude only that the murder of the victim occurred in the course of an attempted [sale of a narcotic substance]. The evidence in th[e] [present] case unequivocally support[s] the jury's conclusion that the defendant murdered [Officer Williams] during the commission of . . . an attempted [narcotics sale]."[98] Id., 483.

[98] Of course, the state also was required to prove, pursuant to § 53a-46a (h) (1), that the defendant previously had been convicted of the felony sale of a narcotic substance. In light of the defendant's stipulation that he had

The defendant nevertheless contends that the state has failed to show that the invalid finding concerning the existence of the aggravating factor enumerated in § 53a-46a (h) (4) was harmless beyond a reasonable doubt. In support of his claim, the defendant asserts that the evidence adduced by the state pertaining to the gunshots that the defendant fired after he had shot Williams in the head was admissible only to prove the existence of the aggravating factor enumerated in § 53a-46a (h) (4), and, therefore, the jury should not have heard that evidence in light of our conclusion that the evidence was insufficient to sustain the jury's finding regarding the existence of that aggravating factor. The defendant further contends that the evidence regarding those additional gunshots was unduly harmful.

The simple answer to the defendant's claim is that the evidence of those additional gunshots was admissible under General Statutes (Rev. to 1991) § 53a-46a (d),[99] which provides that the jury shall determine whether any alleged mitigating factor is, in fact, mitigating in nature, "considering all the facts and circumstances of the case." Certainly, the particular manner in which the defendant committed the capital felony is one of the relevant "facts and circumstances of the case" to be considered by the jury in evaluating the defendant's alleged mitigating factors. Moreover, the evidence of those additional gunshots also was admissible in connection with the state's allegation of the existence of the aggravating factor enumerated in General Statutes (Rev. to 1991) § 53a-46a (h) (3), which requires proof that "the defendant committed the [capital felony] and in such commission knowingly created a grave risk of death to another person in addition to the victim of the

a prior felony conviction for the sale of a narcotic substance in New York, the court properly instructed the jury that the state had satisfied its burden of proving that element of the aggravating factor.

[99] See footnote 4 of this opinion for the text of § 53a-46a (d).

offense . . . ."[100] Inasmuch as the evidence concerning the additional gunshots properly was admitted for the foregoing purposes, the defendant cannot prevail on his claim that he was harmed by the jury's consideration of the evidence concerning the additional gunshots or that the jury's improper finding regarding the existence of the aggravating factor enumerated in § 53a-46a (h) (4) otherwise improperly affected its finding of the existence of the aggravating factor enumerated in § 53a-46a (h) (1).[101]

## E

## Three Judge Panel

The defendant next claims that the panel improperly denied his motion to have all three members of the panel preside over the penalty phase hearing rather than just one member. The defendant maintains that § 53a-46a (b)[102] entitled him to have the same three judges who determined his guilt preside over the penalty phase hearing.[103] We disagree.

---

[100] Although the state alleged the existence of this aggravating factor, the jury rejected the state's allegation.

[101] The defendant also argues that the jury's finding of the aggravating factor enumerated in § 53a-46a (h) (4) prejudiced him in regard to the jury's consideration of the aggravating factor enumerated in § 53a-46a (h) (1) because "the jurors might well have rejected something as mitigating *only* because of their erroneous belief that the capital offense was aggravated in *two* different ways and may well have not reached that same decision if they had actually known that there was only one properly found aggravating factor." (Emphasis in original.) We reject this argument because it would require us to conclude that the jury ignored the court's thorough instructions on the law pertaining to the aggravating and mitigating factors and the manner in which the jury was to determine their existence or nonexistence. We refuse to draw such a conclusion in the absence of some indication that the jury failed or declined to follow the court's instructions. See, e.g., *State* v. *Ancona*, 256 Conn. 214, 219, 772 A.2d 571 (2001).

[102] See footnote 4 of this opinion for the text of § 53a-46a (b).

[103] Inasmuch as the defendant's claim gives rise to an issue of statutory construction, our review is plenary. E.g., *State* v. *Russo*, supra, 259 Conn. 447. As we previously have indicated, the process of statutory construction requires us to ascertain the intent of the legislature as reflected in the language of the statute, its legislative history, the policy that the statute

The defendant relies on the following language of § 53a-46a (b), the statutory provision governing the procedure for the penalty phase in capital cases, to support his claim: "For the purpose of determining the sentence to be imposed when a defendant is convicted of . . . a capital felony, *the judge or judges who presided at the trial* . . . shall conduct a separate hearing to determine the existence of any mitigating factor . . . and any aggravating factor . . . ." (Emphasis added.) General Statutes (Rev. to 1991) § 53a-46a (b). The defendant contends that § 53a-46a (b) clearly directs that the "judges" who decided the guilt phase of the case, that is, the three members of the panel, are to preside over the penalty phase hearing.

We note, preliminarily, that several other statutory provisions and their relationship to § 53a-46a (b) inform our resolution of the defendant's claim. Under General Statutes § 54-82 (a),[104] a criminal defendant has the option of having his or her guilt or innocence determined by the court instead of a jury. Pursuant to General Statutes §§ 53a-45 (b)[105] and 54-82 (b),[106] a defendant

_____

was designed to implement and the statute's relationship to other relevant legislative provisions and common-law principles. E.g., *State* v. *Russo*, supra, 447–48.

[104] General Statutes § 54-82 (a) provides: "In any criminal case, prosecution or proceeding, the party accused may, if he so elects when called upon to plead, be tried by the court instead of by the jury; and, in such case, the court shall have jurisdiction to hear and try such case and render judgment and sentence thereon."

[105] General Statutes § 53a-45 (b) provides in relevant part: "If a person indicted for murder or held to answer for murder after a [probable cause] hearing . . . waives his right to a jury trial and elects to be tried by a court, the court shall be composed of three judges designated by the Chief Court Administrator or his designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly."

[106] General Statutes § 54-82 (b) provides: "If the accused is charged with a crime punishable by death or imprisonment for life and elects to be tried by the court, the court shall be composed of three judges to be designated by the Chief Court Administrator, or his designee, who shall name one such

charged with committing a capital felony who elects a court trial is entitled to have a three judge panel determine guilt. In the present case, the defendant elected to be tried by a three judge panel but elected to have a jury determine his sentence during the penalty phase.

As the panel noted in its decision denying the defendant's motion, it is true that the first sentence of § 53a-46a (b), when viewed in isolation, may be read to suggest that a capital defendant is entitled to have the three judges who determined the defendant's guilt also preside over the penalty phase hearing. There is, however, no mention of any such right in the third sentence of § 53a-46a (b), which governs, inter alia, cases such as the present case, in which a defendant, who has elected to have his guilt or innocence determined by a three judge panel, chooses to have a jury determine his sentence at the penalty phase hearing.

To be sure, the first sentence of § 53a-46a (b) provides that the penalty phase hearing shall be conducted by "the judge or judges who presided at" the guilt phase portion of the case. But pursuant to §§ 53a-45 and 54-82, the chief court administrator is responsible for designating one of the members of the panel to be the presiding judge. When §§ 53a-46a, 53a-45 and 54-82 are read together, it is apparent that only the panel member who had been selected to be the *presiding judge* during the guilt phase shall preside over the penalty phase hearing. Thus, we do not believe that the literal language of § 53a-46a (b) dictates that *all* three panel members before whom the guilt phase was conducted must preside at a penalty phase hearing that is conducted before a jury. Indeed, we are persuaded that the term "judges" in the first sentence of § 53a-46a (b) does not apply to

judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly."

the first two subdivisions of the third sentence of § 53a-46a (b), both of which contemplate that the penalty phase hearing will be conducted before a jury. See General Statutes (Rev. to 1991) § 53a-46a (b) (penalty phase hearing "shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause"). Rather, we conclude that the term "judges" refers to the final subdivision of the third sentence of § 53a-46a (b), pursuant to which a capital defendant, upon approval of the court and the consent of the state, may elect to have his penalty phase hearing conducted before a court rather than a jury. General Statutes (Rev. to 1991) § 53a-46a (b) (penalty phase hearing "shall be conducted . . . (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state").

We reach this conclusion for several reasons. First, the defendant has not proffered an explanation, and we are aware of none, why the legislature would have required all three members of the panel who determined the defendant's guilt to preside over the penalty phase hearing *when that proceeding is to be conducted before a jury.* In such circumstances, there simply is no reason to have more than one judge preside over the penalty phase hearing. In contrast, when the court is called upon to serve as the fact finder in a murder case, that function is performed by three judges rather than one for good reason, namely, because the legislature has concluded that the "burden of having a murder case tried to the court, when the accused so elect[s], should

not be imposed upon a single judge . . . ." *McBrien* v. *Warden*, 153 Conn. 320, 329, 216 A.2d 432 (1966).

Second, there is no other circumstance under which a three judge panel is authorized to preside over a jury trial. This is hardly surprising in light of the fact that, as we already have explained, there is no justification for having more than one judge preside over a hearing or trial in which a jury, rather than a judge, serves as the fact finder. Because the role of a three judge court is to serve as a *substitute* for a jury,[107] it would make no sense to establish a scheme whereby three judges preside over a trial in which a jury, not the court, serves as the fact finder. We will not lightly interpret § 53a-46a (b) to reach an untenable result. See, e.g., *Southington* v. *Commercial Union Ins. Co.*, 254 Conn. 348, 360, 757 A.2d 549 (2000) ("[w]e ordinarily read statutes with common sense and so as not to yield bizarre results"); *Interlude, Inc.* v. *Skurat*, 253 Conn. 531, 539, 754 A.2d 153 (2000) ("[t]he law favors a rational statutory construction and we presume that the legislature intended a sensible result" [internal quotation marks omitted]).

Third, there exists a strong reason why there should *not* be more than one judge presiding over a jury trial, namely, only one judge is necessary to perform the duties of the court. Indeed, to have three judges participate in the time consuming task of jury selection for the penalty phase hearing, and then to require the same three judges to preside over that hearing, would result in a significant waste of judicial resources.

Finally, there is nothing in the relevant statutory genealogy or legislative history to support the defendant's

---

[107] As this court has observed in construing the precursor to § 54-82 (b); Public Acts 1921, c. 267, § 2, codified at General Statutes (1930 Rev.) § 6477; "[t]he court is by this statute substituted for the jury and fulfills in the trial of a criminal cause without a jury the duties of both court and jury." *State* v. *Frost*, 105 Conn. 326, 329, 135 A. 446 (1926).

claim. On the contrary, those considerations militate against the statutory construction urged by the defendant. Prior to 1973, sentencing in capital matters was governed by General Statutes (Rev. to 1972) § 53a-46,[108] which contains no provision for a penalty phase hearing before a jury and a three judge panel. As the legislative history of § 53a-46a reflects, this state enacted a revised capital sentencing scheme in 1973 in response to *Furman* v. *Georgia*, 408 U.S. 238, 239–40, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), in which the United States Supreme Court essentially rendered various death penalty statutes throughout the country, including this state's death penalty statutory scheme, constitutionally infirm. There is nothing in that legislative history to suggest that the legislature intended to change the pre-existing scheme in the manner asserted by the defendant. We agree with the state that, if the legislature had intended such a radical departure from the traditional role of the three judge court, it most likely would have articulated that change explicitly and unambiguously.

For the foregoing reasons, we conclude that, inasmuch as the defendant had elected to have a jury determine his sentence at the penalty phase hearing, the panel properly determined that the defendant was not entitled to have all three members of the panel preside over that hearing. Consequently, we reject the defendant's claim to the contrary.

F

Excusal of Juror for Cause

The defendant next claims that the trial court improperly granted the state's request to excuse a prospective

[108] General Statutes (Rev. to 1972) § 53a-46 provides in relevant part: "(a) When a defendant has been found guilty of murder, there shall thereupon be further proceedings before the court or jury on the issue of penalty. Such proceedings shall be conducted before the court or jury which found the defendant guilty. . . ."

General Statutes (Rev. to 1972) § 53a-46 was repealed with the enactment of § 53a-46a. See Public Acts 1973, No. 73-137, §§ 4, 15.

juror, M.K.,[109] for cause. The defendant contends that the reason that the trial court gave for excusing M.K., namely, that M.K. appeared to be unwilling to return a verdict that would result in the imposition of the death penalty, is not supported by the record and, therefore, M.K.'s dismissal from the panel of venirepersons violated the defendant's rights under the United States constitution. We disagree.[110]

We begin our analysis of the defendant's claim with a brief review of the governing law. "Our constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine the venireperson's fitness to serve on the jury. Conn. Const., art. I, § 19; General Statutes § 54-82f;[111] Practice Book § [42-12].[112] After the comple-

[109] We refer to M.K. by his initials to protect his legitimate privacy interests. See, e.g., *State* v. *Dehaney*, 261 Conn. 336, 346 n.8, 803 A.2d 267 (2002).

[110] The defendant also maintains that the trial court improperly excused a prospective alternate juror, C.D., for cause on the basis that C.D. had indicated during voir dire that she was uncertain about whether she could render a decision that would result in a sentence of death. We do not reach this claim, however, because all twelve regular jurors had been selected prior to the voir dire of C.D., and those twelve jurors, at the conclusion of the evidence, deliberated and reached a verdict in the case. Thus, no alternate jurors were needed to reach a verdict. Consequently, the defendant's claim concerning C.D. is moot because C.D. would not have participated in the jury deliberations even if the trial court had not excused her for cause.

[111] General Statutes § 54-82f provides: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

[112] Practice Book § 42-12 provides: "Each party shall have the right to examine, personally or by counsel, each juror outside the presence of other

tion of the voir dire of a particular venireperson, a party may challenge the venireperson for cause. The court must excuse that juror if the judge . . . is of the opinion from the examination that [the] juror would be unable to render a fair and impartial verdict . . . . General Statutes § 54-82f; Practice Book § [42-12]. . . . The trial court is vested with wide discretion in determining the competency of jurors to serve. . . . [T]he exercise of [the trial court's] discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted." (Citations omitted; internal quotation marks omitted.) *State* v. *Griffin*, 251 Conn. 671, 710–11, 741 A.2d 913 (1999).

"In *Wainwright* v. *Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985) . . . the United States Supreme Court . . . considered the effect [of] a prospective juror's beliefs concerning the death penalty . . . on that individual's eligibility to serve as a juror in a capital case . . . [and] clarified the standard for determining whether a venireperson properly may be challenged for cause on the basis of his beliefs regarding the death penalty. Specifically, the court concluded that the federal constitution permits the excusal for cause of venirepersons whose opposition to capital punishment would prevent or substantially impair the performance of their duties as jurors in accordance with the court's instructions and the juror's oath. Id., 424. . . . [A]s interpreted in . . . *Witt*, the federal constitution permits the excu-

prospective jurors as to qualifications to sit as a juror in the action, or as to interest, if any, in the subject matter of the action, or as to relations with the parties thereto. If the judicial authority before whom such examination is held is of the opinion from such examination that any juror would be unable to render a fair and impartial verdict, such juror shall be excused by the judicial authority from any further service upon the panel, or in such action, as the judicial authority determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of the trial."

sal for cause of venirepersons whose opposition to the death penalty would prevent or substantially impair the performance of their duties as jurors during either: (1) the guilt phase of the trial; *or* (2) the sentencing phase of the trial. For a venireperson's opposition to the death penalty to be considered as preventing or substantially impairing the performance of that individual's duties as a juror during the sentencing phase of the trial, so as to permit excusal for cause, the federal constitution does not require that the venireperson explicitly state that . . . he automatically would vote not to impose a sentence of death. Instead, the federal constitution permits the excusal for cause of venirepersons whose responses during voir dire raise serious doubt as to their ability to follow the law during the sentencing phase."[113] (Citation omitted; emphasis in original.) *State* v. *Griffin*, supra, 251 Conn. 686–87.

Furthermore, "a trial judge's finding that a particular venire[person] was not biased and therefore was properly seated [is] a finding of fact . . . . [T]he question whether a venire[person] is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venire-[person's] state of mind. . . . [S]uch a finding [also] is

[113] As the court stated in *Wainwright*, this standard "does not require that a juror's bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many venire[persons] simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these venire[persons] may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [Consequently] deference must be paid to the trial judge who sees and hears the [prospective] juror." (Internal quotation marks omitted.) *Wainwright* v. *Witt*, supra, 469 U.S. 424–26.

based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference even on direct review . . . . [This] holding applies equally [as] well to a trial court's determination that a prospective capital sentencing juror was properly excluded for cause." (Citation omitted.) *Wainwright* v. *Witt*, supra, 469 U.S. 428–29.

Applying the foregoing principles to the present case, we conclude that the record fully supports the court's decision to strike M.K. for cause. First, M.K. stated on his jury questionnaire that he could not serve as a juror because he did not believe in capital punishment. Thereafter, in response to questions by the state's attorney regarding his views on the subject, M.K. stated that he believed that capital punishment is morally wrong and that he "wouldn't want to be part of" the process of evaluating the alleged aggravating and mitigating factors for the purpose of determining whether the defendant would be sentenced to death. When the trial court sought to clarify M.K.'s views on the death penalty, M.K. indicated that those views probably would affect his ability to be impartial, and that he would "tend more toward the defendant." Although M.K. later stated, in response to questioning from defense counsel, that he would be able to find facts fairly, he also reiterated his desire that he not be required to participate in a fact-finding process that might lead to the imposition of the death penalty in light of his belief that "it's [not] the right thing to do."

We conclude that the trial court properly excused M.K. for cause. M.K. expressed strong moral opposition to capital punishment and repeatedly explained that, in light of his views, it would be very difficult for him to remain impartial. Although M.K. did indicate that he thought that he could listen to and analyze the evidence fairly, he also candidly acknowledged that he was, at

the least, uncertain as to whether he could discharge his responsibility to be objective if, on the basis of the factual findings, the defendant would be subject to the death penalty. Furthermore, at no time during voir dire did M.K. retreat from his views or otherwise indicate that he could find in favor of the state, if the facts so required, notwithstanding his belief in the immorality of capital punishment.[114] In light of M.K.'s strongly held views against the death penalty and his clearly articulated concern about his ability to be impartial when evaluating whether the defendant should live or die, we reject the defendant's claim that the trial court improperly excused M.K. for cause.

## G

### The Role of the Jury as Sentencer

The defendant also contends that the court's jury instructions did not adequately apprise the jury of its responsibility to determine whether the defendant would be sentenced to death or to life in prison without the possibility of release.[115] We disagree.

---

[114] In support of his claim that M.K. should not have been excused for cause, the defendant relies almost entirely on M.K.'s response to questioning during voir dire that he could be a fair fact finder. The defendant, however, ignores the fact that M.K. also expressed strong misgivings about his ability to remain fair and objective to the state owing to his belief that capital punishment is morally wrong.

[115] The trial court instructed the jury in relevant part as follows:

"Now, as you have been told during the course of these proceedings, the court will impose the death penalty only if the state proves at least one aggravating and the defendant fails to prove any mitigating factors. If no aggravating or if any mitigating factor is proven, the court will impose a penalty of life without the possibility of release.

"The evaluation of aggravating and mitigating factors involves two different burdens of proof. The state has the burden of proving an aggravating factor beyond a reasonable doubt while the defendant has the burden of proving a mitigating factor by a preponderance of the evidence. . . .

* * *

"Now, as you are aware, the defendant in this case stands convicted of the charge of capital felony. . . . It's the law of this state that the penalties for an individual found guilty of a capital felony shall be either death or a sentence of life without the possibility of release. These two sentences are

It is a well established principle of death penalty jurisprudence that "the capital sentencer must make a reasoned moral and individualized determination based

the only possible alternatives.

"The first sentence, the sentence of death, means exactly what it says, that the defendant will be put to death by the state of Connecticut.

"The second sentence, life without the possibility of release, means just what it says, that the defendant will spend the rest of his natural life imprisoned by the state of Connecticut. That's the law. You, the jury, will make the determination of facts which will result in the court imposing one or the other of the above-stated sentences. Specifically, you will be asked to determine the existence or nonexistence of aggravating and mitigating factors based upon the evidence adduced at the hearing. The existence or nonexistence of these factors will dictate the ultimate sentence. You must recognize that your decision is not one of simply making objective factual findings. Rather, you are, in fact and in law, actually making the decision whether the defendant should be sentenced to life imprisonment with no possibility of release or to death. Your response, therefore, is truly of immense proportion as you are no doubt aware. Basically, if you find the state has proven the existence of an aggravant beyond a reasonable doubt and are further satisfied that the defense has failed to prove any mitigating factor by a preponderance of the evidence, then the court will impose the death penalty. If the state fails to prove an aggravating [factor] or the defense proves any mitigating factor, the court will then impose a sentence of life without the possibility of release.

"I will now explain to you in detail the process of evaluating the evidence with respect to the above-described factors.

\* \* \*

"Now, if you find the state has failed to prove each one of the three aggrava[ting] factors beyond a reasonable doubt, then this court will impose the penalty of life without the possibility of release. If you find the state has proven one or more of the alleged aggrava[ting] factors beyond a reasonable doubt, then you will go on to consider whether the defendant has proven any mitigating factor by a preponderance of the evidence as I've explained that phrase to you. Mitigating factors are such as do not constitute a defense or excuse for the capital felony committed by the defendant but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of . . . culpability or blame for the crime or to otherwise constitute a basis for a sentence of less than death.

"Mitigating factors basically consist of two types. Number one, factors concerning the defendant's character, background or history, and, number two, factors concerning the facts and circumstances of the crime itself. You must consider the evidence with respect to both types of mitigating factors without prejudice [toward] either. In other words, you should consider the evidence presented with an open mind as to either type of mitigating fact.

"Now, in this case, the defense claims that it has established by a prepon-

on the defendant's background, character and crime that death is the appropriate punishment. *Penry* v. *Lynaugh*, [492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed.

derance of the evidence, firstly, a statutory mitigating factor. Statutory mitigating factors are certain circumstances listed in our General Statutes which, if proven to you by a preponderance of the evidence, are, as a matter of law, mitigating factors. These circumstances are statutory mitigating factors and do not limit the factors you may determine are mitigating in nature. The statutory mitigating factors are intended to insure that the death penalty is not imposed in certain situations.

\* \* \*

"Now, the list I just read to you was a list of nonstatutory mitigating factors alleged by the defendant. With respect to these claimed nonstatutory factors, you must determine, first, whether one or more such factors have been proven by a preponderance of the evidence to exist and, second, whether using your individual judgments any such factor or factors are mitigating in fairness and mercy tend to either extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or otherwise constituted a basis for a sentence of less than death.

"Now, in determining whether the factor is mitigating, you may consider it in the context of all the facts and circumstances of the case including the nature of [the] capital felony itself and all the surrounding circumstances. Mitigation should not be considered in a vacuum. Thus, the process of determining the existence or nonexistence of mitigating factors differs from the process of determining the existence or nonexistence of aggrava[ting] factors. The state has the burden of proving the elements of one or more of the statutory aggrava[ting] factors beyond a reasonable doubt while the defense has the burden of proving the statutory mitigating factors by a preponderance of the evidence. And with respect to nonstatutory mitigating factors alleged, first, the facts constituting the alleged factor by a preponderance of the evidence, and, second, that the fact or facts proven constitute a mitigating factor as that phrase has been defined for you. So, with respect to the statutory mitigating factor, the defendant's burden is to prove it by a preponderance of the evidence. . . . With respect to the list of factors I read to you thereafter, those are nonstatutory factors which, first, the defense has to prove they exist and, second, has to—and, second, you decide whether or not in your judgment they constitute mitigating factors once you are satisfied as to their existence.

"Furthermore, in addition to any of the statutory and nonstatutory mitigating factors claimed by the defendant, you may give mitigating force to any fact taken alone or in conjunction with any—or facts presented providing, of course, you are satisfied [as] to the existence of the fact or facts by a preponderance of the evidence and that the facts are mitigating in nature as that term has been defined for you. Furthermore, you may consider the cumulative impact of some or all of the evidence offered in mitigation as constituting the equivalent of a mitigating factor. You are bound by our law

2d 256 (1989)]; *Caldwell* v. *Mississippi*, [472 U.S. 320, 330–32, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985)]; see also *Saffle* v. *Parks*, [494 U.S. 484, 492–93, 110 S. Ct. 1257, 108 L. Ed. 2d 415 (1990)]; *California* v. *Brown*, [479 U.S. 538, 541, 543, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987)]." (Internal quotation marks omitted.) *Cobb II*, supra, 251 Conn. 454. Under our capital sentencing scheme, "[t]he sentencer determines whether the defendant, who has been convicted of a capital felony, should receive the punishment of death by making findings regarding the existence of any aggravating or mitigating factors. . . . The requirement that the sentencer's determination be made by setting forth its findings regarding aggravating and mitigating factors merely guides the sentencer's discretion to achieve a more focused and rational response. . . .

"The sentencer makes the required moral and individualized determination, under our statute, because it must consider a nonexclusive list of mitigating factors and by your oath as jurors to consider any mitigating factor, whether statutory or nonstatutory, as well as any other mitigating evidence presented concerning the defendant's character, background and history, or the nature and circumstances of the offense.

"If you find any mitigating factor to exist, then this court will impose the penalty of life without the possibility of release. If you find any aggravant to exist and no mitigating factor to exist, the court will impose the penalty of death. If you find that no mitigation exists, you must each individually agree that no mitigating circumstance exists in the case.

\* \* \*

"Now, in a few minutes, the decision in this case will be in your hands. If I made any reference in my charge to the position of the state or the defendant, I assure you it's not my intention to convey to you directly or indirectly how the court feels as to what should be the outcome of the case. The decision rests in your hands. You will apply the law as I explained it to you to the facts found by you and render your verdict. It's not within your province to be affected by the consequences your verdict may have upon the participants in this trial or anyone else. The defendant relies on you to consider his claims, to evaluate carefully all the evidence and to render a verdict in his favor if the facts and the law require such a verdict. The state, likewise, looks to you to deal with this case fairly, firmly and honestly, and to render a verdict in its favor if the facts and the law require."

as well as a catchall category consisting of any other mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime. . . . The catchall category of mitigating factors includes those factors which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death. . . . The ability to consider an unrestricted set of mitigating factors satisfies the federal constitutional requirements for a moral and individualized decision. . . .

"Furthermore, it is evident that the capital sentencer, either a jury or the court, in making its determination regarding the existence of aggravating and mitigating factors during the separate sentencing hearing is aware that its task [is] the serious one of determining whether a specific human being should die at the hands of the [s]tate. . . . Finally, the death sentence is mandatorily imposed only after the capital sentencer has determined unanimously that at least one aggravating factor exists and no mitigating factors exist, and has come to this unanimous determination by engaging in a full, individualized consideration as to whether death is the appropriate penalty for each defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn. 240–41.

Thus, "great care must be taken by the trial court to ensure that a capital sentencing jury fully appreciates the momentous nature of its duty and, in particular, that the jury not be led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. *Caldwell* v. *Mississippi*, supra, [472 U.S.] 329." (Internal quotation marks omitted.) *State* v. *Breton*, 235 Conn. 206, 245–46, 663 A.2d 1026 (1995) (*Breton II*). To ensure that the jury is "fully aware of its determinative role in our capital sentencing

process"; id., 246; "[i]t is imperative . . . that the jury instructions in a capital case clearly and unequivocally explain to the jury that it is solely responsible for determining whether the defendant will receive the death penalty or, instead, a sentence of life imprisonment without the possibility of release." Id., 249.

The defendant claims that the trial court's instructions regarding the jury's ultimate role in determining the appropriate sentence were inadequate because "[t]he overall effect of [those] . . . instructions . . . was an impermissible lessening or lowering of the jurors' sense of responsibility" in regard to that role. The defendant further contends that the trial court improperly declined to give the charge that he had requested regarding the jury's responsibility in deciding the appropriate sentence.[116]

---

[116] The defendant's request to charge provides in relevant part: "[A]lthough you will be presented with certain factual questions for your resolution, the central task you are about to undertake is not exclusively one of fact-finding. Instead, what our law now asks you to undertake is nothing less than exercising your own individual judgment as to what the appropriate sentence is in this case. . . .

"[T]he determination of sentence is not my job; it is your job. The legislature and the court do not and cannot control the sentencing decision you make. It is in your power to make the sentencing decision in this case according to the law I give you and it is your responsibility to do so. . . .

"While our statute guides your decision by using the concepts of aggravating and mitigating factors, you must recognize that your decision is not one of simply making objective factual findings; rather, you are, in fact and in law, actually making the awesome decision of whether the defendant should be sentenced to life imprisonment with no possibility of release or to death . . . . That is your function in this case and it is your responsibility. Neither I as the judge . . . nor the legislature decide the appropriate sentence for [the defendant]; you do. Your task is the serious one of determining whether the defendant should die at the hands of the state. . . .

"[T]he law does not require any juror to vote for the death penalty unless, upon your personal evaluation of the evidence, you decide that death is the appropriate penalty under all the facts and circumstances of the case. You, the jurors, ultimately must determine the punishment that is appropriate in this particular case.

\* \* \*

"[I]t is crucial that you understand that even in this situation the legislature

The defendant's claim fails because the trial court's instructions adequately apprised the jury of its responsibility for determining whether the defendant would be sentenced to death or to life imprisonment without the possibility of release. After explaining that only two sentences were possible, namely, death or life imprisonment without the possibility of release, the court apprised the jury that it would "make the determination of facts which will result in the court imposing one or the other" of those two sentences. The court then explained: "Specifically, you will be asked to determine the existence or nonexistence of aggravating and mitigating factors based upon the evidence adduced at the hearing. *The existence or nonexistence of these factors will dictate the ultimate sentence. You must recognize that your decision is not one of simply making objective factual findings. Rather, you are, in fact and in law, actually making the decision whether the defendant should be sentenced to life imprisonment with*

cannot make the decision about whether the defendant should die or not. You cannot rely on your findings to avoid having to make the hard decision about whether death is really appropriate. Our law will not tolerate someone being put to death while there is some doubt by any of the jurors that death is the appropriate sentence for that individual in light of all the circumstances. If you are not convinced that death is the appropriate sentence, you can find a non-statutory mitigating factor on that basis alone. You should only return a verdict resulting in the death sentence if you are convinced that death is the appropriate sentence under all of the circumstances of this case."

The defendant also requested the court to instruct the jury as follows: "In conclusion, it is my duty once more to remind you of the gravity of your task in this case. . . .

"The responsibility for determining the existence of the factors upon which the defendant's liability for the imposition of the death penalty depends is exclusively yours, not mine, and indeed the responsibility for deciding whether death or life imprisonment without possibility of release should be imposed is yours, within the confines of the law I have described for you.

"Remember that in capital cases the jury is to serve as the link between contemporary community values and standards of decency and the penal system, and that no man is to be condemned to death unless his fairly selected jury unanimously agrees that he should be."

*no possibility of release or to death. Your response, therefore, is truly of immense proportion as you are no doubt aware."* (Emphasis added.) The court then reiterated that the defendant would receive a sentence of death if the jury found the existence of an aggravating factor but did not find the existence of a mitigating factor, and a sentence of life imprisonment without the possibility of release if the jury did not find the existence of an aggravating factor or if it did find the existence of a mitigating factor. The court also instructed the jury properly regarding statutory and nonstatutory mitigating factors. With respect to the latter, the court made it clear that, in determining whether such a mitigating factor existed, the jury was required to determine whether the alleged mitigating factor exists as a matter of fact and, if so, whether those facts were sufficiently mitigating such that they tended to *"extenuate or reduce the degree of [the defendant's] culpability or blame for the [capital] crime or to otherwise constitute a basis for a sentence of less than death."* (Emphasis added.)

The trial court's instructions were sufficient to inform the jurors that they were ultimately responsible, by virtue of their statutory duty to determine the existence or nonexistence of the alleged aggravating and mitigating factors, for deciding whether the defendant would be sentenced to death or to life imprisonment without the possibility of release. Furthermore, inasmuch as the court properly had explained the jury's role in evaluating the defendant's claimed mitigating factors, the jury necessarily was aware of the "moral and individualized"; *State* v. *Ross*, supra, 230 Conn. 240; nature of its determination.

The defendant also contends that the trial court should have instructed the jury, as he had requested, that it "ultimately must determine the punishment in this particular case." Contrary to the defendant's contention, the trial court was not obligated to instruct the

jury in the precise language requested as long as the court's instructions were legally correct and adapted to the issues, thereby providing the jury with a clear understanding of its determinative role in the sentencing process. E.g., *State* v. *Pinnock*, 220 Conn. 765, 789–90, 601 A.2d 521 (1992). We are satisfied that the court's instructions met that standard.

In addition to his general challenge to the effect of the jury charge as a whole, the defendant specifically challenges the following language contained in the court's charge: "It's not within your province to be affected by the consequences your verdict may have upon the participants in this trial or anyone else." The defendant contends that this portion of the court's instructions, which was given toward the conclusion thereof, conveyed the false impression that the jury's function merely was to find facts without regard to whether death was the appropriate sentence.

"The standard of review for constitutional claims of improper jury instructions is well settled. In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 182, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

It is clear that the challenged language, when considered in the broader context of the charge as a whole,

simply was intended to remind the jury that its verdict was to be predicated upon the facts and the law, and not on any undue concern, borne of passion, sympathy or other emotion, as to how that verdict might affect the defendant, the state or anyone else. Inasmuch as the court's instructions informed the jury of its function and responsibility, we are satisfied that there is no reasonable possibility that the jury was misled by the challenged portion of the charge.

## H

### The Right to a Bifurcated Penalty Phase Hearing

The defendant next asserts that the panel improperly denied his motion for a bifurcated penalty phase hearing. Specifically, the defendant contends that he was entitled to separate hearings to determine the existence of the aggravating factors that the state alleged, on the one hand, and to determine the existence of the mitigating factors that he alleged, on the other hand, the necessity of the latter hearing being dependent on whether the jury found the existence of one or more aggravating factors during the first hearing. According to the defendant, the panel's failure to bifurcate the penalty phase hearing gave rise to an undue risk that the jury, in deliberating on the alleged aggravating and mitigating factors, weighed those factors in contravention of the statutory sentencing scheme.[117] We are not persuaded by the defendant's claim.

[117] In 1992, when the defendant committed the capital felony that is the subject of this appeal, our death penalty scheme did not permit the weighing of aggravating and mitigating factors. As we have explained previously, under the statutory scheme applicable to the present case, a capital defendant cannot be sentenced to death if the capital sentencer: (1) does not find the existence of an aggravating factor; or (2) finds the existence of a mitigating factor. Only if the jury finds one or more aggravating factors and no mitigating factors will the defendant be sentenced to death. *State* v. *Ross*, supra, 230 Conn. 237–38. In 1995, the legislature amended our death penalty statutory scheme to permit the sentencer to weigh the aggravating factors against the mitigating factors. Public Acts 1995, No. 95-19, § 1; see General Statutes (Rev. to 2003) § 53a-46a (f) ("[i]f the jury or, if there is no jury, the

First, there is nothing in the relevant statutory provisions to support the defendant's contention that he was entitled to a bifurcated penalty phase hearing.[118] On the contrary, § 53a-46a makes repeated reference to the "hearing" that is to be conducted in the event that the defendant is found guilty of having committed a capital felony. Section 53a-46a contains no language to suggest that the hearing is to be bifurcated.[119] The pertinent legislative history similarly contains no indication that the legislature contemplated a bifurcated penalty phase hearing. See, e.g., 16 S. Proc., supra, p. 1863, remarks of Senator Guidera ("[The statute] essentially sets up a two-step procedure. Step [one] would be the finding of guilt in the Commission of Selected Crimes which have been labeled capital felonies. Even if a defendant were found guilty of one of the crimes specified, there would be a second step which is a special *hearing* to determine whether the sentence shall be life imprisonment or in fact the death penalty." [Emphasis added.]).

Furthermore, we see no reason why a bifurcated penalty phase hearing was necessary under the circumstances of the present case. Pursuant to the court's instructions, the jury was required to determine, first,

court finds that (1) none of the factors set forth in subsection (h) exist[s], (2) one or more of the aggravating factors set forth in subsection (i) exist and (3) (A) no mitigating factor exists or (B) one or more mitigating factors exist but are outweighed by one or more aggravating factors set forth in subsection (i), the court shall sentence the defendant to death"); General Statutes (Rev. to 2003) § 53a-46a (g) ("[i]f the jury or, if there is no jury, the court finds that (1) any of the factors set forth in subsection (h) exist, or (2) none of the aggravating factors set forth in subsection (i) exists, or (3) one or more of the aggravating factors set forth in subsection (i) exist and one or more mitigating factors exist, but the one or more aggravating factors set forth in subsection (i) do not outweigh the one or more mitigating factors, the court shall impose a sentence of life imprisonment without the possibility of release").

[118] Indeed, the defendant does not cite to any such statutory provision.

[119] We note, however, that the relevant statutory provisions do not expressly prohibit a bifurcated penalty phase hearing.

whether one or more aggravating factors existed. The court further instructed the jury that if it failed to find an aggravating factor, its task was complete: in such circumstances, the jury was not to consider whether the defendant had established the existence of one or more mitigating factors because, in the absence of the existence of a single aggravating factor, the defendant necessarily would receive a sentence of life without the possibility of release. Only if the jury had disregarded these instructions could it possibly have engaged in an improper weighing of the aggravating and mitigating factors. In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them. E.g., *State* v. *Ancona*, 256 Conn. 214, 219, 772 A.2d 571 (2001) ("[u]nless there is evidence to the contrary, the jury is presumed to follow the court's instructions" [internal quotation marks omitted]). Because there is nothing to suggest that the jury failed to follow the court's instructions regarding the manner in which it was to consider the aggravating and mitigating factors, the defendant cannot prevail on his claim that the panel's decision not to bifurcate the penalty phase hearing resulted in the jury's improper weighing of aggravating and mitigating factors.

I

Issues Regarding the Mitigating Factors and Evidence

1

Evidence Establishing the Existence of
One or More Mitigating Factors

The defendant contends that the jury "erroneously and arbitrarily" failed to find that the evidence adduced at the penalty phase hearing established the existence

of one or more mitigating factors.[120] In support of his

[120] The defendant submitted the following list of alleged mitigating factors:

"1. At the time of the offense, [the defendant's] ability to conform his conduct to the requirements of law was significantly impaired, as the result of his diagnosis of Antisocial Personality Disorder, and that such impairment constitutes a statutory mitigating factor pursuant to Connecticut law.

"2. At the time of the offense, [the defendant's] ability to conform his conduct to the requirements of law was impaired, so as to constitute a [nonstatutory] mitigating factor.

"3. [The defendant] was taken from New York to Jamaica to live with his 'grandparents' when he was six weeks old and, as a result, neither he nor his parents were able to participate in the 'bonding' that is essential during the early phases of healthy child development.

"4. [The defendant] was a quiet and well-behaved child while being raised in a healthy and nurturing environment by his 'grandparents' in Jamaica.

"5. As the 'baby' of the family in Jamaica, [the defendant] was the favored child of his 'grandmother' and received the kind of parental attention necessary to a child's healthy development.

"6. [The defendant's] 'grandfather' was loving and kind to [the defendant] . . . and contributed to [the defendant's] healthy development in Jamaica.

"7. [The defendant's] 'grandfather' was killed in a car accident when [the defendant] was approximately six years old, an event which was akin to losing one's own father at that age since his 'grandfather' was the primary male figure in [the defendant's] life at the time.

"8. [The defendant's] only contact with his parents prior to coming to New York was during visits which included intimidation and humiliation by his father.

"9. [The defendant's] misbehavior and legal problems only began after he left Jamaica and his 'grandmother,' who had served as his mother in Jamaica, and was sent to live with his parents in New York when he was approximately eight years old.

"10. [The defendant] became the middle [child] of five children when he was brought to New York.

"11. [The defendant's] parents worked the 4 p.m. to 11 p.m. shift plus second jobs and overtime throughout [the defendant's] childhood.

"12. [The defendant's] thirteen year old sister was responsible for all the children when their parents were at work during the afternoon and evening hours.

"13. [The defendant's] family was the first black family in their neighborhood in New York.

"14. [The defendant] and his brothers and sisters were home alone when racially motivated attacks were directed at them.

"15. [The defendant's] Jamaican dialect caused him language problems when he entered public school in New York City.

"16. [The defendant's] father beat him severely and frequently.

"17. [The defendant's] father fashioned rubber objects at work to beat

claim, the defendant argues that, under § 53a-46a

[the defendant] with.

"18. [The defendant's] father used household objects such as a plastic baseball bat, a hammer and a [two by four] during beatings.

"19. [The defendant's] father would lock [the defendant] in the basement and beat him until he was too tired to beat [the defendant] anymore.

"20. [The defendant's] efforts to do better in school such as his graduation from elementary school were ignored.

"21. [The defendant's] parents offered no praise or reward for positive behavior.

"22. [The defendant's] father began throwing [the defendant] out of the house when [the defendant] was twelve years old.

"23. [The defendant] would live with friends or sleep in the park when his father threw him out.

"24. [The defendant's] father threw his mattress out the front door into the rain.

"25. When evicted by his father, [the defendant] could only return home to shower or eat when his father was not home.

"26. [The defendant's] 'grandmother,' mother, [sister] Jackie, and other siblings disagreed with his father's treatment of [the defendant] but were unable to stop the father's mistreatment, beatings and evictions.

"27. The discovery that [the defendant's] 'grandmother' was not his mother's biological mother caused [the defendant] great confusion at a time when he was already experiencing profound problems at home.

"28. [The defendant's] 'grandmother' left the family home after this 'discovery' because of health problems, the pregnancy [of] [the defendant's] aunt and disagreements with [the defendant's] father on how to raise the boys.

"29. [The defendant] was not allowed to live regularly at his [parents'] home after the age of [fourteen].

"30. [The defendant's] 'grandmother' died when [the defendant] was [fifteen] years old.

"31. [The defendant] was first arrested on January 4, 1984.

"32. [The defendant's] behavior improved greatly when he was removed from his [parents'] custody and placed in a structured environment at [a] Youth Center.

"33. [The defendant] won a Black History Essay Contest and school awards while at [the] Youth Center.

"34. [The defendant's] misbehavior and legal problems resumed when he returned home after being at [the] Youth Center.

"35. [The defendant] agreed to enter [a] religious school and his academic performance again improved greatly, although there were also reports of various behavioral problems.

"36. [The defendant's] parents refused to allow him to live at home when he left [the religious school].

"37. [The defendant's] father did not answer . . . letters [that the defendant had sent to him while the defendant was attending religious school]

(d),[121] the jury was required to find the existence of an alleged mitigating factor if: (1) the evidence established the existence of the mitigating factor as a matter of fact; and (2) the mitigating factor was "mitigating . . . even to the slightest degree." The defendant claims that this test is required because to permit the capital sentencer to determine whether the mitigating factor is *sufficiently* mitigating to warrant a sentence of life imprisonment without the possibility of release instead of death would be tantamount to requiring the sentencing authority to weigh aggravating and mitigating factors, a process that is not permitted under the statutory scheme in effect when the defendant murdered Officer Williams. The defendant further asserts that many of his alleged mitigating factors satisfied the test he advances because the evidence establishing the existence of those mitigating factors was undisputed and, in addition, each of those mitigating factors was mitigating, at least to some extent.

in which [the defendant] apologized for his misbehavior and sought reconciliation.

"38. [The defendant] repeatedly told Karen Smith 'I'm sorry, I'm sorry, I'm sorry . . . ' immediately after shooting Officer Williams.

"39. [The defendant] admitted shooting . . . Williams immediately after Inspector Maia and Detective Keegan appealed to his conscience and told him to . . . [get it off his chest].

"40. That, because of considerations of fairness, the existence of the alleged aggravating factor involving the attempted sale of cocaine on December 18, 1992, if proven beyond a reasonable doubt, does not constitute a sufficient basis for [the defendant's] execution in light of the fact that neither Anthony Crawford, Robert 'Po' Bryant, nor . . . Smith were ever prosecuted for attempting to sell, possess, or hide the same drugs from the police."

The defendant also alleged the following mitigating factor: "41. That, because of considerations of fairness, the existence of the alleged aggravating factor of creating a grave risk of death, if proven beyond a reasonable doubt, does not constitute a sufficient basis for [the defendant's] execution in light of the fact that the person said to be at risk . . . Crawford, has stated that he was himself an accomplice to the alleged attempted sale of drugs which preceded the shooting." Because the jury rejected the state's claim regarding the existence of the aggravating factor to which this mitigating factor relates, this particular mitigating factor is not at issue in this appeal.

[121] See footnote 4 of this opinion for the text of § 53a-46a (d).

In *Cobb II*, supra, 251 Conn. 285, we recently
addressed and rejected a claim identical to the claim
that the defendant raises in the present case. We stated
in *Cobb II*: "The defendant [Sedrick Cobb] contends
. . . that if anything positive—no matter how slight—
was established about him, § 53a-46a required the panel
to find the existence of mitigation. In [Cobb's] view,
permitting a capital sentencer to determine whether
proof of something positive about a defendant consti-
tutes mitigation under all the facts and circumstances
of the case improperly allows the sentencer to balance
aggravation against mitigation. . . . Thus, [Cobb]
argues that, unless his interpretation of the statutory
scheme is adopted—namely, that proof of the underly-
ing factual basis of any claimed nonstatutory factor
requires a concomitant finding of proof of a mitigating
factor—the statute becomes in effect a weighing or
balancing statute, [even though *State* v. *Ross*, supra,
230 Conn. 239] plainly holds it is not. We disagree.

"First, [Cobb's] argument would effectively read out
of § 53a-46a (d) the requirement that the sentencer
determine whether that factor is mitigating in nature
. . . . We ordinarily do not read statutes so as to render
parts of them superfluous or meaningless. *United Illu-
minating Co.* v. *New Haven,* [240 Conn. 422, 439, 692
A.2d 742 (1997)]. Thus, § 53a-46a (d) contemplates that
a capital sentencer may reject a proven proposed miti-
gant on the ground that, under all of the facts and
circumstances of the case, the factor does not extenuate
or reduce the degree of [the defendant's] culpability or
blame for the offense or to otherwise constitute a basis
for a sentence of less than death.

"Second, we can discern nothing inconsistent
between the statutory provision, on the one hand, that
directs a capital sentencer to consider the facts and
circumstances of the case in determining whether a
particular factor is in fact mitigating in nature; see Gen-

eral Statutes (Rev. to 1989) § 53a-46a (d); and the statutory requirement, on the other hand, that, once a particular factor has been found to be mitigating in nature, the capital sentencer may not balance that mitigating factor against the proven aggravants, but instead must impose a sentence of life without possibility of release. See General Statutes (Rev. to 1989) § 53a-46a (f) and (g). A [sentencer] that is entrusted with the awesome responsibility for deciding whether the death penalty should be imposed cannot be asked to find facts in a vacuum. *State* v. *Ross*, supra, 230 Conn. 284. Thus, the sentencer, in determining whether a proposed, factually proven mitigating factor is actually mitigating in nature, in light of all the facts and circumstances of the case, must make a value judgment about that factor in light of those facts and circumstances. That is not the same, however, as *balancing* a factor proven to be mitigating against the aggravating factor or factors that have been proven.

"In sum, § 53a-46a does not require a capital sentencer to give mitigating force to any particular proven factor solely because that factor establishes something good about the defendant. Instead, the statute leaves the decision as to whether a proven factor is mitigating in nature to the sentencer's reasoned moral judgment." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Cobb II*, supra, 251 Conn. 494–96. The defendant has failed to articulate any reason why we should reconsider our conclusion in *Cobb II*, and we know of none. Consequently, the defendant's claim fails.

2

Proof of Mitigating Value

The defendant also asserts that the trial court improperly instructed the jury that the defendant had the burden of proving, not only the existence of an alleged

mitigating factor as a matter of fact, but, in addition, that the mitigating factor was sufficiently mitigating to warrant a sentence of life imprisonment without the possibility of release rather than a sentence of death. As we have explained, however; see part III I 1 of this opinion; that is precisely what the defendant was required to do. See *Cobb II*, supra, 251 Conn. 458 (defendant shoulders burden of establishing mitigating nature of facts proven in furtherance of establishing existence of mitigating factor). We therefore reject the defendant's claim.

### 3

### Special Verdict Form—Mitigation

At the conclusion of the penalty phase hearing, the defendant requested that the court give the jurors a special verdict form requiring them to indicate, for each of the forty-one mitigating factors alleged by the defendant, whether they had found a factual basis for each of the alleged mitigating factors and, if so, whether one or more jurors had found that factor to be mitigating. The defendant claimed that this customized special verdict form was necessary for adequate appellate review of the jury's findings concerning the mitigating factors. The trial court rejected the defendant's request and, instead, provided the jury with a special verdict form that required the jury to indicate only whether it unanimously had found the existence of any mitigating factor.[122] On appeal, the defendant renews his claim that

---

[122] The special verdict form provides in relevant part:
"SPECIAL VERDICT FORM
* * *

"MITIGATING FACTORS (Only to be considered if one or more aggravating factors have been proven beyond a reasonable doubt)

"Do you unanimously agree that there exists any mitigating factor concerning the character, background, or history of the defendant . . . or the nature and circumstances of the offense?

"___ Yes, we the jury unanimously agree that there does exist a mitigating factor concerning the character, background, or history of the defendant . . . or the nature and circumstances of the offense.

the special verdict form submitted to the jury did not provide sufficient information for meaningful review of the jury's verdict with respect to the mitigating factors. We reject the defendant's claim.

As the defendant notes, "it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." *Gardner* v. *Florida*, 430 U.S. 349, 361, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977). Consistent with this requirement, General Statutes (Rev. to 1991) § 53a-46a (e) provides that "[t]he jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to *the existence* of any aggravating or mitigating factor." (Emphasis added.) The special verdict form that the trial court submitted to the jury satisfies that statutory mandate, and the defendant has failed to articulate any reason why a form that complies with § 53a-46a (e) is inadequate for appellate review of the jury's findings with respect to the mitigating factors. We, like the United States Supreme Court, "are not impressed with the claim that without written jury findings concerning mitigating circumstances, appellate courts cannot perform their proper role." *Clemons* v. *Mississippi*, 494 U.S. 738, 750, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990). Accordingly, we reject the defendant's claim.

4

### The Cumulative Effect of the Mitigating Evidence as an Independent Mitigating Factor

The defendant next contends that the trial court improperly rejected his request to include, in his written

---

\* \* \*

"___ No___, we the jury unanimously agree that no mitigating factor exists concerning the character, background, or history of the defendant . . . or the nature and circumstances of the offense."

The jurors were instructed to render a verdict by placing a checkmark on the appropriate line and to sign their names under the answer in the space provided.

list of proposed mitigating factors submitted to the jury, a mitigating factor predicated upon the cumulative effect of all of the evidence adduced by the defendant in support of his claim of mitigation. Although we agree with the defendant that he was entitled to have the cumulative effect of the mitigating evidence as an independent factor included in his list of mitigating factors, we nevertheless conclude, under the circumstances, that the court's refusal to do so does not warrant a new penalty phase hearing.

The following facts are necessary to our determination of this issue. The defendant requested that the following mitigating factor be submitted to the jury along with his other proposed mitigating factors: "That any of the [mitigating] factors, either taken individually or in combination with any other factor, constitutes not an excuse for the murder of [Williams], but in fairness or mercy provides a reason for sentencing [the defendant] to life in prison with no possibility of release rather than sentencing him to death . . . ." The defendant also requested that the trial court instruct the jury that it "must . . . consider the cumulative or combined effect of all of the mitigating evidence and information which [it had] heard. If the cumulative or combined effect of that evidence satisfies the preponderance of the evidence standard, and is in your judgment mitigating, then you will have found a mitigating factor . . . ."

The trial court rejected the defendant's request, essentially concluding that the proposed mitigating factor regarding the cumulative effect of the mitigating evidence was not factually separate and distinct from the other proposed mitigating factors, and, therefore, there was no reason to include that factor in the list of mitigating factors to be submitted to the jury. The court, however, instructed the jury that it "may consider the cumulative impact of some or all of the evidence offered

in mitigation as constituting the equivalent of a mitigating factor."

A defendant is entitled to have the capital sentencer consider individual mitigating factors as well as their combined effect. "[E]ven if [specific mitigating facts] are not in themselves cause for a sentence less than death, they are still relevant to mitigation and must be weighed in conjunction with other factors to determine if all of the circumstances together warrant a lesser sentence." *Smith* v. *McCormick*, 914 F.2d 1153, 1168 (9th Cir. 1990); see also *Boyde* v. *California*, 494 U.S. 370, 377–78, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990) (eighth amendment requires capital sentencers to consider "all relevant mitigating evidence" offered by defendant). Moreover, we have stated that, as a matter of sound judicial policy, the trial court should submit an accurate written list of each of the claimed statutory and nonstatutory mitigating factors if the defendant so requests. *Breton II*, supra, 235 Conn. 254–55.[123] Although a claimed mitigating factor that is based upon the cumulative effect of the evidence already adduced in support of the other mitigating factors does not require the jury to consider any new or additional evidence, it nevertheless provides an independent basis upon which the jury may conclude that a sentence of death is not warranted. Consequently, a mitigating factor founded on the cumulative weight of the evidence adduced in support of a defendant's claim of mitigation is sufficiently distinct from any other mitigating factor to warrant its inclusion as a separate factor in a written list of mitigating factors submitted to the jury.

---

[123] It is important to note, however, that our statement in *Breton II*, supra, 235 Conn. 254–55, was not founded on constitutional principles but, rather, on sound policy considerations. Moreover, we did not release our decision in *Breton II* until after the trial in the present case had been concluded. Accordingly, the principle that we announced in *Breton II* regarding the necessity of giving a jury a written list of mitigating factors is not applicable to the present case.

Although the trial court failed to include the cumulative effect of the mitigating evidence as a separate mitigating factor in the defendant's list of proposed mitigating factors, the court did instruct the jurors that "[it] may consider the cumulative impact of some or all of the evidence offered in mitigation as constituting the equivalent of a mitigating factor." This instruction properly apprised the jury that it was to consider the cumulative effect of the mitigating evidence as it would any other mitigating factor. In the absence of any indication to the contrary, we presume that the jury followed the court's instruction. E.g., *State* v. *Ancona,* supra, 256 Conn. 219. In light of the court's instruction, there is no reasonable possibility that the defendant was prejudiced by the court's failure to include the cumulative effect of the mitigating evidence as an independent mitigating factor in the defendant's written list of mitigating factors.[124] Accordingly, we reject the defendant's claim.

5

Catchall Mitigating Factors

The defendant asserts that the trial court improperly determined that he was not entitled to include, in his written list of mitigating factors, two claimed mitigating

[124] The defendant claims that the court's instruction was inadequate because its language was permissive rather than mandatory. Specifically, the defendant contends that the instruction *allowed* the jury to consider the cumulative effect of the mitigating evidence, whereas he was entitled to an instruction *requiring* the jury to do so. We disagree with the defendant's interpretation of the court's instruction. The instruction did not give the jury the option to consider the cumulative weight of the mitigating evidence, as the defendant contends. Rather, the court informed the jury that it was to treat the "cumulative impact" of the mitigating evidence as it would have treated any other claimed mitigating factor. In other words, the instruction did not advise the jury to decide whether to consider the cumulative effect of the mitigating evidence but, rather, directed the jury to determine whether it considered the cumulative effect of the evidence to be sufficiently mitigating so as to constitute a mitigating factor.

factors concerning any facts or circumstances of a miti- gating nature that otherwise were not identified in the defendant's list. We reject the defendant's claim that the court's refusal to allow the defendant to include those mitigating factors in his list of mitigating factors warrants a new penalty phase hearing.

The defendant sought to include in his written list of mitigating factors the following two factors: (1) "That there exists a factor concerning the facts or circum- stances of the case that has not been specifically men- tioned in this list that a juror or jurors consider in fairness or mercy to constitute a basis for imposing . . . a sentence of life in prison with no possibility of release rather than [a sentence of death]"; and (2) "[t]hat there exists a factor concerning [the defendant's] char- acter, history or background that has not been specifi- cally mentioned in this list that a juror or jurors consider in fairness or mercy as [a] basis for sentencing [the defendant] to life in prison with no possibility of release rather than sentencing him to death . . . ." In addition, the defendant sought an instruction explaining these two proposed mitigating factors.[125]

The trial court declined to allow the defendant to include the two mitigating factors in his list, concluding that it was not appropriate to do so because those

---

[125] The defendant requested the court to instruct the jury in relevant part: "[These] mitigating factors refer to any other factor in the circumstances of the case or in the defendant's character, history or background that a juror or jurors considers [sic] mitigating but which has not specifically [been] included on the written list prepared by the defense.

"Although you might be tempted to overlook these factors, you are instructed that you should not do so. These are very important factors. . . . In [your] position as the judges of the appropriate sentence, you must look at everything and consider everything. . . . [Y]ou as individuals or as a group, may perceive other factors of a mitigating nature that have not been expressly listed by the defendant's counsel. You are obligated by our law to consider those factors and any other factors that occur to you even if they are not on this list."

factors were not based on any specific evidence adduced during the penalty phase hearing. The court, however, instructed the jury as follows: "[I]n addition to any of the statutory and nonstatutory mitigating factors claimed by the defendant, you may give mitigating force to any fact taken alone or in conjunction with any—or facts presented providing, of course, you are satisfied [as] to the existence of the fact or facts by a preponderance of the evidence and that the facts are mitigating in nature . . . . You are bound by our law and by your oath as jurors to consider any mitigating factor whether statutory or nonstatutory *as well as any other mitigating evidence presented* concerning the defendant's character, background and history, or the nature and circumstances of the offense." (Emphasis added.)

As we have explained previously in this opinion; see part III I 4 of this opinion; a trial court, if so requested, should include all proposed mitigating factors in the list of mitigating factors submitted to the jury. *Breton II*, supra, 235 Conn. 254–55. The defendant should have been permitted to include these so-called "catchall" mitigating factors in the list along with his other proposed mitigating factors. The court's failure to do so, however, does not constitute reversible error because the court, in its instructions to the jury, adequately apprised the jury of its responsibility to consider those proposed mitigating factors. In view of the court's instructions, it is not reasonably possible that the jury failed to consider the defendant's proposed catchall mitigating factors.

6

The Defendant's Request to Present as an Independent Mitigating Factor the Inappropriateness of the Death Penalty Under the Circumstances of the Case

The defendant maintains that the trial court improperly declined to allow the jury to consider, as an inde-

pendent mitigating factor, the defendant's claim that the jury's finding of the existence of one or more aggravating factors nevertheless did not warrant the imposition of the death penalty under the circumstances of the present case. In other words, the defendant contends that, even if the jury was to find that the state had established the existence of one or more aggravating factors and that the defendant had failed to establish the existence of a mitigating factor, the jury nevertheless should have been required to make the additional finding that, notwithstanding the existence of one or more aggravating factors and the nonexistence of a mitigating factor, the circumstances of the case still warranted the imposition of the death penalty. We are not persuaded by the defendant's claim.

The defendant sought to include the following mitigating factor on his list of mitigating factors: "That, because of considerations of fairness or mercy, a juror or jurors do not consider the existence of any aggravating factor which [they] may have found proven beyond a reasonable doubt to be a sufficient basis for [the defendant's] execution under the facts and circumstances of the case."[126] The court denied the defendant's

---

[126] The defendant also requested the following jury instruction: "[A]lthough you will be presented with certain factual questions for your resolution, the central task you are about to undertake is not exclusively one of fact-finding. Instead, what our law now asks you to undertake is nothing less than exercising your own individual judgment as to what the appropriate sentence is in this case. . . .

\* \* \*

"It is your responsibility to return special verdicts with regard to aggravating factors and mitigating factors. While our statute guides your decision by using the concepts of aggravating and mitigating factors, you must recognize that your decision is not one of simply making objective factual findings; rather, you are, in fact and in law, actually making the awesome decision of whether the defendant should be sentenced to life imprisonment with no possibility of release or to death . . . . Neither I as the judge, nor the legislature decide[s] the appropriate sentence for [the defendant]; you do. . . .

"You, the jurors, ultimately must determine the punishment that is appropriate in this particular case. . . .

request, concluding that the requested instruction was "inaccurate as a matter of law in that [it] suggests that the jury [should] ignore proof of one of the aggravating factors." On appeal, the defendant renews his claim that he is constitutionally entitled to have the jury determine whether a sentence of death is unwarranted notwithstanding the existence of one or more aggravating factors and the absence of a mitigating factor.

The trial court properly declined the defendant's request to permit the jury to consider the proposed mitigating factor. See *Cobb II*, supra, 251 Conn. 475–76, 478 (rejecting substantially similar claim). First, the defendant's contention is incorrect "[a]s a matter of the meaning of our statutory capital sentencing scheme"; id., 476; which requires the imposition of the death penalty if the sentencer finds the existence of one or more aggravating factors and no mitigating factor. See General Statutes (Rev. to 1991) § 53a-46a (f) ("[i]f the jury or, if there is no jury, the court finds that one or more of the [aggravating] factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death"). "Thus, contrary to the defendant's contention, under our statute, once the sentencer has found an aggravating factor proven beyond a reasonable doubt, there is no requirement that it go further and make an additional determination that the presence of that factor justifies the imposition of the death penalty. In effect, the legislature has stated that as a matter of fundamental policy, the presence of such a factor requires the imposition of that penalty unless a mitigating factor is found." *Cobb II*, supra, 478. Second, as we repeatedly have stated, our capital sentencing scheme fully comports with the constitutional requirement that the capital sentencer make a

* * *

"If you are not convinced that death is the appropriate sentence, you can find a non-statutory mitigating factor on that basis alone."

reasoned and individualized determination regarding whether the death penalty should be imposed by affording the defendant a full and fair opportunity to present any and all mitigating evidence. See id., 478–80; see also *State* v. *Ross*, supra, 230 Conn. 240–41. Because the defendant's claim finds no constitutional or statutory support, we must reject it.

7

## Mercy as a Mitigating Factor

The defendant claims that the trial court improperly failed to instruct the jury that mercy is an independent mitigating factor. Although the defendant acknowledges that he did not request such an instruction, he seeks review of his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[127] and the plain error doctrine.[128] The defendant's claim is without merit.

We note, preliminarily, that considerations of mercy play an important role in our capital sentencing scheme.

[127] In *Golding*, we held "that a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[128] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." As we recently have reiterated, however, "[p]lain error review is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [Thus, a] defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 279–80, 780 A.2d 53 (2001).

General Statutes (Rev. to 1991) § 53a-46a (d)[129] expressly provides that "[m]itigating factors . . . do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but . . . *in fairness and mercy*, may be considered as tending either to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or otherwise constitute a basis for a sentence less than death." (Emphasis added.) Because the trial court used this exact language in its instructions explaining the mitigating factors, the jurors were well aware of the relevance of mercy to its ultimate sentencing decision. Under the statutory scheme applicable to the present case, however, once the state has proven the existence of at least one aggravating factor beyond a reasonable doubt, a sentence of death is mandatory unless the defendant can establish that, in light of his "character, background or history, or the nature and circumstances of the crime"; General Statutes (Rev. to 1991) § 53a-46a (d); a sentence of life imprisonment without the possibility of release is appropriate. Thus, under the statutory scheme, mercy is a legitimate consideration only insofar as it is related to mitigating evidence.

The defendant nevertheless claims that he was constitutionally entitled to have the court instruct the jury that mercy *itself* constituted an independent mitigating factor. In essence, the defendant claims that he had a right to have the jury consider whether he should receive a sentence of life imprisonment without the possibility of release on the basis of mercy *irrespective* of whether the facts adduced at the penalty phase hearing warranted a finding of the existence of any other mitigating factor. This claim is foreclosed by United States Supreme Court precedent. The United States Supreme Court has held that a state properly may prohibit the capital sentencer from "dispens[ing] mercy

---

[129] See footnote 4 of this opinion for the text of § 53a-46a (d).

[solely] on the basis of a sympathetic response to the defendant." *Johnson* v. *Texas*, 509 U.S. 350, 371, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993); see also *Saffle* v. *Parks*, supra, 494 U.S. 493 ("[t]he [s]tate must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice"); *California* v. *Brown*, supra, 479 U.S. 542–43 (federal constitution does not prohibit instruction cautioning jurors not to be swayed by considerations, such as those based on sympathy, which are wholly divorced from evidence adduced during penalty phase hearing). In other words, as long as the capital sentencing scheme does not limit the defendant's right to present all mitigating evidence, the state may guide the sentencer's discretion by requiring the defendant to prove *facts* sufficient to warrant a sentence of life imprisonment without the possibility of release rather than of death. Thus, the legislature was free to craft a statute limiting arguments based on mercy to the jury's consideration of facts supporting the existence of mitigating factors. See *United States* v. *Allen*, 247 F.3d 741, 782 (8th Cir. 2001). Consequently, the defendant cannot prevail on his claim that he has a constitutional right to have the jury determine whether considerations of mercy, unrelated to any evidence, warrant a sentence of life imprisonment without the possibility of release as opposed to a death sentence.

J

Vagueness Challenge to § 53a-46a (d)

The defendant asserts that § 53a-46a (d), which directs the capital sentencer to consider "all the facts and circumstances of the case" in determining the existence of mitigation is unconstitutionally vague because it authorizes the capital sentencer to reject evidence of mitigation on irrelevant and improper grounds. The

defendant maintains that the vagueness doctrine requires that the phrase "all the facts and circumstances of the case" contained in § 53a-46a (d) be given a limiting construction or be read out of the statute altogether.

We rejected a virtually identical claim raised by Sedrick Cobb, the defendant in *Cobb II*, supra, 251 Conn. 482–86. We stated in *Cobb II*: "[I]n this context, constitutional vagueness analysis involves the application of the eighth amendment . . . [rather than] the due process fair notice principle. The purpose of the eighth amendment vagueness doctrine is to channel the capital sentencing decision sufficiently so as to ensure that the decision is not made arbitrarily and capriciously. Put another way, the eighth amendment vagueness doctrine requires that a death penalty statute adequately inform the capital sentencer regarding what it must find in order to impose the death penalty. See *Breton I*, supra, 212 Conn. 264. Moreover, eighth amendment vagueness analysis applies only to the eligibility phase and not to the selection phase of the sentencing hearing of a capital felony trial. The due process vagueness principle, however, requires fair warning as to whether conduct constitutes a crime, and clarity of the prohibited conduct sufficient to prevent arbitrary enforcement. It therefore is not relevant at the sentencing phase of a capital trial. . . .

"In *Buchanan* v. *Angelone*, 522 U.S. 269, 275–77, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998), the United States Supreme Court stated: [O]ur cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. *Tuilaepa* v. *California*, 512 U.S. 967, 971 [114 S. Ct. 2630, 129 L. Ed. 2d 750] (1994). In the eligibility phase, the [sentencer] narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. [Id.] In the selection phase,

the [sentencer] determines whether to impose a death sentence on an eligible defendant. [Id., 972]. . . . It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the [sentencer's] discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. [Id., 971–73]; *Romano* v. *Oklahoma*, 512 U.S. 1, 6–7 [114 S. Ct. 2004, 129 L. Ed. 2d 1] (1994); *McCleskey* v. *Kemp*, 481 U.S. 279, 304–306 [107 S. Ct. 1756, 95 L. Ed. 2d 262] (1987); [*Zant* v. *Stephens*, supra, 462 U.S. 878–79].

"In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Penry* v. *Lynaugh*, [supra, 492 U.S. 317–18]; *Eddings* v. *Oklahoma*, [455 U.S. 104, 113–14, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982)]; *Lockett* v. *Ohio*, [438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978)]. However, the state may shape and structure the [capital sentencer's] consideration of mitigation [as] long as it does not preclude the [sentencer] from giving effect to any relevant mitigating evidence. *Johnson* v. *Texas*, [supra, 509 U.S. 362]; *Penry* [v. *Lynaugh*, supra, 326]; *Franklin* v. *Lynaugh*, 487 U.S. 164, 181 [108 S. Ct. 2320, 101 L. Ed. 2d 155] (1988). Our consistent concern has been that restrictions on the . . . sentencing determination not preclude the [sentencer] from being able to give effect to mitigating evidence. . . . [O]ur decisions suggest that [at the selection phase], complete . . . discretion is constitutionally permissible. See *Tuilaepa* [v. *California*, supra, 512 U.S. 978–79] (noting that at the selection phase, the state is not confined to submitting specific propositional questions to the [capital sentencer] and may indeed allow [it] unbridled

discretion); [*Zant* v. *Stephens*, supra, 462 U.S. 875] (rejecting the argument that a scheme permitting the [capital sentencer] to exercise unbridled discretion in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that accepting that argument would require the [c]ourt to overrule *Gregg* [v. *Georgia*, supra, 428 U.S. 153]). . . . See also *State* v. *Ross*, supra, 230 Conn. 232 ([a] statutory requirement that, before death may be imposed, the sentencer must find at least one statutorily mandated aggravating circumstance is a constitution- ally permissible response to the need to avoid stan- dardless sentencing discretion). Consequently, [Cobb's] vagueness challenge to § 53a-46a (d), which pertains only to the selection phase and not to the eligibility phase of a capital sentencing hearing, is without merit.

"It is equally well settled that the federal constitution permits a capital sentencer to consider the circum- stances of the crime in deciding whether to impose the death penalty. *Tuilaepa* v. *California*, supra, 512 U.S. 976; see also *Monge* v. *California*, 524 U.S. 721, 731–32, 118 S. Ct. 2246, 141 L. Ed. 2d 615 (1998); *Woodson* v. *North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). Further, although [General Statutes (Rev. to 1989)] § 53a-46a is not a balancing statute; see *State* v. *Ross*, supra, 230 Conn. 239; the federal constitution permits a state to adopt a death penalty scheme that requires the capital sentencer to balance aggravating factors against mitigating factors at the sen- tencing hearing. See *Tuilaepa* v. *California*, supra, 979; *Clemons* v. *Mississippi*, supra, 494 U.S. 745; *Blystone* v. *Pennsylvania*, [494 U.S. 299, 305, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990)]; *McCleskey* v. *Kemp*, supra, 481 U.S. 313–15 n.37. Obviously, in order to balance aggra- vating factors against mitigating factors, a capital sen- tencer first must be permitted to consider evidence regarding aggravation. Thus, the federal constitution

necessarily permits a capital sentencer to consider evidence relating to aggravation at the selection phase of a sentencing hearing. Consequently, [Cobb's] argument that [General Statutes (Rev. to 1989)] § 53a-46a (d) violates the constitution by permitting a capital sentencer to consider evidence regarding the circumstances of the crime and aggravation [in determining whether an alleged factor is mitigating in nature] is without merit.

"Furthermore, [Cobb's] claim that [General Statutes (Rev. to 1989)] § 53a-46a (d) unconstitutionally authorizes a capital sentencer to reject a factor that has been proposed as a mitigant on improper grounds, such as the respective races of the defendant and the victim, is unpersuasive. Section 53a-46a (d) simply directs the sentencer to make its determination as to whether a proven factor is mitigating in nature in light of all of the evidence that has been presented in the case; it cannot reasonably be construed to authorize a capital sentencer to base its determination on nonevidentiary factors. [Cobb], moreover, has presented absolutely no evidence that . . . the panel based its determination that the defendant had not proven the existence of a mitigating factor on any improper ground." (Citation omitted; internal quotation marks omitted.) *Cobb II*, supra, 251 Conn. 483–86.

The defendant has suggested no reason why we should reconsider our conclusion in *Cobb II* regarding the constitutionality of § 53a-46a (d), and we know of none. We therefore reject the defendant's constitutional challenge to § 53a-46a (d).

### K

### State's Use of Evidence Purportedly Admissible During the Guilt Phase Only

The defendant claims that the trial court improperly permitted the state to offer evidence, during the penalty

phase hearing, that the defendant intentionally bumped his left elbow into Officer Williams' chest for the purpose of determining whether Williams was wearing a bulletproof vest. According to the defendant, this prejudicial evidence, although relevant to the issue of the defendant's guilt, had no bearing on any aggravating or mitigating factor and, therefore, should have been excluded.[130] We disagree.

Under General Statutes (Rev. to 1991) § 53a-46a (d), a capital sentencer is required to determine, with respect to each of the defendant's proposed mitigating factors, whether any such factor "is mitigating in nature, considering *all the facts and circumstances of the case.*" (Emphasis added.) In recognition of the fact that a sentencer "entrusted with the awesome responsibility for deciding whether the death penalty should be imposed cannot be asked to find facts in a vacuum"; *State* v. *Ross*, supra, 230 Conn. 284; we previously have recognized that the relevant facts and circumstances of the case include the facts and circumstances of the underlying capital offense. See *Cobb II*, supra, 251 Conn. 494. Thus, the defendant's contrary contention is without merit.[131]

L

The Admissibility of Anthony Crawford's Testimony

The defendant next contends that the trial court improperly permitted the state to elicit certain testimony from Anthony Crawford during the penalty phase hearing because that testimony differed materially from

---

[130] The defendant filed a motion in limine seeking to preclude the state's use of the challenged evidence during the penalty phase hearing. The trial court denied the defendant's motion.

[131] We therefore need not address the issue of whether the challenged evidence was relevant to one or more of the state's proposed aggravating factors.

the statements contained in the state's revised bill of particulars. We reject this claim.

The following additional facts are necessary to our determination of this issue. Prior to the commencement of the penalty phase hearing, the court ordered the state to file a supplemental bill of particulars setting forth the factual basis for its claim regarding the existence of the aggravating factor enumerated in § 53a-46a (h) (1).[132] The state thereafter filed a revised bill of particulars that provided in relevant part: "The [s]tate alleges that the defendant committed the offense of [c]apital [f]elony during the attempted commission of a felony, to wit, a violation of [General Statutes §] 21a-277 (a) in that the defendant was attempting to sell, dispense, offer, or give to another person the narcotic substance cocaine. The factual basis for said allegation is contained in [the transcription] of . . . Crawford's testimony given on September 15, 1994 . . . ." The two pages attached to the bill of particulars contained a transcription of a portion of Crawford's guilt phase testimony during which he stated that he and the defendant were proceeding to an apartment on Locust Street to "drop . . . off" some cocaine when they were stopped by Officer Williams in the early morning hours of December 18, 1992.

During the penalty phase hearing, Crawford testified that he and the defendant had been on their way to Locust Street to "[s]ell" some cocaine when Williams stopped them. The defendant moved to strike Crawford's testimony that he and the defendant were planning to "[s]ell" drugs that morning, claiming a material difference between that testimony and the testimony referred to in the state's revised bill of particulars that Crawford and the defendant were planning to "drop

---

[132] See footnote 4 of this opinion for the text of § 53a-46a (h) (1).

. . . off" drugs at the Locust Street address. The trial court denied the defendant's motion to strike.

"The purpose of a bill of particulars is to inform the defendant of the charges against him with sufficient precision to enable him to prepare his defense and avoid prejudicial surprise. . . . A bill of particulars limits the state to proving that the defendant has committed the offense in substantially the manner described." (Citation omitted; internal quotation marks omitted.) *State* v. *Correa*, supra, 241 Conn. 341. "It is the defendant's burden on appeal to demonstrate that he was in fact prejudiced in his defense on the merits as a result of a material variance between the allegations in a bill of particulars and proof at trial, and that substantial injustice was done to him because of the language of the state's pleadings." (Internal quotation marks omitted.) *State* v. *Steve*, 208 Conn. 38, 45, 544 A.2d 1179 (1988). "[If] the state's pleadings . . . informed the defendant of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and were definite enough to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense, they have performed their constitutional duty." (Internal quotation marks omitted.) *State* v. *Killenger*, 193 Conn. 48, 55, 475 A.2d 276 (1984).

We conclude that the slight difference between Crawford's guilt phase testimony and penalty phase testimony did not require the trial court to grant the defendant's motion to strike Crawford's testimony during the penalty phase hearing. First, there is no inherent inconsistency between "dropping off" drugs and "selling" them; indeed, drugs generally are dropped off, or delivered, when they are sold. Second, for purposes of § 21a-277 (a)—the provision setting forth the felony offense that the defendant was alleged to have been attempting to commit when he committed the capital

felony—the term "sale" is broadly defined as "any form of delivery which includes barter, exchange or gift, or offer therefor, and each such transaction made by any person whether as principal, proprietor, agent, servant or employee . . . ." General Statutes § 21a-240 (50). Thus, the defendant has failed to establish any material variance between Crawford's guilt phase testimony, as set forth in the state's revised bill of particulars, and his penalty phase testimony. Finally, the defendant otherwise has failed to demonstrate that he suffered any prejudice as a result of the slight and insignificant difference in Crawford's guilt phase testimony and penalty phase testimony. Inasmuch as the state's revised bill of particulars afforded the defendant fair notice of the state's evidence in regard to the alleged existence of the aggravating factor enumerated in § 53a-46a (h) (1), we conclude that the trial court properly denied the defendant's motion to strike.

## M

### Alleged Juror Misconduct

The defendant claims that certain comments purportedly made by several jurors to a reporter[133] after the conclusion of the penalty phase hearing indicate that one or more of those jurors failed to follow the law in its deliberations and, consequently, reached an arbitrary verdict in violation of General Statutes § 53a-46b (b) (1).[134] The defendant seeks either a new penalty phase

---

[133] The comments to which the defendant refers appeared in an article in the April 24, 1995 edition of the Connecticut Law Tribune entitled "Weighing Death." E. Song, "Weighing Death," 21 Conn. L. Trib., April 24, 1995, pp. 1, 20–21.

[134] General Statutes § 53a-46b (b) provides in relevant part: "The Supreme Court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor . . . ."

Although subsection (b) of § 53a-46b was amended in 1995; see Public Acts 1995, Nos. 95-16, § 3, and 95-19, § 3, those amendments did not modify the text of subdivision (1) of that subsection. Thus, we refer to the current revision of § 53a-46b (b) (1) for ease of reference.

hearing or a remand to the trial court for an evidentiary hearing on the issue of whether the jury properly followed the court's instructions.

The defendant's claim is not properly before this court. To the extent that the defendant is aware of facts that support his allegation of juror impropriety, those facts have not been established.[135] "[I]t is the function of the trial court, not this court, to find facts." (Internal quotation marks omitted.) *State* v. *Cobb*, 234 Conn. 735, 750, 663 A.2d 948 (1995) (*Cobb I*). Indeed, the defendant has filed a petition for a new trial in the trial court raising this precise claim. Consequently, the defendant is not entitled to appellate review of the merits of his claim.

N

### Preliminary Determination of the Evidentiary Sufficiency of the Aggravating Factors

The defendant requests that this court invoke its supervisory authority over the administration of justice to require our trial courts, upon request by a defendant charged with a capital felony, to conduct a preliminary hearing to determine whether there is sufficient evidence to establish the existence of the aggravating factor or factors alleged by the state.[136] Although the defendant does not seek such a hearing at this advanced

---

[135] In fact, the state maintains that a review of the Connecticut Law Tribune article containing the purported comments; see footnote 133 of this opinion; clearly indicates, contrary to the defendant's claim, that the jurors properly applied the law as instructed. We agree with the state that the comments attributed to the jurors do not, on their face, support the defendant's contention of juror impropriety. Nevertheless, the defendant is free to bring his claim in the appropriate forum.

[136] The defendant suggests that this hearing would be akin to a hearing in probable cause. See generally General Statutes § 54-46a.

stage of the proceedings, he requests that we require such hearings in future capital cases.[137]

The defendant advances several arguments in support of his contention. First, he maintains that a preliminary hearing would provide a necessary check on the power of the state to allege the existence of aggravating factors for which there is insufficient evidence. Next, he claims that " 'the spect[re] of death should not hang over the head of an accused without some basis of fact.' " The defendant further claims that the hearing he contemplates would eliminate the unnecessary selection of death-qualified jurors, who, according to the defendant, may be more conviction-prone than non-death qualified jurors.[138] Finally, the defendant maintains that considerations of judicial economy militate in favor of such a hearing.[139]

We decline to exercise our supervisory authority as the defendant requests for two primary, albeit nonexclusive, reasons. First, the procedures governing the prosecution of capital cases are the subject of a comprehensive legislative scheme, and we will not tinker with those procedures in the absence of a compelling justifi-

[137] We note that, prior to the penalty phase hearing, the defendant moved for the imposition of a sentence of life without the possibility of release on the ground that there was insufficient evidence to establish any of the three aggravating factors alleged by the state. In connection with that motion, the defendant urged the panel to afford the defendant a hearing, in the exercise of its "inherent jurisdiction and authority," so that he could prove his claim of evidentiary insufficiency. The panel denied his motion without a hearing. The defendant does not challenge in this appeal the denial of his request for a hearing but, rather, contends that this court should require such hearings in future capital prosecutions in light of what he characterizes as "the tendency of this issue to escape appellate review."

[138] We note that we recently have rejected the contention that death-qualified jurors generally are more likely to convict than nondeath qualified jurors. *State* v. *Griffin*, supra, 251 Conn. 703–707.

[139] The defendant, however, fails to account for the time that necessarily would be expended in conducting such hearings, which, undoubtedly, would be requested in most, if not all, death penalty cases.

cation to do so. Indeed, if the legislature had determined that a preliminary hearing on the sufficiency of evidence supporting the existence of the alleged aggravating factors was appropriate, the legislature would have provided for such a hearing in the statutory scheme. The second reason is related to the first: we are not persuaded that such a preliminary hearing is necessary, because we disagree with the defendant's basic premise, namely, that prosecutors in this state are apt to allege the existence of aggravating factors without a sufficient basis in fact or for reasons unrelated to the merits of the case. Although it is true that both courts and juries have found on numerous occasions that the evidence adduced by the state was insufficient to sustain a finding of the existence of the aggravating factor alleged by the state—indeed, this case provides an example of each—we are not convinced that this fact alone militates in favor of engrafting a second "probable cause" hearing onto our capital sentencing scheme.[140] The mere fact that the state ultimately fails to establish the existence of a particular aggravating factor beyond a reasonable doubt does not mean that the state alleged the existence of that aggravating factor in bad faith. Moreover, as we previously have observed, "[c]onstitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts." *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998). Thus, we conclude that, under the circumstances of the present case, it would be inappropriate to invoke our supervisory authority over the administration of justice

---

[140] Of course, a capital defendant already is statutorily entitled to a probable cause hearing with respect to the sufficiency of evidence supporting the state's decision to charge the defendant with a capital felony. See generally General Statutes § 54-46a.

to require trial courts to conduct the type of hearing that the defendant proposes.

## IV

## PROSECUTORIAL MISCONDUCT

The defendant contends that he was deprived of his constitutional right to a fair penalty phase hearing owing to the misconduct of the state's attorney during the penalty phase hearing. Specifically, the defendant claims that the state's attorney: (1) made irrelevant and prejudicial references to the family of Officer Williams during voir dire, cross-examination and closing arguments; (2) invited the jury, during closing arguments, to ignore the legal standards governing the determination of whether to impose the death penalty; and (3) injected his personal opinions and beliefs into his closing arguments. Because the defendant failed to object to the majority of the conduct that he challenges on appeal,[141] he seeks to prevail under *State* v. *Golding*, supra, 213 Conn. 233,[142] the plain error doctrine[143] and this court's inherent supervisory authority over the administration of justice.[144] Although we agree with the

[141] On occasions when the defendant did object to the alleged misconduct of the state's attorney, we note that objection in our discussion of the defendant's claim.

[142] See footnote 127 of this opinion. The defendant's prosecutorial misconduct claim is reviewable under *Golding* because the record is adequate for our review and the defendant alleges a violation of constitutional magnitude.

[143] See footnote 128 of this opinion for the relevant text of Practice Book § 60-5, which sets forth the plain error doctrine. We reiterate that plain error review "is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [Thus, a] defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 279–80, 780 A.2d 53 (2001).

[144] We may review a claim of prosecutorial misconduct under our inherent supervisory authority over the administration of justice even though the alleged impropriety does not rise to the level of a constitutional violation.

defendant that several of the comments made by the state's attorney were improper, we disagree that those improprieties entitle the defendant to a new penalty phase hearing.[145]

Before addressing the merits of the defendant's claim, we first review the principles that govern our resolution of claims of prosecutorial misconduct. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . [M]oreover . . . [a defendant is not entitled to prevail under *Golding*] whe[n]

See, e.g., *State* v. *Payne*, 260 Conn. 446, 450–52, 797 A.2d 1088 (2002). "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . Although [w]e previously have exercised our supervisory powers to direct trial courts to adopt judicial procedures . . . we also have exercised our authority to address the result in individual cases, notably those involving instances of prosecutorial misconduct because we recognize that such conduct, although not rising to the level of constitutional magnitude, is unduly offensive to the maintenance of a sound judicial process." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 438–39, 773 A.2d 287 (2001).

[145] We note that the defendant also asserts that he is entitled to review of his claim under the so-called "special capital reviewability rule." We previously have refused to adopt such a rule, however, concluding that our authority under *State* v. *Golding*, supra, 213 Conn. 239–40, the plain error doctrine and our inherent supervisory authority over the administration of justice, is "capacious enough to rectify any constitutional or nonconstitutional trial court errors that affect the outcome of a criminal case, capital or otherwise, and that, under those doctrines, require the reversal of the judgment." *Cobb II*, supra, 251 Conn. 343–44 n.34. The defendant has failed to articulate any reason why we should adopt a rule of "special capital reviewability" in the present case and, consequently, we decline to do so.

the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, 256 Conn. 291, 306, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001); accord *State* v. *Correa*, supra, 241 Conn. 357. "In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 297–98.

As we previously have recognized, prosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments. E.g., *State* v. *Whipper*, 258 Conn. 229, 262, 780 A.2d 53 (2001); *State* v. *Brown*, supra, 256 Conn. 306. "When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Citation omitted; internal quotation marks omitted.) *State* v. *Whipper*, supra, 252–53. "Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 712, 767 A.2d 1214 (2002).

Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. "[The prosecutor] is not only an officer of the court,

like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." *State* v. *Ferrone,* 96 Conn. 160, 168–69, 113 A. 452 (1921); accord *State* v. *Williams,* 204 Conn. 523, 537–38, 529 A.2d 653 (1987).

Thus, the "prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Singh,* supra, 259 Conn. 713. A prosecutor also may not appeal to the emotions, passions and prejudices of the jurors; e.g., *State* v. *Alexander,* 254 Conn. 290, 307, 755

A.2d 868 (2000); or otherwise "inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Whipper*, supra, 258 Conn. 271.

"Prosecutorial misconduct [also] may occur in the course of cross-examination of witnesses; *State* v. *Hafner*, 168 Conn. 230, 249, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975); and may be so clearly inflammatory as to be incapable of correction by action of the court. Id., 252–53. In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. Id., 253." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 700; accord *State* v. *Williams*, supra, 204 Conn. 538–39.

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument; *State* v. *Falcone*, 191 Conn. 12, 23, 463 A.2d 558 (1983); the severity of the misconduct; see *United States* v. *Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981), cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982); the frequency of the misconduct; *State* v. *Couture*, 194 Conn. 530, 562–63, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985) . . . the centrality of the misconduct to the critical issues in the case; *Hawthorne* v. *United States*, 476 A.2d 164, 172 (D.C. App. 1984); the strength of the curative measures adopted; *United States* v. *Modica*, supra, 1181 . . . and the strength of the state's case. See [id.] . . . ." (Citations omitted; internal quotation marks

omitted.) *State* v. *Whipper*, supra, 258 Conn. 262–63; accord *State* v. *Singh*, supra, 259 Conn. 700–701.

Furthermore, whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any of the prosecutor's improper remarks. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. *State* v. *Negron,* supra, 221 Conn. 330; see also *State* v. *Andrews,* 248 Conn. 1, 19–20, 726 A.2d 104 (1999) (failure of defense counsel to object to prosecutor's rebuttal argument suggested that "defense counsel did not believe that it was unfair in light of the record of the case at the time"); *State* v. *Robinson,* supra, 227 Conn. 745–46 (failure to object to closing arguments indicated that defense counsel "did not regard . . . remarks as seriously prejudicial at the time they were made"). Moreover, ordinarily, when a defendant who raises an objection to the allegedly improper remarks of a prosecutor elects to pursue one remedy at trial instead of another, he will not be permitted to claim on appeal that the remedy he pursued was insufficient. Cf. *State* v. *Drakeford,* 202 Conn. 75, 81, 519 A.2d 1194 (1987).

"[E]ven when prosecutorial misconduct is not so egregious as to implicate the defendant's [due process] right to a fair trial, an appellate court may invoke its supervisory authority [over the administration of justice] to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . Such a sanction generally is appropriate, however, only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Citations omitted; internal quotation marks

omitted.) *State* v. *Pouncey*, 241 Conn. 802, 811–12, 699 A.2d 901 (1997). Thus, in cases in which prosecutorial misconduct does not rise to the level of a constitutional violation, we will exercise our supervisory authority to reverse an otherwise lawful conviction only when the drastic remedy of a new trial is clearly necessary to deter the alleged prosecutorial misconduct in the future. See, e.g., *State* v. *Andrews*, supra, 248 Conn. 20. Accordingly, "[r]eversal of a conviction under [our] supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Internal quotation marks omitted.) *State* v. *Pouncey*, supra, 813. With these overarching principles in mind, we turn to the defendant's specific allegations of prosecutorial misconduct.

A

References to Officer Williams' Family

The defendant claims that the state's attorney repeatedly made improper, prejudicial and gratuitous references to Officer Williams' wife and children, and to the anguish that they had suffered as a result of Williams' death. The defendant contends that the sole objective of the state's attorney in making these allegedly inflammatory comments was to arouse the passions of the jury to the detriment of the defendant and, further, that the remarks of the state's attorney likely achieved their intended effect. According to the defendant, these improprieties occurred during the voir dire process, during cross-examination of several defense witnesses and during closing arguments.

The defendant first claims that the state's attorney made several unnecessary and prejudicial references to Williams' family during his introductory remarks to several panels of venirepersons during jury selection.[146] In support of his claim, the defendant notes that the state's attorney stated that Williams had a wife and children who lived in Wolcott, and that some members of the Williams family would be present in the courtroom during the penalty phase hearing.

The defendant also challenges the propriety of certain statements made by the state's attorney during his cross-examination of several of the defendant's witnesses. First, the state's attorney asked James McLaughlan, one of the ambulance attendants who had transported Williams to the hospital, if he knew the name of Williams' wife.[147] Second, during his cross-examination of the defendant's sister, Jacqueline Reynolds, about her grandfather's death and its impact on the defendant,[148] the state's attorney asked: "And to lose a parent at a young age like that is just a terrible, terrible, terrible thing, isn't it?" The state's attorney also asked the defendant's sister about the difficulties that her grandmother had encountered after her grandfather's death. Specifically, the state's attorney asked: "[It is]

[146] It is undisputed that a number of venirepersons from those panels ultimately were chosen to serve as jurors.

[147] The defendant objected to the question on relevancy grounds. The trial court overruled the objection, and McLaughlan testified that he did not recall the name of Williams' wife. McLaughlan was able to do so, however, after reviewing a document that had been prepared by the ambulance attendants and that already had been introduced as an exhibit by the defendant.

[148] The defendant was born in the United States, but was sent to Jamaica, along with his sister, to live with an elderly couple who the defendant believed to be his grandparents. The defendant learned many years later that they were not his grandparents, but we refer to them as the defendant's grandparents for ease of reference. The defendant, who resided with his grandparents in Jamaica until he was approximately nine years old, was particularly close to his grandfather, who died when the defendant was approximately seven years old.

tough being a single parent, isn't it?"[149] The defendant challenges the propriety of both of those questions, claiming that they were thinly veiled attempts to remind the jury of the tragic consequences of Williams' death.

A third instance of alleged improper cross-examination by the state's attorney involves his questioning of John Collins, a psychologist retained by the defendant. Collins testified on direct examination that he administered the Thematic Apperception Test (test) to the defendant. Collins explained that, as part of the test, he had shown the defendant a drawing of a reclining female figure. According to Collins, the defendant interpreted the drawing as depicting a wife worrying about her husband who had been critically injured in a serious accident. Collins opined that, inasmuch as the defendant's grandfather had died as a result of injuries he had suffered in an accident, the defendant's reaction to the drawing supported the conclusion that the defendant had been affected deeply by his grandfather's death. On cross-examination, the state's attorney asked Collins if he knew that Williams had a wife, that Williams had lived for fifteen hours after having been shot by the defendant, and that this fifteen hour time period was extremely traumatic for Williams' wife.[150] After reciting certain details relating to the shooting and its immediate aftermath, the state's attorney then asked Collins if he saw any parallel between the suffering that Williams' wife and the defendant's grandmother were forced to endure while awaiting word as to whether their respective husbands would survive the critical injuries that they had sustained.[151] Finally, the state's attorney elic-

---

[149] The defendant's sister acknowledged, in response to the questions of the state's attorney, that it is traumatic to lose a parent at a young age and that it is difficult being a single parent.

[150] Collins responded that he was not aware of the circumstances surrounding Williams' death.

[151] The trial court overruled several objections made by the defendant in connection with this line of questioning. Collins thereafter suggested that, although there were parallels between the losses suffered by the two families,

ited testimony from Collins that at no time during Collins' interviews with the defendant did the defendant express remorse for killing Williams or for the pain that he had caused Williams' family.[152]

The defendant also contends that the state's attorney improperly referred to Williams' suffering and that of his family during closing arguments. In particular, the defendant refers to three occasions on which the state's attorney mentioned that Williams had died "one week before Christmas." On each such occasion, the state's attorney referred to the temporal proximity of Christmas to the shooting in furtherance of his argument that Williams had suffered extreme psychological pain,[153] a fact necessary to establish the existence of the aggravating factor enumerated in § 53a-46a (h) (4).[154] See part III B 1 of this opinion.

The defendant alleges a second improper reference to Williams' wife and family during a rebuttal argument in which the state's attorney alluded to certain comments that defense counsel had made in his closing argument about the aggravating factor enumerated in § 53a-46a (h) (4). Specifically, defense counsel argued, in support of his contention that the state's attorney had failed to prove the existence of that aggravating

the death of the defendant's grandfather was accidental whereas Williams' death was not.

[152] Collins testified that the defendant denied having killed Williams.

[153] For example, the state's attorney argued: "Here's a man, [Williams] a thirty-four year old man, a police officer who knows he's just been shot in the head, lying there defenseless, by himself, and what does he hear while he's lying there dying? More gunshots being fired at him. If that is not psychological pain, what is? And I don't care if . . . Williams was conscious for five minutes, for ten minutes or for three minutes. He knew he was being shot at. He knew he was helpless. He knew he was going to die *one week before Christmas . . . .*" (Emphasis added.) The state's attorney's two other references to Christmas were of similar tone and import.

[154] See footnote 4 of this opinion for the text of § 53a-46a (h) (4); see also part III B 1 of this opinion (discussing construction of the phrase "in an especially heinous, cruel or depraved manner" found in § 53a-46a [h] [4]).

factor, that "there is a difference between somebody who intentionally kills somebody and somebody who taunts them, somebody who tortures them psychologically. Now you know what we're talking about. You've seen it in every Clint Eastwood movie made. You've seen it in all sorts of literature [and] television program[s]. This is the psychopath who before he shoots the person starts talking about, 'you're going to die.' And he inflicts upon them psychological—extreme psychological pain above and beyond that necessarily accompanying the killing." In his rebuttal argument, the state's attorney responded to defense counsel's comments by stating: "And [defense counsel is] . . . very, very, very wrong in another respect. This is not a Clint Eastwood movie. This is real life. This is life in an urban center in 1990 in America. In a Clint Eastwood movie, Officer Williams would have been able, after being shot in the head—would have been able, when the director called 'cut,' to *get up and go to his wife and family.* This is not a movie. . . . [R]eal life doesn't happen like things happen in the movie[s]."[155] (Emphasis added.)

The defendant claims that the state's attorney made yet another improper reference to Williams' family during closing arguments. At the conclusion of his closing argument, the state's attorney urged the jury to view the photographs that had been taken in connection with the autopsy performed on Williams. In directing the jury's attention to those photographs, the state's attorney noted that defense counsel had introduced the defendant's family album into evidence. The state's attorney then referred to the autopsy photographs as the "Williams [family] album" and informed the jurors that they also would have that album in the jury room

---

[155] The defendant challenges the propriety of this argument only insofar as it refers to Williams' wife and family. The defendant does not claim that the remarks of the state's attorney about the differences between real life and the movies otherwise was improper.

to review. The state's attorney further stated that the defendant "created these [autopsy] pictures and I know they are not pleasant to look at and they weren't introduced . . . and shown to you to make you feel uneasy. They were introduced because this is what [the defendant] left the [Williams family]. That's their family album."[156]

The state maintains that none of the foregoing comments was improper. According to the state, the state's attorney was entitled to apprise the venirepersons that Williams had a wife and children who resided in Wolcott so that prospective jurors could determine whether they knew any member of the Williams family. The state also claims that the fact that Williams had a wife and children was admissible for the purpose of establishing the extreme psychological pain or torture element of the aggravating factor enumerated in § 53a-46a (h) (4), because there is a reasonable likelihood that Williams would have been thinking about his family as he lay in the street, critically wounded, while the defendant fired six additional gunshots in his direction. The state further contends that testimony and argument as to the impact of Williams' death on his wife and children was appropriate under General Statutes (Rev. to 1991) § 53a-46a (d),[157] which provides that the jury "shall . . . determine whether a particular factor concerning the defendant's character, background or history . . . has been established by the evidence, and shall determine further whether that factor is mitigating in nature, *considering all the facts and circumstances of the case.*"[158]

---

[156] The defendant also claims that the introduction of the autopsy photographs into evidence was so prejudicial as to require a new penalty phase hearing. We address and reject this claim in part III B 2 of this opinion.

[157] See footnote 4 of this opinion for the text of § 53a-46a (d).

[158] In accordance with General Statutes (Rev. to 1991) § 53a-46a (f) and (g), a defendant must be sentenced to life imprisonment without the possibility of release as opposed to death if the fact finder finds the existence of a mitigating factor.

(Emphasis added.) According to the state, the impact of a capital felony on Williams' family is undeniably one of the relevant "facts and circumstances of the case." General Statutes (Rev. to 1991) § 53a-46a (d).

We reject the defendant's claim that it was improper for the state's attorney to have referred to Williams' wife and children and their town of residence in his remarks to prospective jurors. Both the state and the defendant had the right to apprise prospective jurors of the identities of persons connected with the case so that those prospective jurors could ascertain whether they knew any such person and, if so, report that potentially disqualifying fact to the court and to the parties.[159]

The defendant's more substantive claim of impropriety relates to the references of the state's attorney, during cross-examination and closing arguments, to the mental pain and anguish that Williams' wife and children had suffered as a result of Williams' death. Before addressing this claim, however, it is important to emphasize that the federal constitution erects no per se bar to the state's use of victim impact evidence in capital cases. In *Payne* v. *Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), the United States Supreme Court stated that "a [s]tate may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. [T]he [s]tate has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss

---

[159] We also agree with the state that the fact that Williams had a wife and children was relevant to the nature and extent of his mental pain and suffering for the purpose of establishing the existence of the aggravating factor enumerated in § 53a-46a (h) (4).

to society and in particular to his family. . . . [I]f the [s]tate chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A [s]tate may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed."[160] (Citations omitted; internal quotation marks omitted.) Id., 825–27; see also *Jones* v. *United States*, 527 U.S. 373, 395, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999). The court further explained that, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment provides a mechanism for relief." *Payne* v. *Tennessee*, supra, 825.

Although the court in *Payne* opined that victim impact evidence "serves entirely legitimate purposes" in most capital cases; id.; it did not purport to adopt a rule authorizing the use of such evidence in all capital cases. The court made clear, rather, that a state is free to permit the use of such evidence, if it so chooses, subject only to constraints of due process. Id., 825–27. As we have indicated, the state contends that § 53a-46a (d) reflects a determination by our legislature that victim impact evidence is admissible in penalty phase hearings inasmuch as that statutory provision expressly requires the fact finder to determine whether the mitigation evidence introduced by the defendant is sufficient, "considering all the facts and circumstances of the case"; General Statutes (Rev. to 1991) § 53a-46a (d); to

[160] In *Booth* v. *Maryland*, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987), and *South Carolina* v. *Gathers*, 490 U.S. 805, 109 S. Ct. 2207, 104 L. Ed. 2d 876 (1989), the court previously had concluded that the eighth amendment bars victim impact evidence in capital cases. *Payne* overruled *Booth* and *Gathers*. *Payne* v. *Tennessee*, supra, 501 U.S. 830.

warrant a sentence of life imprisonment without the possibility of release rather than a sentence of death.[161]

In light of *Payne*, we need not decide, for purposes of the present case, whether § 53a-46a (d) authorizes the use of victim impact evidence in capital cases, because even if we assume, arguendo, that it does not, the defendant can prevail on his constitutional claim only if he can establish that the references made by the state's attorney concerning the suffering of Williams' family were so inflammatory and prejudicial as to render his penalty phase hearing fundamentally unfair. We are not persuaded that the defendant has demonstrated that the remarks of the state's attorney deprived him of a fair hearing.

With respect to the questions about the suffering of Williams' family, those questions were few in number and were neither asked nor answered in such a manner as to give rise to any reasonable likelihood of prejudice to the defendant. Indeed, jurors necessarily are aware that the tragic loss of a loved one inevitably causes great emotional distress to the family of the decedent; the questions posed by the state's attorney did no more than underscore that obvious fact. Thus, the state's attorney's questions on cross-examination about the grief and suffering of the Williams family were not so inflammatory or provocative as to cause undue prejudice to the defendant.

We also disagree with the defendant that the references to Christmas were gratuitous and likely to arouse the passions of the jury. First, the state plausibly argued that Williams' mental suffering may have been exacerbated by his realization that he likely would not have been with his family to celebrate Christmas. Even if we assume, however, that, contrary to the state's argument,

___

[161] We note that the defendant did not address this argument by the state either in his initial brief to this court or in his reply brief.

the proximity of the shooting to Christmas was irrelevant to the issue of Williams' suffering, we nevertheless are not persuaded that the references to Christmas had any bearing on the jury's verdict. Although it is true that the state's attorney mentioned Christmas on three occasions during closing arguments, his comments regarding Christmas did not comprise a major focus or theme of those arguments. Rather, the comments were more in the nature of passing references. Furthermore, on each such occasion, the state's attorney expressly linked the reference to Christmas to Williams' suffering in order to establish the aggravating factor of § 53a-46a (h) (4). The state's attorney did not refer to Christmas in such a manner as to create a realistic risk of unfair prejudice to the defendant. Under the circumstances, therefore, we are not persuaded that the brief references to Christmas caused the defendant any appreciable harm.

With respect to the reference to the autopsy photographs, we agree with the defendant that characterizing those photographs as the "Williams [family] album" exceeded the bounds of appropriate argument. Although the state contends that the comments of the state's attorney were a fair rejoinder to the defendant's use of *his* family album, we believe, to the contrary, that the comments constituted an improper appeal to the emotions of the jury. As we have indicated, some leeway is permitted to account for zeal of counsel in the heat of closing arguments, which "are seldom[ly] carefully constructed in toto before the event . . . ." *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 646–47, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). The reference of the state's attorney to the autopsy photographs as the "Williams [family] album," however, cannot be defended as mere rhetorical flourish.

Nevertheless, we are not persuaded that that reference violated the defendant's right to a fair penalty

phase hearing. The reference, although improper, was brief and isolated, and did not direct the jury's attention to facts not in evidence. Moreover, the defendant failed to object to the reference. As we previously have noted, defense counsel's failure to object to the allegedly improper argument when it was made indicates that counsel did not consider it to be unfair or seriously prejudicial in light of the record of the case at the time.[162] E.g., *State* v. *Andrews*, supra, 248 Conn. 19–20; see *State* v. *Satchwell*, 244 Conn. 547, 565, 710 A.2d 1348 (1998). When the reference to the autopsy photographs is viewed in the broader context of the entire penalty phase hearing, we are convinced that it did not so taint that hearing as to render it unfair.

We conclude, therefore, that the questions and comments of the state's attorney regarding Williams' wife and children and the impact of his death on them were not unduly prejudicial. Consequently, the defendant has failed to establish that those questions and comments violated his due process rights or that they otherwise require a new penalty phase hearing.

B

Inviting the Jury to Ignore the Law

The defendant next claims that the state's attorney engaged in misconduct in his closing argument by inviting the jury to ignore the legal principles that govern the

---

[162] We note, moreover, that prior to the closing arguments of counsel, the trial court instructed the jury that counsel's "comments and their arguments do not constitute evidence in the case." At the conclusion of those arguments, the court again reminded the jury that "[t]he arguments and statements by the lawyers do not constitute evidence in the case." The court further instructed the jury: "You are the sole judges of the facts. It's your duty to find the facts. You are to recollect and weigh the evidence and form your own conclusions as to what those ultimate facts are. You may not go outside the evidence to find the facts. This means you may not resort to guesswork, conjecture, or suspicion and you must not be influenced by any personal likes, dislikes, opinions or prejudices."

question of whether death is the appropriate sentence. Specifically, the defendant maintains that the state's attorney improperly: (1) suggested that the jury was not ultimately responsible for determining whether the defendant would be sentenced to death or to life imprisonment without the possibility of release; (2) indicated to the jurors that their "oath" and "civic duty" required them to find that the defendant's conduct warranted the imposition of the death penalty; (3) urged the jury to return a verdict that would send a message to the community regarding the conduct of the defendant; (4) argued that a capital defendant who, like the defendant, commits the "ultimate crime," should receive the "ultimate penalty"; (5) mischaracterized the function of the mitigating factors under our capital sentencing scheme; and (6) urged the jury to draw an adverse inference from the defendant's failure to call his father as a witness in support of the existence of mitigating factors. We reject each of these claims, which we address in turn.

1

The defendant first contends that the state's attorney improperly argued to the jury that it was responsible only for finding facts and not for the ultimate determination of whether the defendant should live or die. We disagree.

We begin our consideration of this claim by acknowledging that a capital defendant has an eighth amendment right to "a capital sentencing jury [that] recognizes the gravity of its task and [that] proceeds with the appropriate awareness of its truly awesome responsibility." (Internal quotation marks omitted.) *Caldwell* v. *Mississippi*, supra, 472 U.S. 341, quoting *McGautha* v. *California*, 402 U.S. 183, 208, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971). Because of the "[e]ighth [a]mendment's heightened need for reliability in the determination that death is the appropriate punishment in a specific case;

*Caldwell* v. *Mississippi,* supra, [340], quoting *Woodson* v. *North Carolina,* [supra, 428 U.S. 305]; see *State* v. *Ross,* supra, 230 Conn. 230; the jury must be fully aware of its determinative role in our capital sentencing process." (Internal quotation marks omitted.) *Breton II,* supra, 235 Conn. 246. Consequently, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell* v. *Mississippi,* supra, 328–29; see also *Breton II,* supra, 245–46. In addition, it is improper for a prosecutor to argue to the jury that it is not ultimately responsible for determining whether the capital defendant will live or die; see, e.g., *Caldwell* v. *Mississippi,* supra, 325–26, 333; and "[s]uch comments, if left uncorrected, might so affect the fundamental fairness of the sentencing proceeding as to violate the [e]ighth [a]mendment." Id., 340. A review of the closing argument of the state's attorney in the present case, however, does not support the claim that he improperly advised the jury that it was not responsible for deciding whether the defendant would live or die.

At the beginning of his closing argument, the state's attorney stated that "[t]here's been a lot of evidence presented, a lot of testimony and, indeed, the task you're about to embark on is, as we've said from the beginning when we were questioning you in voir dire . . . perhaps the most awesome task that the government could ever ask one of its citizens to participate in, that is, determining whether or not the death penalty should be imposed in this case.

"Now, in our final arguments, I'm going to allude to some of the evidence. I'm also going to make comments about the law. Now the important thing to remember about that—and I'm sure [defense counsel] is going to do the same thing—the important thing to remember

about that, what I say the facts are or what I view the evidence to be or what [defense counsel] views the evidence to be or even what [the judge] may comment on the evidence, the facts of this case are not what I believe the facts to be, not what [defense counsel] believes the facts to be, or not even what [the judge] believes the facts to be. The job of deciding what the facts in this case are—that's what the jury does. The jury decides the facts. So if I state a fact that . . . you may disagree with, I'm not trying to mislead you. That's just my recollection of the facts, but again, it's your recollection of the facts that counts.

"And . . . you must follow what the judge says the law is. Nobody is going to intentionally try to mislead you, but if my version of the law or [defense counsel's] version differs from what the judge says it is, it's the judge that you have to follow because, again, as we said during the voir dire process, the job of the jury—you decide what the facts are, you take the law from the judge, you apply the law to the facts, and that's how [you] come up with your decision."

The state's attorney continued: "Now, the task that is before you . . . is unique . . . . The defendant has already been proven guilty beyond a reasonable doubt . . . . And because it is a capital felony conviction . . . that is what brings us here, to determine what the appropriate punishment would be.

"And again . . . there is a lot of talk and controversy and debate about the death penalty and a lot of people . . . they say if it was up to me, I'd pull the switch or I don't believe in the death penalty. And I think some of your attitudes may have reflected one way or the other when you first came in. But believe me, I know that today what we're asking you to do is to make that decision and it is not easy at all. I know it's not easy for anyone in this courtroom. It's not easy for me. I

think the most awesome task that I will ever face in my entire life being a lawyer, being a state's attorney, being a human being is to come before people and ask them to make a decision that will lead to the death of another human being. That's not easy for me. . . . It's not easy, but that doesn't mean it can't be done. It has to be done."

The defendant asserts that these remarks were misleading because they suggested that the jury was not truly responsible for determining whether the defendant would receive a sentence of death or life imprisonment without the possibility of release. In essence, the defendant contends that the state's attorney minimized the jury's responsibility by indicating that its function was limited to "apply[ing] the law to the facts . . . ." We disagree that the remarks of the state's attorney conveyed any such improper suggestion.

The state's attorney initially explained the respective functions of the court and the jury by emphasizing that the court's role is to apprise the jury of the applicable law and the jury is responsible for finding the facts and applying the law to those facts. This explanation of the respective roles of the court and the jury was accurate in all respects.

Thereafter, the state's attorney repeatedly reminded the jurors of their responsibility to decide that ultimate question. First, the state's attorney emphasized that "*the task you're about to embark on is,* as we've said from the beginning when we were questioning you in voir dire . . . *perhaps the most awesome task that the government could ever ask one of its citizens to participate in, that is, determining whether or not the death penalty should be imposed* in this case." (Emphasis added.) Second, the state's attorney emphasized that "the job of the jury . . . [is to] decide what the facts are, [to] take the law from the judge, [to] apply the law to the

facts, and that's how [you] come up with *your decision.*" (Emphasis added.) Third, the state's attorney emphasized that "*the task that is before you . . . is unique . . . . And because it is a capital felony conviction . . . that is what brings us here, to determine what the appropriate punishment would be.*" (Emphasis added.) Fourth, the state's attorney stated: "[A] lot of people . . . say if it was up to me, I'd pull the switch or I don't believe in the death penalty. . . . But believe me, *I know that today what we're asking you to do is to make that decision* and it is not easy at all. . . . It's not easy, but that doesn't mean it can't be done." (Emphasis added.) The foregoing comments forcefully underscored the jury's "unique" and "awesome" responsibility of determining whether the defendant would live or die.

Furthermore, the trial court properly instructed the jury regarding its responsibility in relevant part: "You, the jury, will make the determination of facts which will result in the court imposing [a sentence of death or a sentence of life imprisonment without the possibility of release]. Specifically, you will be asked to determine the existence or nonexistence of aggravating and mitigating factors based upon the evidence adduced at the hearing. The existence or nonexistence of these factors will dictate the ultimate sentence. *You must recognize that your decision is not one of simply making objective factual findings. Rather, you are, in fact and in law, actually making the decision whether the defendant should be sentenced to life imprisonment with no possibility of release or to death. Your response, therefore, is truly of immense proportion as you are no doubt aware.* Basically, if you find the state has proven the existence of an aggravant beyond a reasonable doubt and are further satisfied that the defense has failed to prove any mitigating factor by a preponderance of the evidence, then the court will

impose the death penalty. If the state fails to prove an aggravating [factor] or the defense proves any mitigating factor, the court will then impose a sentence of life without the possibility of release." (Emphasis added.)

We find no merit to the defendant's contention that the comments of the state's attorney led the jury to believe that it was not ultimately responsible for determining whether the defendant would be sentenced to death or to life imprisonment without the possibility of release. Moreover, any possibility of confusion was eliminated by the trial court's clear and forceful instructions. We therefore reject the defendant's claim.

2

The defendant also maintains that the state's attorney improperly suggested to the jurors that his oath of office required him to seek the death penalty and that their oath and "civic duty" obligated them to return a verdict requiring the imposition of the death penalty. The state responds that the challenged argument was nothing more than a reminder to the jurors of their duty to set aside any personal feelings about the death penalty and to decide the issue solely on the basis of the law and the facts. We are not persuaded that the comments of the state's attorney require a new penalty phase hearing.

The following additional facts are necessary to our resolution of this claim. After telling the jury that it had the "awesome task" of "determining whether or not the death penalty should be imposed," the state's attorney remarked: "I took an oath to enforce the laws of the state of Connecticut. The judge took an oath and you as jurors took an oath to see that the laws of the state of Connecticut are upheld and I do this, I make this argument to you . . . because I, like you, have taken an oath to uphold and enforce the law. And, indeed, if the facts are there and the law calls for it, based on my oath and your oath and the court's oath, the death

penalty must be imposed. . . . I know it's not easy. I don't take it lightly and I know nobody on this panel takes it lightly and [the judge] doesn't take it lightly, but it's asking—we've been sworn as citizens as part of our civic duty to do."

At the conclusion of closing arguments and before the court instructed the jury, defense counsel objected to the comments of the state's attorney concerning his "oath" and the oath taken by the jurors. Defense counsel further requested the court to instruct the jurors that defense counsel, too, had taken such an oath. The court overruled the objection and also refused to instruct the jury in accordance with defense counsel's request.

As the defendant contends, it generally is improper for the state to argue that the jurors' oath obligates them to return a particular verdict because such language poses a risk of diverting the jury from its duty of deciding the case on the basis of the evidence and the applicable law. E.g., *State* v. *Pennington*, 119 N.J. 547, 576, 575 A.2d 816 (1990). We are not persuaded, however, that the comments of the state's attorney, when considered in context, were likely to have had such an effect. The comment to which the defendant primarily objects, namely, "based on . . . your oath . . . the death penalty must be imposed," was immediately preceded by the qualifying statement, "if the facts are there and the law calls for it . . . ." The comment regarding the jurors' "civic duty" also was qualified by an earlier reference to the facts and the law. Thus, the challenged argument was a rhetorical device employed by the state's attorney to remind the jurors of their duty to render a verdict requiring a sentence of death if, upon application of the facts to the law, that verdict was appropriate.

We also believe, however, that the state's attorney should not have referred to *his* oath of office in

explaining why, in his view, the defendant should receive a death sentence. A jury in a capital case undoubtedly knows that the prosecutor has concluded that the death penalty is warranted under the particular facts of the case. A prosecutor is not justified, however, in suggesting, by reference to his oath, that it is his sworn duty to seek the death penalty. Argument of that kind is all too likely to convey the false impression that, under the circumstances, the law *requires* the state to seek execution in all capital cases.[163] In the present case, however, the reference of the state's attorney to his oath of office was a fleeting one, and he did not repeat or otherwise emphasize it. In light of the fact that the jurors repeatedly were apprised that it was *their* responsibility, and their responsibility *alone*, to determine the appropriate sentence, there is no reason to believe that the isolated reference of the state's attorney to his oath had any bearing on the jury's verdict. We therefore conclude that none of the challenged comments requires a new penalty phase hearing.

3

The defendant next claims that the state's attorney improperly invited the jury to send a message to the community by returning a verdict requiring a sentence of death. We disagree.

During his argument to the jury, the state's attorney remarked: "The death penalty is about a person being told by society you have to take responsibility for your conduct. That's what the death penalty is: society as a community pointing to someone who has committed a terrible crime, who has committed the ultimate crime,

---

[163] In addition, we note that, "[b]ecause the jury is empowered to exercise its discretion in determining punishment, it is wrong for the prosecutor to undermine that discretion by implying that he, or another high authority, has already made the careful decision required. This kind of abuse unfairly plays upon the jury's susceptibility to credit the prosecutor's viewpoint." *Brooks* v. *Kemp*, 762 F.2d 1383, 1410 (11th Cir. 1985).

and say[ing] to that person you have to take responsibility for your actions. Don't blame your father. Don't blame your teacher in school. . . . Step up and take responsibility for your actions. You committed the ultimate crime. Now you must pay with the ultimate penalty. That's what the death penalty is about. That's the message that has to be sent. Richard, Kilt, David Robinson,[164] whatever your name is, you committed the ultimate atrocity. . . . Take responsibility for that."

After closing arguments and before the court charged the jury, defense counsel objected to the comment that the jury should send a message by its verdict and requested a curative instruction that sending a "message" to the community was not a proper consideration for the jury. Neither the court nor the state's attorney could recall the challenged argument, and the court therefore overruled the objection and refused to give the requested instruction. On appeal, the defendant renews his claim that it is improper for a prosecutor to exhort the jury to send a message to the community by returning a verdict requiring the imposition of the death penalty.[165]

---

[164] When interviewed by the police after the shooting, the defendant initially told them that his name was David Robinson.

[165] The defendant relies primarily on *State* v. *Rose*, 112 N.J. 454, 548 A.2d 1058 (1988), to support his claim of impropriety. In *Rose*, the prosecutor had argued to the jury: "[W]hat you do here today is going to send a message. Everybody that lives in this [c]ounty, everybody that lives in this [s]tate and you're going to send a message and you're going to say that the law is in place; we live by these laws; fortunately, some people die by these laws." (Internal quotation marks omitted.) Id., 520. The prosecutor thereafter stated that the jury "must send a message out to everybody outside in this community, in this county, if you're going to do what he did, remember, think about it . . . . Let them know out there what happens if you're going to do it. Let them know that the penalty has to be paid for the ultimate crime. Maybe they'll think twice. Maybe they'll think twice before they even go buy the damn gun and practice with it and threaten others with it." (Internal quotation marks omitted.) Id. The court in *Rose* concluded that such statements improperly "focused the jury's attention on matters extraneous to the aggravating and mitigating factors . . . . [Furthermore] [t]he emotional force of the prosecutor's arguments posed a significant risk that the jury would be

We reject the defendant's claim because we disagree with his characterization of the state's attorney's argument. Although the state's attorney did state that the jury should send a "message," he did not urge the jury to send that message to the community but, rather, to the *defendant himself*. The state's attorney first explained that the death penalty reflected society's judgment as to the price that an accused should pay for committing the "ultimate crime . . . ." He next indicated that because the defendant had committed such a crime, the defendant should suffer the "ultimate penalty," namely, death. In making this point, the state's attorney urged the jury to send "the message that has to be sent" by saying to the defendant, through its verdict requiring the imposition of a death sentence, that, "you committed the ultimate atrocity. . . . Take responsibility for that."

Thus, a fair interpretation of the challenged argument leads us to conclude that the defendant, not the community, was the intended receiver of the message that the state's attorney urged the jury to send through its verdict.[166] Consequently, the defendant's claim is without merit.

---

diverted from its duty to determine [the] defendant's punishment based on the evidence . . . ." Id., 521; cf. *State* v. *Ramseur*, 106 N.J. 123, 321, 524 A.2d 188 (1987) (improper for prosecutor to argue that death penalty was appropriate to protect society from "cruel, horrible, inhumane acts of murder").

[166] Although we acknowledge that the argument of the state's attorney on this point was not a model of clarity, we are not persuaded that the jury was likely to have understood it as the defendant contends. See *Donnelly* v. *DeChristoforo*, supra, 416 U.S. 646–47 ("[C]losing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through [a] lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.").

### 4

The defendant next claims that the state's attorney improperly argued that, because the defendant had committed the "ultimate crime," he should receive the "ultimate penalty." We are not persuaded by the defendant's claim. The use of such rhetoric in closing argument is not necessarily inappropriate. E.g., *State* v. *Singh*, supra, 259 Conn. 712. The state's attorney used the challenged language in the course of extended argument as to why the jury should hold the defendant accountable for his conduct, which, by any standard, was egregious. When viewed in that context, the remarks were not improper.

### 5

The defendant further contends that the state's attorney's closing argument contained several misleading and prejudicial statements regarding the mitigating factors alleged by the defendant. The defendant claims that he is entitled to a new penalty phase hearing because the state's attorney: (1) mischaracterized the proof necessary to establish two of those mitigating factors; (2) argued that the jury should not find the defendant's confession to be a mitigating factor as alleged by the defendant because he never expressed remorse for murdering Williams; and (3) improperly characterized several of the defendant's mitigating factors as "emotional blackmail." The state contends that the comments of the state's attorney were not improper. The state also asserts that, to the extent that any of the relevant comments were inaccurate, they were neither intentionally misleading nor prejudicial. We conclude that, although several of the state's attorney's comments were improper, those improper comments do not merit a new penalty phase hearing.

The defendant first claims that the state's attorney misled the jury with respect to the proof necessary to

establish two of the mitigating factors alleged by the defendant. Specifically, the defendant asserts that, with respect to the nonstatutory mitigating factor relating to the defendant's allegedly abusive childhood, the state's attorney incorrectly suggested that the defendant was required to establish that he had murdered Williams "because of" his allegedly abusive childhood. The defendant further claims that the state's attorney incorrectly indicated that, in order to prove the existence of the statutory mitigating factor enumerated in § 53a-46a (g) (2),[167] the defendant was required to demonstrate that he was unable to "conform his conduct to the requirements of law . . . ." General Statutes (Rev. to 1991) § 53a-46a (g) (2). The defendant contends that he was prejudiced by this comment because the mitigating factor enumerated in § 53a-46a (g) (2) requires proof only that the defendant's "ability to conform his conduct to the requirements of law *was significantly impaired* . . . ." (Emphasis added.) General Statutes (Rev. to 1991) § 53a-46a (g) (2).

The following excerpts from the transcription of the state's attorney's closing argument and the trial court's jury instructions are necessary to our resolution of the defendant's claim. The state's attorney commenced his closing argument with the admonition that, if either counsel's comments about the law differed from the instructions of the court, the jurors "must follow what the judge says the law is. Nobody is going to intentionally try to mislead you, but if my version of the law . . . differs from what the judge says it is, it's the judge that you have to follow . . . ." Later, after summarizing the evidence adduced by the defendant in support of his claim that he had been subject to abuse as a child, the state's attorney commented: "So [the defendant's mental health experts] come in and . . . say [that the defendant] had a terrible childhood. You have to ask

---

[167] See footnote 4 of this opinion for the text of § 53a-46a (g) (2).

yourselves if [the defendant] had such a terrible childhood and *because of* this terrible childhood he shot Officer Williams." (Emphasis added.)

With respect to the defendant's proof concerning the mitigating factor enumerated in § 53a-46a (g) (2), the state's attorney remarked: "[Defense counsel] . . . is going to stand up and tell you why [the defendant] shot . . . Williams. He's going to tell you *it's because of his antisocial personality disorder. He can't conform his conduct to the law.* That's what he's going to tell you. I haven't heard him say that but I know he's going to tell you that. Couldn't conform his conduct to the law? When he wanted to do good in school, he could. When he wanted to be a good son and be a mechanic, he could. When he wanted to help the kids in the neighborhood fix their bike, he could. To say that because of their—you know, to say that people who have this personality disorder shouldn't be held responsible [for] the ultimate punishment is nonsense." (Emphasis added.)

Thereafter, defense counsel asserted during his closing argument that the evidence supported the existence of the nonstatutory mitigating factor regarding the defendant's allegedly abusive childhood. In explaining that mitigating factor, defense counsel repeatedly argued that the defendant's difficult childhood, although not an excuse for his crime, "matter[ed] enough" to warrant a sentence of life imprisonment without the possibility of release rather than a death sentence. Defense counsel also emphasized that the mitigating factor enumerated in § 53a-46a (g) (2) requires only that the defendant establish that his psychiatric condition significantly impaired his ability to conform his conduct to the law, not that he establish that his condition was so "extreme" that it "caused [the defendant] to shoot" Williams.

Thereafter, the court instructed the jury on the law governing mitigating factors. With respect to the miti-

gating factor enumerated in § 53a-46a (g) (2), the court informed the jury that "the defendant claims . . . [t]hat, at the time [he] committed the capital felony, his ability to conform his conduct to the required elements of law was significantly impaired but not so impaired as to constitute a defense for the prosecution." After reminding the jury that the defendant's claim under § 53a-46a (g) (2) was predicated on evidence adduced by the defendant that he suffered from "a condition known as antisocial personality disorder," the court continued: "It should be noted that, as a matter of law, the condition does not constitute a defense to the crime of capital felony. The inquiry as to the defendant's ability to conform his conduct to the requirements . . . of [the] law relate[s] to his condition at the time of the offense. The question is whether he was or was not significantly impaired at that time, that is, impaired to a degree that affected his conduct in some noticeable or material manner. . . .

"Thus, to find the existence of this statutory mitigating factor, you must find the following elements proven to you by a preponderance of the evidence: number one, that at the time of the capital felony, number two, his ability to conform his conduct to the requirements of the law was significantly impaired. If you find this statutory mitigating factor proven by a preponderance of the evidence, then the court will impose the penalty of life without the possibility of release."

Under all of the circumstances, we disagree with the defendant that the comments of the state's attorney were likely to have confused or misled the jury regarding the proof necessary to establish either the statutory mitigating factor enumerated in § 53a-46a (g) (2) or the nonstatutory mitigating factor concerning the defendant's allegedly abusive childhood. The brevity of the ostensibly objectionable comments belies the defendant's suggestion that the state's attorney intentionally

misstated the essential nature of the mitigating factors alleged by the defendant. At most, the challenged comments were inaccurate in a technical sense only, and any such inaccuracy was not likely to have affected the jury's view of the alleged mitigating factors. Indeed, defense counsel's failure to object to the challenged statements when they were made strongly supports our conclusion. Moreover, as we have indicated; see footnote 166 of this opinion; closing argument is rarely scripted and, as in the present case, counsel are required to address a broad range of issues within the time frame allotted by the court.[168] Closing argument must be considered in light of this reality and in the broader context of the entire case. To hold that the challenged comments were improper would require us to engage in the kind of hindsight dissection of closing argument that we generally have refused to undertake on appeal. See, e.g., *State* v. *Brown*, supra, 256 Conn. 304; *State* v. *Copas*, supra, 252 Conn. 337.

Finally, the state's attorney reminded the jurors that the court, not counsel, was responsible for instructing the jury on the law. In addition, defense counsel accurately summarized the precise nature of the mitigating factors, and the court properly instructed the jury on the law governing mitigating factors generally and on the particular mitigating factors alleged by the defendant. We conclude, therefore, that the defendant's contention of prosecutorial impropriety is without merit.

The defendant also claims that the state's attorney improperly argued that the defendant's confession should not be considered a mitigating factor because the defendant lacked remorse for having murdered Wil-

---

[168] Consistent with our rules of practice; see Practice Book, 1978–1997, § 879, now Practice Book § 42-37; the trial court placed reasonable limits on the time that the state's attorney and defense counsel were permitted to argue to the jury.

liams and, in fact, had denied doing so. We reject this claim.

The evidence adduced at the penalty phase hearing revealed that several hours after the shooting, investigators learned that Robert Bryant had information relating to the crime. The investigating officers interviewed Bryant, who told them that he had been in Karen Smith's apartment earlier that morning when the defendant and Anthony Crawford came running in and "talked about shooting the police officer." The officers then went to Smith's apartment[169] and entered the apartment with Smith's consent. The door through which the investigating officers entered Smith's apartment opened directly into Smith's bedroom, where the defendant was lying in bed. Sergeant O'Leary asked the defendant his name, and the defendant told O'Leary that his name was "David." Other officers found Crawford lying on a couch in the living room. O'Leary asked the defendant to go into the living room and join Crawford on the couch, and the defendant did so. O'Leary then asked the defendant and Crawford their names. The defendant identified himself as David Robinson, and Crawford told O'Leary that his name was Jamal James. Ultimately, Crawford admitted his true identity. After establishing Crawford's identity, O'Leary asked the defendant and Crawford where they had been earlier that morning. Both men indicated that they had been in Smith's apartment all night and denied having any knowledge of the shooting. Both the defendant and Crawford then agreed to accompany the investigating officers to the police station. Upon their arrival at the station, the two men were separated and interviewed individually.

After being advised of his rights, the defendant initially denied having any knowledge of the shooting. The

---

[169] The investigating officers arrived at Smith's apartment at approximately 7:30 a.m. on December 18.

defendant told Inspector Maia of the Waterbury office of the state's attorney that "Derrick shot the cop." When asked who Derrick was, the defendant stated that Crawford would know who he was.

The police then questioned Crawford about Derrick. Crawford responded that Derrick did not exist. Crawford thereafter admitted that he was present when the defendant shot Williams. Other investigators learned from Smith that the defendant had admitted to her that he had shot Williams and that he had expressed sorrow for what he had done. Armed with this information, Maia and Detective Keegan confronted the defendant and told him that Smith had given a sworn statement that the defendant had told her that he had "just shot a police officer." Keegan then indicated that the defendant should take responsibility for his actions, and Maia suggested that the defendant should "get it off his chest . . . ." The defendant then put his head in his hands and said, "I did it. I shot the cop." When asked about the gun that had been used in the shooting, the defendant responded that it was "in transit" and never would be found. Keegan asked the defendant if he would be willing to provide a written statement explaining his involvement in the shooting, and the defendant agreed. Before Keegan could locate a typewriter to take the defendant's statement, however, the defendant indicated that he wanted to speak to an attorney before proceeding any further.

During the fingerprinting process, the defendant again stated that his name was David Robinson and signed the fingerprint identification card in that name. After taking the defendant's fingerprints, the police immediately sent the fingerprint identification card to the identification division of the Federal Bureau of Investigation (FBI). Within one hour, the FBI notified the Waterbury police that the fingerprints were those of Richard Reynolds. O'Leary then asked the defendant

if that was his real name, and the defendant answered in the affirmative.

The defendant did not again acknowledge his involvement in the shooting. In fact, John Collins, the psychologist who testified for the defendant, indicated that the defendant had denied to him that he had committed the crime.[170]

The defendant alleged numerous mitigating factors, one of which was his cooperation with the police in admitting that he had shot Williams. The defendant also alleged as a mitigating factor that he had demonstrated remorse for his conduct by telling Smith that he was sorry for shooting Williams.

In his closing argument, the state's attorney commented in relevant part: "There's one [mitigant] in here. It says, well, it's mitigating because when [the defendant] went to the police station [and] when Inspector[s] Keegan[171] and Maia told him to get it off his chest, he admitted it. He said, I shot the cop. So that's mitigating? What was all the stuff that led up to that scenario prior to him saying I shot the cop? He lied to the cops about his name. He lied up at the house. He gave his name as David Robinson. He lied to the police about his name. They only found out who he really was [when] they got his fingerprints back from the FBI and did he confess to the police? After he was advised of this rights . . . what . . . did he say, gee, I'm sorry I shot the cop, I didn't mean it? Derrick shot the cop? Remember he told

---

[170] Collins also testified, however, that the defendant's comment to Smith after the shooting that he was sorry for what he had done seemed to constitute remorse for his conduct. Collins also noted that the defendant's admission to the police suggested that the defendant was attempting to take responsibility for his actions.

[171] By the time of trial, Keegan had left the Waterbury police department and was serving as an inspector for the office of the state's attorney in the judicial district of Waterbury.

Maia that? That's remorse? That's forgiveness? That's a mitigating factor?

"He also told him [that] you're not going to find the gun. My gun's a .45 [caliber] and the gun is in transit. So that's again . . . the kind of thing I'm asking . . . you [to] look at when you look at this list they[172] proposed and it's their list. It's not the legislature's list like the aggravants are. It's not [the judge's] list. It's their list."

The defendant contends that these remarks improperly suggested to the jury that his inculpatory statement to the police was not a valid mitigating factor because the defendant also had not shown any remorse for the crime. We are not persuaded by this argument. General Statutes (Rev. to 1991) § 53a-46a (c)[173] provides in relevant part that "[a]ny information relevant to any mitigating factor may be presented by either the state or the defendant . . . [and] [t]he state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating . . . factor. . . ." Thus, the trial court properly instructed the jurors that they were to consider each of the mitigating factors alleged by the defendant "in the context of all the facts and circumstances of the case, including the nature of the capital felony itself and all the surrounding circumstances." The court further instructed the jury that "[m]itigation should not be considered in a vacuum." Inasmuch as the defendant sought to persuade the jury that his admission to the police and his alleged statements to Smith after the shooting were sufficiently mitigating to warrant a sentence of life imprisonment

[172] We presume that the use of the word "they" refers to the defendant and defense counsel.

[173] See footnote 4 of this opinion for the text of § 53a-46a (c).

without the possibility of release rather than a death sentence, the state's attorney was entitled to argue to the jury that it should consider and reject those claims in the broader factual context of the case. With respect to the defendant's admission to the police, that factual context included the circumstances leading up to and following his admission, including the overwhelming nature of the evidence against him and his refusal to provide the police with his real name. With respect to the defendant's claim that he had expressed remorse for his conduct, it was reasonable for the state's attorney to urge the jury to consider that claim in light of the fact that the defendant had denied to Collins that he had committed the crime. The comments of the state's attorney, therefore, were not improper.

The defendant next claims that the state's attorney improperly characterized certain of the defendant's mitigating factors, including the factor concerning abuse that the defendant suffered during childhood, as "emotional blackmail," and as an effort to shift responsibility for his conduct to others. In particular, the defendant challenges the following comments of the state's attorney: "Emotional blackmail. . . . [T]hat's what this mitigating evidence is. It's an attempt to promote emotional blackmail on the jury. And that's not what the death penalty is about. The death penalty is about a person being told by society you have to take responsibility for your conduct. That's what the death penalty is: society as a community pointing to someone who has committed a terrible crime, who has committed the ultimate crime, and say[ing] to that person you have to take responsibility for your actions. Don't blame your father. Don't blame your teacher in school. Don't blame your grandparents in Jamaica. Don't blame your sister. Don't blame your brother. Don't blame the courts. Don't blame that you run around with the wrong crowd. Step up and take responsibility for your actions. . . . Take

responsibility for that. For once in your life, don't hold everybody up to emotional blackmail."

We acknowledge that it would have been preferable for the state's attorney to have refrained from using the term "emotional blackmail" to characterize the mitigating factors alleged by the defendant. Although the state's attorney was entitled to argue forcefully why, in his view, the defendant's mitigating factors lacked merit, he was not free to do so in an inflammatory manner or by appealing to the emotions of the jury. The reference to "emotional blackmail" exceeded the bounds of fair comment because such a reference goes beyond a claim that the mitigating factors lack merit; the term suggests, rather, that those mitigating factors constituted an improper attempt by the defendant to coerce or manipulate the jurors by appealing unfairly to their emotions. Nevertheless, we do not believe that the two isolated references to the term—to which defense counsel raised no objection—were likely to have affected the jury's consideration of the defendant's mitigating factors.

Contrary to the defendant's claim, the state's attorney's argument that the jury should hold the defendant fully responsible for his crime was not improper. The state's attorney merely was expressing the position of the state that the mitigating factors alleged by the defendant were not of sufficient force to minimize the consequences of the defendant's crime. Those comments, therefore, constituted fair argument in support of the contention of the state's attorney that the defendant had not established any persuasive reason why he should be spared the death penalty.

6

Finally, the defendant claims that the state's attorney improperly indicated that the defendant should have called his father as a witness. The defendant contends

that his father, who, according to the evidence, mistreated the defendant during his childhood, clearly was not a witness whom the defendant would have been expected to call and, consequently, the contrary suggestion made by the state's attorney constituted misconduct.

The defendant's claim is predicated on the following remarks that the state's attorney made during his closing argument: "Where's [the defendant's father] Cleveland Reynolds? I didn't see him on the stand. Other people spoke for him. Dr. [Cecil St. George] Henry[174] spoke for him. But I didn't hear Cleveland's side." The defendant did not object to these comments.

In *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960), overruled by *State* v. *Malave*, 250 Conn. 722, 738, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000), we stated that "[t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause." (Internal quotation marks omitted.) *Secondino* v. *New Haven Gas Co.*, supra, 675. When the party seeking to invoke this principle, commonly referred to as the *Secondino* rule or the missing witness rule, has established both that the witness is available and that the opposing party naturally would have produced the witness, the party invoking the rule is entitled to an instruction that the jury may draw an inference adverse to the party who failed

[174] Henry, a psychologist, had testified for the defense that the defendant's father, Cleveland Reynolds, was a very strict disciplinarian who regularly assaulted the defendant physically. Henry testified that, although Cleveland Reynolds' purpose in meting out such severe punishment was to motivate the defendant rather than to harm him, it did not have its intended effect but, rather, seriously scarred the defendant emotionally.

to call the witness.[175] Furthermore, a party who has satisfied the requirements of the *Secondino* rule is permitted to argue that adverse inference to the jury. See, e.g., *State* v. *Woods*, 250 Conn. 807, 813 n.5, 740 A.2d 371 (1999).

In the present case, however, the state did not claim that the defendant's father was a witness whom the defendant naturally would have called, and it did not seek a missing witness instruction. Moreover, the state's attorney did not argue to the jury that it should draw an adverse inference by virtue of the fact that the defendant had failed to call his father as a witness. Rather, the state's attorney's remarks served only to underscore the fact that the evidence adduced at the penalty phase hearing regarding the abuse that the defendant had suffered at the hands of his father had come not from the father's trial testimony but, rather, from the testimony of those who had interviewed the defendant, his father or both of them. Consequently, the comments of the state's attorney were intended only to raise a question regarding the reliability of the evidence adduced by the defendant concerning the abuse that he claimed to have suffered. Because such argument is not improper; see, e.g., *State* v. *Malave*, supra, 250 Conn. 739; we reject the defendant's claim.[176]

C

Expression of Personal Opinions and Beliefs During Closing Arguments

The defendant also contends that the state's attorney improperly expressed his personal opinions and beliefs

[175] Subsequent to the trial in the present case, this court, in *State* v. *Malave*, supra, 250 Conn. 738, abandoned the *Secondino* rule in criminal cases.

[176] Furthermore, the evidence clearly established that the relationship between the defendant and his father was not a good one. Under the circumstances, therefore, it is highly likely that the jury would not have expected the defendant to call his father as a witness, notwithstanding any possible suggestion to the contrary. Consequently, there is no reasonable likelihood that the comments of the state's attorney prejudiced the defendant.

during closing arguments. Specifically, the defendant claims that he is entitled to a new penalty phase hearing because the state's attorney expressed his personal opinion that: (1) the evidence established the three aggravating factors alleged by the state; (2) the mitigating factors alleged by the defendant were weak; (3) defense counsel, himself, lacked confidence in the viability of those mitigating factors; and (4) the testimony of certain defense witnesses was fabricated or contrived. The defendant also maintains that the state's attorney improperly vouched for the credibility of Anthony Crawford, who testified for the state. We agree with the defendant that, on several occasions, the state's attorney improperly expressed his personal opinions during closing arguments. We also conclude that the comments regarding Crawford's credibility were improper. We nevertheless are not persuaded that those improprieties were sufficiently serious to warrant a new penalty phase hearing in light of the particular facts and circumstances of the case.

1

The following additional facts and procedural history are necessary to our resolution of the defendant's claims. Prior to the conclusion of the evidentiary portion of the penalty phase hearing, the trial court informed the parties and the jury that closing arguments would proceed as follows: (1) the state's attorney would address the aggravating factors; (2) defense counsel would respond to the state's argument on the aggravating factors and then address the mitigating factors; (3) the state's attorney would then respond to defense counsel's argument on the mitigating factors and summarize its claims regarding the aggravating factors; and (4) defense counsel would summarize his claims regarding the mitigating factors.

While addressing the aggravating factors in his first argument, the state's attorney remarked: "Now is my

chance to argue to you why *I feel that we have proven* each of these aggravants beyond a reasonable doubt. Again, we don't have to prove all three. . . . [O]f course, *it's my belief* that the evidence in this case supports the finding that all three have been proven." (Emphasis added.)

During defense counsel's first argument, defense counsel adverted only briefly, and in general terms, to the defendant's mitigating factors, choosing instead to address the mitigating factors in detail in his final argument. At the conclusion of defense counsel's first argument, the state's attorney complained to the court, outside the presence of the jury, about defense counsel's failure to address the mitigating factors in any detail. Specifically, the state's attorney claimed that defense counsel's strategy of waiting until his final argument to discuss the mitigating factors violated the court's order regarding the procedure to be followed with respect to closing arguments. The state's attorney further claimed that defense counsel's alleged transgression had prejudiced the state by depriving the state's attorney of a meaningful opportunity to rebut defense counsel's argument regarding the mitigating factors. Finally, the state's attorney asserted that the appropriate sanction for defense counsel's alleged failure to comply with the court's directive regarding closing arguments was to prohibit defense counsel from commenting on the mitigating factors in his final argument. The trial court overruled the state's attorney's objection to the manner in which defense counsel had chosen to proceed, concluding, in essence, that defense counsel had not violated either the letter or the spirit of the court's order regarding the manner in which closing arguments were to be conducted.

Thereafter, the state's attorney stated during his final argument to the jury: "I don't know how I can argue or rebut the mitigants. [Defense counsel] refused to

argue to you when he had the opportunity what these mitigating factors were and what they all meant. He told you [the state's attorney] is going to stand up and he's going to wave the list and smile and laugh. I'm not laughing . . . . I take nothing about this case lightly. I ask you, *if [defense counsel] felt that his mitigating evidence was so strong and so convincing, why didn't he argue it to you when I would have the opportunity to come up and argue against it?* I can't argue against anything now . . . so I'm left here kind of punching at shadows. *If he felt the way I feel—I felt my aggravants are strong. I felt the evidence supported them* and I argued those aggravants to you and I said here they are. Now, [defense counsel stands] up and tries to knock them down. *I have confidence in my case.* You can't knock them down. . . . His part of the case is mitigants. *Does he have confidence in his mitigants? No,* because he knows if he puts them up there, I'd have the opportunity to come up and knock them down. So you have to ask that. Where's his big argument for the mitigants? . . . Because this is my last opportunity and because I don't know what [defense counsel] is going to say about mitigants, I am going to say something about them because *I do think the mitigants are weak.*" (Emphasis added.)

The state's attorney also made the following comments with regard to certain specific mitigating factors: "I'm saying just because they say it's a mitigant doesn't mean it is and I'm not going to point out the one about the middle child. *If you ask me if I thought that was a mitigant, I'd say no.*" (Emphasis added.) The state's attorney continued: "*If [defense counsel] did not have the courage to stand in front of you and argue the mitigants so I can come up and attack them, you have to ask yourselves how strong are those mitigants.*" (Emphasis added.) Defense counsel did not object to these comments when they were made.

Following closing arguments of counsel and immediately prior to the trial court's instructions to the jury, defense counsel stated: "The next matter, Your Honor, would be a charge to the jury . . . and comments by the court to the jury regarding both the personal opinions of the attorneys as well as the personal involvement of any of the attorneys in either prosecuting or defending this matter to the effect that that's not something—either the personal opinions or personal involvement or performance of any attorneys is not a matter that the jury should give any weight to . . . . There was a fair amount of comment by the state's attorney concerning his impression of certain witnesses and what he believed about certain witnesses, Your Honor, which I think quite—in a very technical strict manner is—*we're not raising an objection to the improper nature of argument* but what we're asking the court to do is [to] address it in [the] charge by indicating that the personal opinions of the attorneys are not anything of any weight for the jurors, Your Honor." (Emphasis added.) The trial court responded: "I think both attorneys delved into opinion and I may indicate at the appropriate point that the opinions are not evidence in the case . . . ."[177]

In accordance with defense counsel's request for an instruction regarding the personal opinions of counsel, the trial court, during the initial portion of its charge

---

[177] We note that defense counsel also expressed his personal opinions in the first person during his closing argument. For example, during his first argument to the jury, defense counsel stated: "So when I put things on like the fact that the defendant was [a] middle child in New York, *I think that is an important fact* and I'll talk more about the defendant's life when I come back on my second half and I'll explain why I think that's an important fact." (Emphasis added.) In addition, during his final argument to the jury, defense counsel stated: "The person who does that stuff for the fun of it is the one that deserves to be executed and there is simply no evidence whatsoever that that was the intent in firing back at the officer. *And I don't think it was.*" (Emphasis added.)

to the jury, instructed the jury that "the evidence from which [it was] to decide what the facts are consist[s] of the following: number one, the sworn testimony of witnesses both on direct and cross-examination, regardless of who called the witnesses; number two, the exhibits which you received into evidence; and number three, any facts to which the lawyers have agreed and there are several facts in that regard. In reaching your verdict, you should consider all the testimony and exhibits received into evidence. Certain things are not, however, evidence, and you should not consider them in deciding what the facts are. Now, [here is] a list of items that are not evidence. The arguments and statements by the lawyers do not constitute evidence in the case. And in this regard, during the course of arguments, there is a tendency to give opinion or beliefs by the attorney. This, of course, is not evidence in the case. . . . What they have said in their closing arguments and at other times is intended to help you interpret the evidence but is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of [the] facts controls."[178] The defendant did not object to this instruction or seek any further instruction regarding the expression of personal opinion by counsel.

As we previously have indicated, it is improper for a prosecutor to express his or her personal beliefs about any aspect of the case. "[T]he prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence." *United States* v. *Young*, 470 U.S. 1, 18–19, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985). Because "[t]he prosecutor's office carries a special prestige in the eyes of the jury . . . [i]t is obligatory for prosecutors to find careful ways of inviting jurors to

---

[178] We note that the trial court also had informed the jury immediately prior to closing arguments that closing arguments are not evidence.

consider drawing argued inferences and conclusions and yet to avoid giving the impression that they are conveying their personal views to the jurors." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 722; see also Rules of Professional Conduct 3.4 (5) (during trial, lawyer shall not "state a personal opinion as to the justness of a cause, the credibility of a witness . . . or the guilt or innocence of an accused").

The remarks of the state's attorney violated this well established prohibition. Although each of the challenged comments was improper, the most objectionable comments were, "I [feel] my aggravants are strong," and "I have confidence in my [aggravants]," while defense counsel did not "have confidence in his mitigants."

With respect to the state's attorney's comment on his personal belief in the merits of the aggravating factors, such comment clearly was inappropriate. The state's attorney compounded the impropriety when he personalized the state's case by characterizing the aggravating factors as "my aggravants . . . ." We repeatedly have emphasized that counsel, and especially prosecutors, must be particularly careful to avoid the unnecessary use of the first person. See, e.g., *State* v. *Singh*, supra, 259 Conn. 713–15 and n.18; *State* v. *Satchwell*, supra, 244 Conn. 565–66. Although we do not excuse the impropriety that inheres in such comments, they represent the kind of lapse that sometimes occurs, without premeditation, in the heat of the moment and at the close of an emotional trial. Thus, isolated comments of this type generally do not give rise to a due process violation or otherwise result in manifest injustice because a properly instructed jury is likely to appreciate fully its duty to decide the case on the evidence and not on the basis of such rhetoric.

Of greater concern, however, was the state's attorney's utterly unsupported assertion that defense coun-

sel, himself, lacked confidence in the viability of the mitigating factors alleged by the defendant. This argument had no purpose other than to undermine the legitimacy of those mitigating factors on the basis of a wholly irrelevant consideration, namely, the extent to which defense counsel personally believed in the merits of the defendant's case. Although it is apparent that the state's attorney's comments were prompted by defense counsel's tactical decision to reserve discussion about the mitigating factors until his final argument, the trial court had rejected the contention of the state's attorney that it was improper for defense counsel to do so. The remarks of the state's attorney concerning defense counsel's personal beliefs, therefore, cannot be justified on the ground that defense counsel's trial strategy unfairly had prejudiced the state. Indeed, the remarks cannot be justified on any basis whatsoever. Cf., e.g., *State* v. *Moore*, 122 N.J. 420, 462, 585 A.2d 864 (1991) (cautioning against comments to jury that defense counsel does not believe in theory of defense).

Nevertheless, defense counsel did not object to the comments when they were made, suggesting that he did not view the comments to be seriously prejudicial at the time. E.g., *State* v. *Andrews*, supra, 248 Conn. 19–20; see *State* v. *Satchwell*, supra, 244 Conn. 565. In fact, the likelihood of any such prejudice was significantly reduced because the jury was aware that the comments were prompted by the manner in which defense counsel chose to apportion his closing arguments and not by any real insight or information that the state's attorney might have had regarding defense counsel's personal beliefs. Most importantly, however, it appears that defense counsel made a conscious decision not to seek either a mistrial or a strongly worded curative instruction condemning the improper comments. Rather, defense counsel sought and obtained an

instruction from the trial court regarding the irrelevance of the opinions or beliefs of counsel.

Inasmuch as defense counsel had heard the comments of the state's attorney when they were made, defense counsel was in a position to assess what impact, if any, the comments may have had on the jury and to determine what remedy to seek. Indeed, defense counsel reasonably could have concluded that the comments, which the state's attorney likely made in a fit of pique over opposing counsel's trial strategy and the trial court's tacit approval of that strategy, were so peevish and unprofessional as to undermine the credibility of the *state's attorney* in the eyes of the jurors. Thus, after referring to the irrelevance of argument concerning "personal opinions or the personal involvement or performance of the attorneys," defense counsel expressly stated that the defendant was "not raising an objection to the improper nature of argument but [rather was] asking the court to . . . address it in [the] charge by indicating that the personal opinions of the attorneys are not anything of weight for the jurors . . . ." As we previously indicated, the trial court gave an instruction along the lines requested by defense counsel, who neither objected to the instruction as given nor sought any further curative action by the court.

"Our rules of procedure do not allow a defendant to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade. . . . An appellant cannot create a reviewable claim because his appellate counsel disagrees with the strategy of his trial counsel." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, 48 Conn. App. 812, 819–20 n.6, 713 A.2d 834, cert. denied, 245 Conn. 921, 717 A.2d 238 (1998); see also *Johnson* v. *United States*, 318 U.S. 189, 201, 63 S. Ct. 549, 87 L.

Ed. 704 (1943) ("We cannot permit an accused to elect to pursue one course at the trial and then . . . to insist on appeal that the course which he rejected at the trial be reopened to him. . . . [T]he protection which could have been obtained was plainly waived . . . . The court only followed the course which he himself helped to chart . . . ."); *State* v. *Drakeford*, supra, 202 Conn. 81 (same).

In light of the court's straightforward and timely instruction and defense counsel's informed decision regarding the most efficacious way to address the comments of the state's attorney, we cannot conclude that those comments, although improper, so compromised the fairness of the penalty phase hearing as to constitute a violation of the defendant's due process rights. Under the circumstances—including the fact that defense counsel, apparently for tactical reasons, expressly waived any further curative instructions or other remedy—we also are not persuaded that the comments of the state's attorney necessitate a new penalty phase hearing in the exercise of our supervisory authority over the administration of justice. See part IV D of this opinion. Accordingly, we reject the defendant's claim that the state's attorney's improper injection of his personal opinion entitles the defendant to a new penalty phase hearing.

2

The defendant next claims that the state's attorney suggested during closing arguments that certain statements made by the defendant's family members to defense experts were fabricated to help the defendant avoid the death penalty. The defendant contends that such argument was unfair and improper because there was no evidence in the record to support such an inference. The state claims that the state's attorney did not act improperly in calling into question the credibility

of the defendant's family members in light of their potential bias in favor of the defendant.

The defendant bases his claim on the following comment of the state's attorney: "I don't fault the Reynolds family [for telling the psychologist that the defendant's father beat him during his childhood]. *I think anyone of us would have done the same thing* to try to save [the defendant] from the fate that he faces. I don't blame parents for that." (Emphasis added.)

To the extent that the defendant's claim is predicated on the contention that the state's attorney was prohibited from raising doubt about the accuracy of the information supplied by the defendant's family members to the defendant's experts, we disagree with that claim. For example, it would not have been improper for the state's attorney to point out that persons related to the defendant may have had an interest in exaggerating the nature of the abuse that the defendant had suffered in light of their probable desire to assist him. Inasmuch as the state's attorney had adduced no specific evidence to indicate that the defendant's family or friends were lying when they reported the abuse that the defendant allegedly had suffered as a child, however, it would have been preferable for the state's attorney to have spoken in somewhat less categorical terms. Nonetheless, in light of the isolated nature of comment and the court's instructions to the jury regarding the expression of personal opinions by counsel, we are not persuaded that the comment of the state's attorney prejudiced the defendant.

3

The defendant also claims that the state's attorney improperly vouched for the credibility of Crawford, one of the state's witnesses, during closing arguments. We conclude that the state's attorney acted improperly under the circumstances but reject the defendant's

claim that the impropriety entitles him to a new penalty phase hearing.

During the penalty phase hearing, Crawford testified that he had been convicted of robbery in the third degree in 1991, and that he had received a suspended sentence and three years probation for that offense. Crawford also testified that, later that year, he was convicted of larceny in the second degree and received a sentence of ten years imprisonment, execution suspended after five years, and five years probation. According to Crawford, he was on parole when the defendant shot and killed Williams and was on probation as of the date of his testimony during the guilt phase of the defendant's case. Crawford also acknowledged that he was in possession of $3500 worth of cocaine when the shooting occurred. At no time, however, did Crawford indicate that he had been charged in connection with his possession of cocaine at the time of the shooting. Crawford further testified that, approximately one year prior to the penalty phase hearing in the defendant's case, he had been charged with escape in the first degree, a felony carrying a maximum sentence of ten years imprisonment, in connection with his unauthorized departure from a halfway house.[179] Crawford indicated that those charges, which had been pending in the judicial district of Hartford, were nolled by the office of the state's attorney after Crawford testified during the guilt phase of the defendant's case.[180] Crawford also stated that he had been charged with hindering prosecution in connection with the investiga-

---

[179] Crawford stated that he left the halfway house and traveled to North Carolina to be with his family and to avoid having to testify against the defendant.

[180] Although Crawford stated that he was not aware of any agreement with the state in connection with the nolle of the escape charges, Crawford could not explain why those charges had been nolled.

tion of the murder of Williams.[181] Finally, Crawford indicated that there were no charges currently pending against him, and that the state had not made him any promises in return for his cooperation or testimony against the defendant.

During his initial closing argument to the jury, the state's attorney, who anticipated that defense counsel would argue that Crawford lacked credibility because he had received special treatment from the state, commented as follows: "Crawford. He's no altar boy. He told you what he was, and *believe me*, they are going to say, well, don't believe . . . Crawford because he got a break from the state. *He didn't get a break from the state.* I prosecuted him for hindering prosecution in this case. *If I wanted to give Crawford a break in exchange for his testimony, the easiest thing for me to do was not to prosecute him . . . . We don't give a damn what happens to him later on. . . . If I wanted to give . . . Crawford a break in exchange for his testimony . . . would I have ever prosecuted him . . . ? So . . . Crawford has been given no break.* He came and he testified." (Emphasis added.)

Later, while defending the credibility of Crawford's testimony as to the number of gunshots fired, the state's attorney remarked: *"You know why I believe . . . Crawford* that there were seven shots? I'm going to tell you why *I believe . . . Crawford . . . ."* (Emphasis added.) The state's attorney then proceeded to recite in detail the facts upon which Crawford's testimony was based.

During his initial closing argument, defense counsel did, in fact, challenge Crawford's credibility by reference to the special treatment that Crawford ostensibly had received from the state. Defense counsel argued

---

[181] Crawford testified that he was acquitted of the hindering prosecution charge.

in relevant part: "Well, Crawford is on probation or parole at the time [of the shooting] for robbery second. He's also on probation at the time for a larceny second. . . .

"He's never been prosecuted. If they have got such a strong case . . . that [the defendant] was involved in the attempted sale of drugs that night, they have got just as strong a case that Crawford was. In fact, [it is] stronger because Crawford admitted it, in open court, under oath. So why has he not been prosecuted? I'm not suggesting that [the state's attorney] has gone out and made some under-the-table deal, that he's now lying to you all about giving these guys any promises. What I'm suggesting—and I don't think that's the important part—what I'm suggesting is that Crawford's credibility should be held in doubt because he was—he's under probation now . . . .

"There's this drug situation which he admitted would be a fifteen year felony, right? He's got fifteen years that he could get for his own drug activities in this situation if you believe him.

"We know about the escape situation, right? That's a ten year felony, and we know that that was dropped right after he testified at the earlier trial, right?"

We agree with the defendant that the state's attorney improperly vouched for Crawford's credibility when he stated that he believed Crawford's testimony regarding the number of gunshots that the defendant had fired. As we have explained, "[s]uch expressions of personal opinion are a form of unsworn and unchecked testimony, and particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the per-

sonal opinions." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 713.

We nevertheless are persuaded that the comment was not likely to have prejudiced the defendant. First, the state's attorney followed the objectionable comment with a detailed explanation of the facts that supported Crawford's testimony. Second, defense counsel did not object to the comment at the time it was made, suggesting that he did not view the remark as particularly harmful. E.g., *State* v. *Andrews*, supra, 248 Conn. 19–20; *State* v. *Robinson*, supra, 227 Conn. 745–46. Finally, at the conclusion of closing arguments, defense counsel, after reminding the court that the state's attorney had expressed his personal opinion on several occasions, stated that he was "not raising an objection to the improper nature of [that] argument . . . ." Rather, defense counsel requested and received a general instruction to the effect that the opinions or beliefs of counsel are not evidence and are not to be considered by the jury. Under these circumstances, we are not persuaded that the comment of the state's attorney was harmful.[182]

We now turn to the comment of the state's attorney that he had not made a deal with Crawford in return for his testimony. Although the state's attorney was entitled to underscore Crawford's testimony by asserting that the state had made no promises of leniency to him, the state's attorney should not have stated, as he did, that he personally had not made any deal with Crawford in order to obtain Crawford's testimony against the defendant. We previously have stated

[182] We also note that the state's attorney commenced his closing argument by advising the jury that its recollection of the facts, and not counsels' comments on the evidence, is controlling. See part IV B 1 of this opinion. Although this kind of prefatory statement cannot legitimize otherwise improper argument, it has some bearing on the extent to which the improper remarks are deemed to be harmful. *State* v. *Singh*, supra, 259 Conn. 715.

that the proper method of addressing the issue is "by reference to the evidence, or lack thereof, and not via a first person denial of the existence of [an] . . . agreement [between the state and the witness] . . . ." (Citation omitted.) *State* v. *Satchwell*, supra, 244 Conn. 565–66.

Again, however, we are not persuaded that this comment prejudiced the defendant. Indeed, defense counsel, himself, stated in closing argument that he was not claiming that the state's attorney had made any secret deals or promises to Crawford or to any other witness. Moreover, defense counsel did not seek any remedy other than the instruction that the court had given regarding the irrelevance of any expression of personal opinion or beliefs by counsel. Finally, defense counsel forcefully challenged Crawford's testimony that he had no expectation of leniency by highlighting the fact that Crawford had not been charged in connection with his possession of cocaine at the time of the defendant's murder of Williams, that his felony escape charge had been nolled and that he had not been charged with a violation of the conditions of his probation. Thus, even though the state's attorney improperly injected his own credibility into the case by denying that he personally had given Crawford "a break in exchange for his testimony," we do not believe that the impropriety, when viewed in context, constituted harmful error.

### D

### Conclusion

As we have explained, the state's attorney engaged in conduct that clearly was improper on several occasions. For the foregoing reasons, however, we are not persuaded that the sum total of those improprieties rendered the defendant's penalty phase hearing

fundamentally unfair,[183] in violation of his right to due process.[184] In so concluding, we are guided by the principle that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 256 Conn. 306.

We also do not believe that a new penalty phase hearing is warranted in the exercise of our supervisory authority over the administration of justice. "Our supervisory powers are not a last bastion of hope for every untenable appeal. [The exercise of our supervisory powers is] an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) *State* v. *Hines*, supra, 243 Conn. 815.

We acknowledge that the conduct of the state's attorney, at times, did not meet the standard of professionalism required of prosecutors in this state. We strongly disapprove of that conduct and, in particular, the state's attorney's interjection of his personal opinion. The improprieties are especially disturbing in light of the fact that the state's attorney is an experienced litigator who has successfully prosecuted numerous cases, including several death penalty cases. The defendant,

---

[183] Although we necessarily have analyzed each of the defendant's claims of prosecutorial misconduct separately, we are mindful that we must determine whether the "totality of the improprieties leads to the conclusion that the defendant was deprived of a fair trial." *State* v. *Singh*, supra, 259 Conn. 728 (*Borden, J.,* concurring and dissenting). We are not persuaded that the improprieties in the present case, considered in combination, rendered the defendant's penalty phase hearing fundamentally unfair.

[184] We reject the defendant's claim of plain error for essentially the same reasons that we reject his due process claim.

however, expressly declined to seek any remedy for the state's attorney's expression of his personal beliefs other than a general instruction to the effect that the personal opinion of counsel is not entitled to any evidentiary weight. The defendant also did not express any dissatisfaction with the instruction that the court gave in response to his request. In determining whether this is an appropriate case for the exercise of our supervisory powers, we cannot ignore the defendant's informed decision on how best to deal with the improper comments of the state's attorney. We also have carefully considered all of the other factors relevant to the defendant's supervisory authority claim, including our determination that the defendant was not unduly prejudiced by the conduct of the state's attorney and the emotional trauma to Officer Williams' family that inevitably would result from a new trial. See, e.g., *State* v. *Pouncey*, supra, 241 Conn. 813. Under all of the circumstances, therefore, we are not persuaded that the extraordinary remedy of a new penalty phase hearing is necessary to vindicate the interests of the defendant or the public in the fair administration of justice.[185]

[185] The dissent does not conclude that the improprieties deprived the defendant of a fair trial. Rather, the dissent contends that we should reverse the defendant's conviction in the exercise of our supervisory authority over the administration of justice. In support of this contention, the dissent asserts that the state's attorney who committed the prosecutorial improprieties in the present case "is not new to findings of prosecutorial misconduct . . . ." Contrary to the suggestion of the dissent, however, that state's attorney heretofore has not been found to have engaged in any prosecutorial impropriety that warranted reversal of a conviction either as a matter of due process or under the exercise of this court's supervisory power. Indeed, *the defendant does not suggest that the conduct of the state's attorney in other cases constitutes a basis to vacate the death sentence in the present case.* Furthermore, we are aware of only one case prosecuted by the office of the state's attorney during this state's attorney's tenure of approximately seventeen years in that position that was reversed on the ground of prosecutorial misconduct; *State* v. *Mills*, 57 Conn. App. 202, 748 A.2d 318, cert. denied, 253 Conn. 914, 754 A.2d 163 (2000); and the assistant state's attorney who engaged in that misconduct is no longer employed as a state's attorney. Therefore, we disagree with the dissent's statement that "nothing short of

Accordingly, we decline the defendant's invitation to afford him a new hearing in the exercise of our supervisory authority over the administration of justice.

## V

## MISCELLANEOUS ISSUES

### A

### Change of Venue

The defendant next claims that the trial court improperly denied his motion for a change of venue.[186] We reject this claim.

The following facts and procedural history are necessary to our resolution of this claim. Prior to the guilt phase of the defendant's case, the defendant filed a motion for a change of venue, claiming that "intense and pervasive media coverage" in the Waterbury area concerning Officer Williams' murder had created "a substantial likelihood" that the defendant would not be able to obtain a fair trial in the judicial district of Waterbury. At a hearing on the defendant's motion, the defendant elicited testimony from G. Donald Ferree, associate director of the Institute for Social Inquiry at the University of Connecticut. Ferree testified that his organization had conducted a telephone poll of residents of the Waterbury, Stamford and Middlesex judicial districts. According to the poll, 16 percent of those

reversal will deter [prosecutorial] misconduct [by the state's attorney or his office] in the future."

[186] The defendant sought to transfer the case to a judicial district other than the judicial district of Waterbury for the guilt phase of the case and, if found guilty of the capital murder charge, for the penalty phase hearing as well. Although the trial court denied the defendant's motion for a change of venue prior to the guilt phase, the defendant again filed a motion for a change of venue for the penalty phase hearing after the panel had found him guilty of capital murder. Unless otherwise indicated, references to the defendant's motion for a change of venue are to the motion that the defendant filed prior to the guilt phase of the case.

surveyed in the Waterbury judicial district indicated that they were "[v]ery familiar" with the case whereas only between 1 and 2 percent of those surveyed in the Stamford and Middlesex judicial districts were very familiar with the case. In addition, 66 percent of those persons polled in the Waterbury judicial district indicated that a person who deliberately murders a police officer always should be sentenced to death. Of those persons polled in the Stamford and Middlesex judicial districts only between 40 and 50 percent agreed that a person who deliberately murders a police officer always should be sentenced to death. Finally, the poll indicated that persons residing in the Waterbury judicial district generally were more familiar with the case than persons residing in the Stamford and Middlesex judicial districts.

The defendant also submitted 158 articles that had been written about the case in the Waterbury Republican-American, Waterbury's daily local newspaper. Furthermore, the defendant provided videotapes reflecting coverage by local affiliates of all of the major television networks in the area, namely, National Broadcasting Company (NBC), American Broadcasting Companies (ABC), Columbia Broadcasting System (CBS), and the Fox Television Network, as well as a videotape of coverage of the case on a local cable access channel.

At the conclusion of the hearing, the trial court denied the defendant's motion without prejudice to renewal pending the voir dire process. In its memorandum of decision on the motion, the court explained that, with respect to press accounts of the case, those accounts were most pervasive in the first two weeks after the murder. Notably, however, even those accounts were, by and large, "straightforward, factual, and, aside from the headlines . . . neither inflammatory nor sensationalized." Although some newspaper articles contained information of an emotional or potentially prejudicial

nature, such as accounts of Williams' funeral, the birth of Williams' child less than two weeks after the shooting, the impact of the murder on the Williams family, the state's announcement of its decision to seek the death penalty, and statements by death penalty advocates regarding the case, the court noted that those accounts were most prevalent in the month after the murder. With respect to television coverage of the case, although "intense on the dates of the incident, arrests, and [Williams'] funeral . . . with some emphasis on aggravating circumstances and prejudicial comments by individual citizens and officers," such coverage thereafter was "straightforward, factual and not extensive, and, therefore, not a significant factor for the court's consideration . . . ."[187]

Finally, although the trial court acknowledged Ferree's expertise and credibility generally, the court also concluded that the results of the telephone poll were of limited value. Specifically, the court observed that the poll was not designed to address the issues that were central to the defendant's motion for a change of venue, including the extent to which the persons polled had prejudged the defendant's guilt or innocence and the extent to which those persons could decide the case fairly and objectively notwithstanding any views they may have expressed—about the case specifically or the death penalty generally—in connection with the survey.[188] The court, however, did accept the survey "as

[187] The court also noted that the defendant had not claimed that the television coverage of the case was either so prejudicial or extensive as to constitute a major factor in the court's decision whether to grant the defendant's motion for a change of venue.

[188] The court stated: "The key concern for . . . consideration in this case is whether or not there is a sufficient pool of Waterbury area residents who are able to set aside whatever awareness or feelings about the case, or emotions regarding the family they may have . . . accord this defendant the presumption of innocence, and judge this case only on the evidence they hear or see in the courtroom. . . .

"The . . . survey does not lend itself to thought provoking analysis and response. It is as superficial a method of dealing with complicated issues

a legitimate indicator of [the] high degree of awareness [about the case] in the Waterbury area . . . ." The court also noted, however, that this fact alone shed no light on the question of whether, notwithstanding that awareness, a fair and impartial jury could be selected from the Waterbury area.

The court concluded that the evidence adduced at the hearing indicated that the defendant could receive a fair trial in the judicial district of Waterbury. In so concluding, the court underscored the fact that the "[p]roper use of [this state's] individual voir dire should be sufficient to assure the defendant of a fair and impartial jury." The court noted, however, that the voir dire process would provide "an opportunity [for the court] to test its . . . [conclusion]" that a change of venue was not warranted. The court indicated that if, during voir dire, it appeared that an impartial jury could not be selected in the judicial district of Waterbury, the court then would reconsider transferring the case to another judicial district.[189]

On the day that jury selection was scheduled to commence, the defendant notified the court that, in light of the court's denial of his motion for a change of venue, he was inclined to change his election from a jury trial to a trial before a three judge panel. The defendant nevertheless requested an opportunity to reflect further on the matter and proposed that the court proceed with jury selection for two days pending the defendant's final decision on the matter.[190] The court granted the

---

as can be imagined, and the necessarily vague categories of responses provide little helpful information relative to the more difficult issue."

[189] The defendant claims that the trial court improperly "concentrated on the issue of whether the defendant could receive a fair trial *on the issue of guilt*." (Emphasis in original.) We reject this contention because the defendant has failed to identify anything in the record or in the court's memorandum of decision, and we are not aware of anything, to substantiate his claim.

[190] The state did not object to the defendant's request.

defendant's request and reiterated that the denial of the motion for a change of venue was subject to reconsideration depending on what would transpire during voir dire.[191]

Jury selection thereafter commenced and proceeded for two days. The initial panel consisted of thirty-three venirepersons, of which twenty-six were excused prior to voir dire. Only one venireperson, however, was excused for reasons relating to pretrial publicity. The remaining seven venirepersons were questioned, and two were chosen to serve as jurors. At the beginning of the third day of jury selection, the defendant elected to be tried before a three judge panel instead of a jury, reasoning that he did not believe that a fair and impartial jury could be selected in the judicial district of Waterbury. With these facts in mind, we now turn to the

[191] In addressing the defendant concerning his decision to entertain the idea of electing a trial by a three judge panel, the court stated in relevant part: "[I]nasmuch as it has been indicated that the reason for this contemplat[ed] [change of election] is the court's decision with respect to the change of venue issue, the court did, in fact, deny the change of venue, but . . . denied [it] without prejudice. This court has every intention of seeing to it . . . that you receive, number one, a fair panel, that is, a fair panel of jurors and a fair trial. And that's going to be whether it's here in Waterbury or whether it's somewhere else. The court, after reviewing all the evidence including the surveys and everything else, indicated that it believes . . . that you can receive a fair trial in Waterbury. But I'm waiting—I'm willing to wait and see. Certainly, it's been established that there's a high degree of awareness [of the case among people residing in the judicial district of Waterbury]. And there's a high degree of concern about the death penalty and these are issues that can all be taken up during the course of the voir dire procedure."
After explaining the voir dire process and the opportunity that defense counsel would have to question prospective jurors during that process, the court continued: "The motion for change of venue was denied without prejudice. That means it's still an open question. This voir dire proceeding means a lot to the court in terms of whether or not this case will proceed in Waterbury. I'm going to watch very carefully. Number one, if we can't have a fair panel [in] Waterbury, this case will be moved. If the process will be so prolonged that it becomes ridiculous to continue seeking jurors to sit on this case [in] Waterbury, the case will be moved . . . to another area. So, I want it clear before you make any decision simply based on the denial of the motion for change of venue what the court's ruling is."

defendant's claim that the trial court improperly denied his motion for a change of venue.

"In requesting a change of venue, a defendant bears the burden of showing that he could not otherwise receive a fair and impartial trial. The trial court exercises its discretion in deciding whether to grant such a change of venue. *State* v. *Miller*, 202 Conn. 463, 477, 522 A.2d 249 (1987); *State* v. *Piskorski*, 177 Conn. 677, 685, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). The trial court's discretion is governed by Practice Book [§ 41-23], which provides: 'Upon motion of the prosecuting authority or the defendant, or upon his own motion, the judicial authority may order that any pending criminal matter be transferred to any other court location: (1) If the judicial authority is satisfied that a fair and impartial trial cannot be had where the case is pending . . . .' " *State* v. *Townsend*, 211 Conn. 215, 224–25, 558 A.2d 669 (1989). "Despite the broad discretion vested in the trial court in considering such a motion, its denial has constitutional implications and appellate review requires an independent evaluation of the circumstances upon which the claim of an unfair trial is based. *Sheppard* v. *Maxwell*, 384 U.S. 333, 362–63, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *State* v. *Piskorski*, [supra, 685]." *State* v. *Vitale*, 190 Conn. 219, 227, 460 A.2d 961 (1983).

"For an appellate court to reverse a conviction on the [ground] of prejudicial pretrial publicity, a defendant generally must prove actual juror prejudice. *State* v. *Pelletier*, 209 Conn. 564, 569, 552 A.2d 805 (1989); *State* v. *Piskorski*, supra, [177 Conn.] 686; *State* v. *Hart*, 169 Conn. 428, 432–33, 363 A.2d 80 (1975). A defendant need not, however, show actual prejudice in extreme circumstances whe[n] there has been inherently prejudicial publicity such as to make the possibility of prejudice highly likely or almost unavoidable. . . . *State* v. *Piskorski*, supra, 686." (Citations omitted; internal quo-

tation marks omitted.) *State* v. *Townsend*, supra, 211 Conn. 225. "A defendant cannot rely, however, on the mere fact of extensive pretrial news coverage to establish the existence of inherently prejudicial publicity. Prominence does not, in itself, prove prejudice. *State* v. *Pelletier*, supra, 570." *State* v. *Crafts*, 226 Conn. 237, 257–58, 627 A.2d 877 (1993). Indeed, "[o]ne who is reasonably suspected [of] murdering [a police officer in the line of duty] cannot expect to remain anonymous. *Dobbert* v. *Florida*, 432 U.S. 282, 303, 97 S. Ct. 2290, 53 L. Ed. 2d 344 [1977]." (Internal quotation marks omitted.) *State* v. *Piskorski*, supra, 688. Rather, "[t]he defendant must demonstrate that the publicity was so inflammatory or inaccurate that it created a trial atmosphere utterly corrupted by press coverage. *Murphy* v. *Florida*, 421 U.S. 794, 798, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Crafts*, supra, 258; see also *State* v. *Kelly*, 256 Conn. 23, 33, 770 A.2d 908 (2001); *State* v. *Piskorski*, supra, 692.

In the present case, the defendant cannot, and does not, claim actual prejudice because a jury was not selected as a result of the defendant's decision to proceed with a trial before a three judge panel instead of a jury trial. The defendant maintains, rather, that the evidence adduced at the hearing on his motion for a change of venue evinces inherent prejudice of such magnitude that there is no reasonable likelihood that an impartial jury *could have been impaneled.*

The defendant has cited to no case, and we are not aware of one, in which a claim of inherent jury prejudice has been raised in circumstances, such as those in the present case, in which a jury is not selected because the accused waives his right to a jury trial and elects to be tried by the court. Indeed, the state contends that the defendant's election of a court trial constitutes a waiver of any claim he may have had arising out of the

denial of his motion for a change of venue. We need not decide this issue, however, because we conclude that the defendant has failed to establish that the trial court abused its discretion in denying that motion.

As the trial court concluded, the publicity surrounding the case was neither so pervasive nor so prejudicial as to require a change of venue. Moreover, the most extensive and potentially prejudicial publicity was generated in the period immediately after the commission of the murder; the guilt phase portion of the case did not commence, however, until approximately twenty-two months after the commission of the crime. Although it cannot be doubted that some, if not many, of the prospective members of the jury pool would have been exposed to at least some pretrial publicity concerning the case, that fact alone is insufficient to warrant removal of the case to a different venue. "[J]urors need not be totally ignorant of the facts and issues involved in a criminal trial and the fact that some jurors have some prior knowledge about the case does not itself constitute identifiable jury prejudice." *State* v. *Townsend*, supra, 211 Conn. 225. Furthermore, there is no reason to believe that any influence of the pretrial publicity could not have been overcome by the voir dire process. See *State* v. *Kelly*, supra, 256 Conn. 34. Indeed, this conclusion is borne out by the fact that two jurors were selected in the two days of jury selection that preceded the defendant's decision to waive his right to a jury trial and to be tried by a three judge panel. Finally, the trial court, in denying the defendant's motion without prejudice, properly left open the possibility of reconsidering the motion in the unlikely event that, during the course of the voir dire process, it became apparent that an impartial jury could not be impaneled in the judicial district of Waterbury.[192] We

[192] In support of his claim that the trial court improperly denied his motion for a change of venue, the defendant refers to the decision of the three judge panel to grant his motion for a change of venue in connection with

therefore conclude that the trial court did not abuse its discretion in denying the defendant's motion for a change of venue.

the penalty phase hearing. Specifically, the defendant asserts that, because he sought and received a change of venue for the penalty phase hearing, he also was entitled to a change of venue for the guilt phase proceeding. This argument lacks merit for several reasons. First, the granting or denial of a motion for a change of venue involves the sound exercise of discretion. Consequently, in many cases, the decision of a court will not be subject to reversal even though another court might have decided the motion differently, as long as the court deciding the motion rationally could have decided as it did. More importantly, however, the panel rendered its decision to grant the defendant's motion for a change of venue in connection with the penalty phase hearing nearly six months after the court rendered its decision on the defendant's initial motion for a change of venue. In the interim, the defendant had been found guilty of the capital felony with which he had been charged and, as the panel explained in its memorandum of decision, "there ha[d] been a substantial change in circumstances since the end of May [when the defendant's first motion for a change of venue was denied]. Jurors now will know that three judges [found] the defendant [guilty] of capital felony and murder. In May of [1994], when the [defendant's motion for a] change of venue was denied, news coverage of the case had abated significantly since the date of the shooting. Since May, the trial of the guilt phase, which has just ended, has been the subject of extensive coverage in the media. The case frequently made the headlines in Waterbury's major local newspaper.

"Media accounts relative to the police version, arrests, background of the suspects and courtroom proceedings before and during the trial of the guilt phase were straightforward, factual and not inflammatory or sensationalized. . . . Unfortunately, the gist of the media publicity subsequent to the [panel's finding of] guilty . . . has been inflammatory, fomenting a virtual cry to battle to see that [the defendant] receives the death sentence. News accounts offered little perspective into the legal and factual issues which must be considered before the imposition of the death penalty." The panel also referred to the upcoming second anniversary of . . . Williams' death as a likely source of prejudicial publicity, as well as the continued activities of the Williams Petition Campaign for Justice, which had held fundraisers, circulated petitions and encouraged people to wear ribbons and T-shirts to urge support for the strengthening of Connecticut's death penalty statutes. Finally, jury selection for the penalty phase hearing was scheduled to commence soon after the completion of the guilt phase and its attendant publicity; indeed, jury selection for the penalty phase hearing commenced less than three months after the conclusion of the guilt phase. Thus, in view of the publicity generated from the panel's finding of guilty, the panel was required to consider the defendant's second motion for a change of venue in a factual context entirely different from the factual context in which the

B

## The Trial Court's Denial of the Defendant's Postverdict Motions for the Imposition of a Life Sentence and an Evidentiary Hearing in Connection Therewith

The defendant next raises two separate but related claims. First, the defendant claims that the trial court improperly denied his postverdict motion for the imposition of a life sentence, claiming that a sentence of death would be arbitrary and discriminatory. Second, the defendant claims that the court improperly rejected his request for the postponement of the imposition of a sentence in order to afford him: (1) a reasonable period of time within which to research and analyze certain data that he contends are relevant to his motion; and (2) an opportunity to present evidence in substantiation of his claims upon completion of that research and analysis. Although the reasons that the trial court proffered in support of its decision to deny the defendant's motions for the imposition of a life sentence and for a hearing on that motion were incorrect as a matter of law, we nevertheless conclude that, under the particular circumstances presented, the defendant was not entitled to the hearing that he sought. We also conclude, however, that the defendant may renew his claim by way of a petition for a writ of habeas corpus.

The following additional facts and procedural history are necessary to our resolution of the defendant's claims. After the jury had returned its verdict revealing that it had found the existence of two aggravating factors and no mitigating factors, the defendant filed a motion for the imposition of a life sentence, claiming that a sentence of death under the circumstances of

defendant's first motion for a change of venue was decided. We therefore reject the defendant's contention that the decision of the panel granting his subsequent change of venue motion lends support to his contention that the denial of his first motion constituted an abuse of discretion.

this case would violate article first, §§ 1,[193] 8,[194] 9[195] and 20,[196] of the state constitution, this state's constitutional prohibition against the infliction of cruel and unusual punishment,[197] and General Statutes (Rev. to 1991) § 53a-46b, as amended by Public Acts 1992, No. 92-260, § 23.[198] The defendant alleged that the imposition of

[193] Article first, § 1, of the constitution of Connecticut provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[194] Article first, § 8, of the constitution of Connecticut provides: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or an indictment of a grand jury, except in the armed forces, or in the militia when in actual service in time of war or public danger."

[195] See footnote 35 of this opinion for the text of article first, § 9, of the constitution of Connecticut.

[196] Article first, § 20, of the constitution of Connecticut provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

[197] We previously have concluded that the infliction of cruel and unusual punishment is prohibited by the due process clauses of article first, §§ 8 and 9, of the state constitution. *State* v. *Ross*, supra, 230 Conn. 246.

[198] General Statutes (Rev. to 1991) § 53a-46b, as amended by Public Acts 1992, No. 92-260, § 23, provides: "(a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar

a death sentence in accordance with the jury verdict "would be illegal, arbitrary, discriminatory, disproportionate, wanton, and freakish" due primarily to "the influence of race and other arbitrary factors on the imposition of capital punishment [throughout] Connecticut . . . ."

The defendant also filed a separate motion seeking an evidentiary hearing on his motion for the imposition of a life sentence. In support of this separate motion, the defendant provided the court with certain "preliminary data" which, according to the defendant, suggest that the death penalty is imposed in a racially discriminatory and arbitrary manner in this state.[199] See *Cobb I*, supra,

cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

[199] These data are the same data that Sedrick Cobb relied on in support of *his* claim that his death sentence should have been vacated on the ground that the death penalty is imposed in a racially arbitrary and discriminatory manner in Connecticut. *Cobb I*, supra, 234 Conn. 738–39 n.4. For purposes of the present case, Cobb's claim and the defendant's claim are similar in all material respects. Indeed, the defendant expressly represented in his motion for a hearing to present evidence in support of his motion for the imposition of a life sentence that the hearing "could be held in conjunction with" any hearing ultimately conducted in connection with Cobb's claim. As we stated in *Cobb I* in explaining the data: "According to [Cobb], his preliminary data show that: (1) since 1973, prosecutors have charged a capital felony pursuant to General Statutes § 53a-54b in seventy-four cases, of which only eleven, or 15 percent, have involved the murder of a victim who was black, even though 40 percent of all murder victims in the state during that same time period were black; (2) since 1973, although there have been eighteen capital prosecutions for murder committed during the course of kidnapping, none was prosecuted where the victim was black; (3) during the same period, there have been twelve capital prosecutions for murder committed in the course of a sexual assault, and only one involved the murder of a black victim; (4) since 1973, twenty-eight cases have resulted in a conviction of capital felony, by verdict or plea, and eighteen of those twenty-eight have proceeded to a hearing on the imposition of the death penalty. Of the twenty-eight capital felony convictions, only four, or 14 percent, have involved the murder of a victim who was black, and of the

234 Conn. 738–40 and n.4. Acknowledging the necessity of supplementing his data, the defendant indicated that he was not prepared to proceed immediately with the requested hearing and that he needed "several months" to do "detailed research into court records and other similar preparation" before the hearing.[200] Finally, the defendant also requested that his sentencing be postponed until after a hearing and decision on his motion for the imposition of a life sentence.

The trial court denied both of the defendant's motions, essentially concluding that the data submitted by the defendant failed to show that the prosecution of the *present case* was predicated on arbitrary or discriminatory factors. The court further stated that there was no reason to delay the imposition of sentence for the extended period of time requested by the defendant in view of the fact that the defendant's motion raised "collateral matters that ha[d] nothing to do with [the] proceedings . . . ." Finally, the court suggested that the defendant's claim is properly raised as a claim under subdivision (3) of General Statutes (Rev. to 1991) § 53a-46b (b), as amended by Public Acts 1992, No. 92-260, § 23, for proportionality review on appeal to this court. See *Webb I*, supra, 238 Conn. 490–91.

Approximately four months after the trial court denied the defendant's motions, we issued our opinion

eighteen that have gone to a penalty phase hearing, only one, or 5.5 percent, has involved the murder of a black victim; (5) of the sixty-six capital convictions in which the guilt phase has been concluded, twenty-one involved black defendants and forty-five involved nonblack defendants. Of the black defendants, thirteen of twenty-one, or 62 percent, were convicted of capital felonies and fifteen of forty-five, or 33 percent, non[black] defendants were so convicted. [Cobb] seeks the opportunity to demonstrate the number of kidnap murders of black victims and the number of sexual assault murders of black victims that were not prosecuted as capital felonies and to demonstrate the disproportionate treatment of those crimes as compared to the treatment of comparable crimes involving white victims." Id.

[200] Defense counsel informed the trial court that preparation for the hearing "most likely [would take] four to six months . . . ."

in *Cobb I*, supra, 234 Conn. 735. In *Cobb I*, the defendant, Sedrick Cobb, filed a motion to expand the universe of cases that we would consider in reviewing Cobb's death sentence for proportionality. Id., 737. In support of his motion, Cobb contended that such an expansion was necessary to evaluate his allegation of disproportionality, which hinged on his claim that race "has an impermissible effect on capital sentencing decisions in Connecticut"; id., 738; a claim that is similar in all material respects to the claim raised by the defendant in the present case in support of his motion for the imposition of a life sentence. We concluded, inter alia, that Cobb's "claim presented . . . in his motion under § 53a-46b (b) (3) is more appropriately presented under § 53a-46b (b) (1)" rather than under § 53a-46b (b) (3) as a claim for proportionality review. Id., 741. We also concluded, however, that the creation of an adequate factual record that is the subject of a full evidentiary hearing is a prerequisite to bringing a claim under § 53a-46b (b) (1) so that any disputed issues may be resolved, in the first instance, by the trial court, subject to appropriate appellate review, on the basis of the record created in the trial court. Id., 762.[201] In light of our decision in *Cobb I*, we agree with the defendant that he was entitled to an evidentiary hearing for the purpose of presenting facts in support of his claim that, notwithstanding the jury verdict, he should be sentenced to life imprisonment without the possibility of release because of the allegedly flawed manner in which this state's death penalty statute is implemented.[202]

[201] Cobb presented his claim directly to this court under § 53a-46b (b) (3) and, therefore, had not created an adequate factual record in the trial court. *Cobb I*, supra, 234 Conn. 741. Consequently, we determined that Cobb would have been ineligible to proceed with his claim under § 53a-46b (b) (1). See id., 762. We nevertheless sanctioned Cobb's use of a postappeal habeas corpus petition as a means of pressing his claim. Id., 762–63. We thereafter reaffirmed Cobb's conviction in *Cobb II*, supra, 251 Conn. 521.

[202] We underscore the fact that the trial court in the present case did not have the benefit of our decision in *Cobb I* when it denied the defendant's request for an evidentiary hearing in connection with his claim.

Although the defendant had a right to an evidentiary hearing, he was not entitled to an indefinite period of time within which to attempt to develop facts in support of his claim. The defendant estimated that he would have needed four to six months to obtain and evaluate the data relevant to this claim; nevertheless, to date, that task has not been completed. Moreover, once the defendant has completed his research and analysis, the state must be afforded sufficient time to review that data and any conclusions that the defendant contends may be drawn therefrom.

In light of the nature and magnitude of the work necessary to prepare the claim for a hearing—as evidenced by the fact that such work has not yet been completed—an extraordinary, indeed, indefinite, delay in the imposition of sentence would have been required to accommodate the defendant's request for a hearing prior to sentencing. Such a lengthy postponement of the hearing simply would not have been acceptable. Indeed, even without the benefit of hindsight, it would not have been reasonable for the defendant to have expected the court to grant the four to six month postponement he requested, especially in view of the fact that the court could not possibly have been assured that the matter would be ready for a hearing even in that extended time frame. Under the circumstances, therefore, there is no reasonable possibility that the trial court would have permitted the requested extension of time even if our decision in *Cobb I* had been available to the trial court when it denied the defendant's motions.[203]

[203] Although we concluded in *Cobb I* that claims that call into question the manner in which the state's death penalty statute is implemented are to be developed in the trial court and subject to an evidentiary hearing; see *Cobb I*, supra, 234 Conn. 762; we did not suggest or otherwise intimate that a court would be bound to postpone sentencing indefinitely, or for an unreasonably long period of time, in order to allow a capital defendant to obtain and analyze the necessary data prior to the imposition of sentence.

We believe, therefore, that the proper course is not to remand the defendant's claim to the trial court but, rather, to afford the defendant an opportunity to renew his claim by way of a habeas corpus petition. Id., 741, 762–63. As long as the defendant has such recourse, he will not be prejudiced in any way by the denial of an evidentiary hearing in the trial court.[204]

Furthermore, since our decisions in *Cobb I* and *Cobb II*, subsequent events have overtaken both the claim that the defendant raises in the present case and the same claim made by Cobb in his case. These events reaffirm our conclusion that the defendant should be required to pursue his claim in a habeas corpus proceeding in the trial court. We affirmed Cobb's conviction and his death sentence. *Cobb II*, supra, 251 Conn. 521. In the course of that opinion, we reaffirmed our earlier conclusion in *Cobb I*, supra, 234 Conn. 762–63, that Cobb would be permitted to raise his statistical claim by way of a petition for a writ of habeas corpus. *Cobb II*, supra, 499.[205]

At some time after our decision in *Cobb I*, which was released in 1995, the office of the public defender began to collect the data that it deemed necessary to establish the claim. In November, 2002, approximately seven years after the defendant in the present case sought his continuance in the trial court, the office of the public

[204] Although the defendant properly sought an evidentiary hearing on his claim in the trial court, we also have concluded that the postponement he sought simply was not reasonable. Under ordinary circumstances, such a procedural default might serve to bar him from raising his claim in a habeas proceeding. Cf. *Cobb I*, supra, 234 Conn. 763. In any event, this is not such a case. The uncertain state of the law when the defendant sought an evidentiary hearing, the difficult and time-consuming nature of the task of obtaining and evaluating the necessary data, and "the nature of the defendant's claim of systemic racial bias, [as well as] the seriousness and finality of the death penalty, [all] counsel against raising any undue procedural barriers to review of such a claim." Id.

[205] See footnote 201 of this opinion.

defender informed this court that it had completed its collection of the data and that an expert's report analyzing the data would be completed by January 1, 2003. The office of the public defender also informed us that its preparation for a hearing on the data and report would take an additional three to six months. That time period does not include, however, the time necessary for the state to prepare its response to the claim. In December, 2002, Chief Justice William J. Sullivan appointed former Chief Justice Robert Callahan to serve as a special master to manage the process and timetable by which the claim would be litigated in the habeas court. At this point, we have received no further information regarding the status of that litigation.

It is apparent, therefore, that neither the office of the public defender nor the state is ready to litigate the merits of this claim in the immediate future. It is also apparent that judicial economy, as well as fairness to both defendants and the state, mandates that this claim be litigated before the same habeas judge and in the same general, consolidated hearing, on behalf of all defendants who have been sentenced to death.

Our conclusion applies to the defendant in the present case.[206] The defendant will have a full opportunity to present his claim in the habeas court and, as we previously have indicated, is not prejudiced in any way by the relegation of his claim to that forum.

Moreover, in order to clarify this matter for other defendants, we now conclude that it is not appropriate for capital defendants to make such a claim in the trial court before which their penalty phase hearings will be or have been held. Such a claim properly is presented

---

[206] Indeed, as we previously have indicated; see footnote 199 of this opinion; the defendant suggested, in his motion for a hearing to present evidence in support of his claim, that the hearing could be held in conjunction with any hearing ultimately conducted in regard to Cobb's claim.

in the consolidated habeas proceeding to which we have referred, so that it may be litigated and resolved at the trial level in one proceeding, rather than several.[207] Therefore, to the extent that we previously have indicated that a capital defendant should present this claim in the trial court before which his penalty phase hearing will be or has been held, we disavow that procedure. A capital defendant should not make such a claim in the trial court, and the trial court should not entertain such a claim. The claim should be presented in the consolidated habeas corpus proceeding that we contemplate will be litigated at some time in the reasonably near future.

## C

### Mandatory Sentence Review

The defendant further asserts that this court should vacate his death sentence because: (1) it "was the product of passion, prejudice or any other arbitrary factor" in violation of General Statutes § 53a-46b (b) (1); and (2) "the evidence fails to support the finding of an aggravating factor" in violation of General Statutes (Rev. to 1991) § 53a-46b (b) (2), as amended by Public Acts 1992, No. 92-260, § 23. In support of these claims, the defendant relies solely on the arguments that he has raised in connection with his other claims. With the exception of the defendant's contention regarding the evidentiary insufficiency of the existence of the aggravating factor enumerated in § 53a-46a (h) (4), we have rejected all of his claims. The persuasive force of the defendant's meritless claims is no greater when

---

[207] We do not intimate, however, whether any particular defendant or the state would be barred from litigating a claim of this nature in the consolidated habeas proceeding that we contemplate when that defendant desires to present a different variation of the claim or when the state has a different variation of its response to the defendant's claim. Those will be discretionary matters of case management for both former Chief Justice Callahan and the habeas judge to resolve.

those claims are viewed cumulatively than when they are considered individually. Except to the extent that the defendant's claim under § 53a-46b (b) (2) relates to the evidentiary insufficiency of the state's allegation of the existence of the aggravating factor enumerated in § 53a-46a (h) (4), we reject his claims under § 53a-46b (b) (1) and (2).[208]

## VI

## THE CONSTITUTIONALITY OF CONNECTICUT'S DEATH PENALTY STATUTES

The defendant challenges the constitutionality of this state's death penalty statutes under the federal and state constitutions. He argues that the statutory scheme is unconstitutional because it: (1) requires the defendant to shoulder the burden of proving the existence of a mitigating factor by a preponderance of the evidence; (2) embodies a presumption that death is the appropriate sentence; (3) requires the jurors to unanimously agree that some mitigating factor exists before the defendant is eligible to receive a sentence of life imprisonment without the possibility of release;[209] (4) calls for the imposition of the death penalty without allowing the jurors to determine whether, in the particular case at issue, the death penalty is appropriate on the basis of the aggravating factor or factors alleged by the state; (5) provides for a standardless and unreviewable determination of the existence of nonstatutory mitigating factors; (6) fails to provide for a capital sentencer who makes an individualized, reasoned and moral decision

[208] As we concluded previously in this opinion; see part III B 1 of this opinion; the evidence adduced at the penalty phase hearing was insufficient to support the jury's finding regarding the existence of the aggravating factor enumerated in § 53a-46a (h) (4). To this extent, therefore, the defendant is entitled to prevail on his claim under § 53a-46b (b) (2).

[209] This claim presupposes that the jurors unanimously have found that the state has proven the existence of at least one aggravating factor beyond a reasonable doubt.

on the appropriateness of the death penalty; (7) sanctions the imposition of the death penalty, which constitutes cruel and unusual punishment in violation of our state constitutional due process clauses; and (8) designates lethal injection as the method of execution.

We previously have considered and rejected each of these claims. Specifically, in *Ross*, we rejected claims identical in all material respects to the first seven claims raised by the defendant. See *State* v. *Ross*, supra, 230 Conn. 229, 239–41 and n.24, 243–44, 256. In *Breton II*, we reaffirmed our conclusion in *Ross* regarding claims identical in all material respects to six of the defendant's claims, namely, the first two claims and claims four through seven. *Breton II*, supra, 235 Conn. 217–18. Thereafter, in *Webb I*, supra, 238 Conn. 401–402, we were asked to reexamine our holdings in *Ross* and *Breton II* that the state's death penalty statutory scheme does not violate the state constitutional prohibition against cruel and unusual punishment. We reaffirmed our holdings in *Ross* and *Breton II*; id., 406; rejecting the precise contention that the defendant raises in his seventh claim. We subsequently reaffirmed our conclusions in *Ross* and *Breton II* in *Cobb II*, supra, 251 Conn. 496–97. Finally, in *State* v. *Webb*, 252 Conn. 128, 146, 147, 750 A.2d 448 (*Webb II*), cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000), we considered and rejected a claim that lethal injection as a method of execution constitutes cruel and unusual punishment in contravention of the federal and state constitutions, a claim identical in all material respects to the defendant's eighth claim.[210]

---

[210] At the time of the defendant's trial, and in April, 1995, when the trial court rendered judgment sentencing the defendant to death, electrocution was the statutorily prescribed method of execution in this state. See General Statutes (Rev. to 1995) § 54-100 ("[t]he method of inflicting the punishment of death shall be by electrocution"); accord General Statutes (Rev. to 1993) § 54-100. After the defendant had been sentenced, however, legislation requiring that all executions that are carried out on or after October 1, 1995, be accomplished by lethal injection, became effective. Public Acts 1995, No.

Although the defendant acknowledges that we previously have rejected all of his constitutional claims, he asks us to reconsider our earlier conclusions. Because we are not persuaded that any of our previous determinations are incorrect, we reject the defendant's claims.

## VII

## PROPORTIONALITY REVIEW

Pursuant to General Statutes (Rev. to 1991) § 53a-46b (a), this court is responsible for reviewing "[a]ny sentence of death imposed in accordance with the provisions of [§] 53a-46a . . . ." In carrying out this function, the legislature has directed us to "affirm the sentence of death unless [we determine] that . . . the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant."[211] General Statutes (Rev. to 1991) § 53a-

95-16, §§ 1, 5. Consequently, the defendant did not have an opportunity to challenge this method of execution during the trial court proceedings. In the brief that he filed with this court in 1998, the defendant specifically claimed that he should be afforded an "opportunity to challenge the [constitutionality] of lethal injection as a method of execution." In January, 2000, we concluded, in *Webb II*, supra, 252 Conn. 146, 147, that lethal injection, as a method of execution, offends neither the eighth amendment's prohibition against cruel and unusual punishment nor the prohibition against cruel and unusual punishment inherent in the due process clauses of article first, §§ 8 and 9, of the Connecticut constitution. In the defendant's reply brief, which the defendant had filed with this court in 2001, he acknowledged our holding in *Webb II*, but provided us with no explanation as to why we should reconsider our holding in *Webb II* or why he should be afforded an opportunity to challenge in the trial court the constitutionality of lethal injection as a method of execution. Consequently, we treat his claim as a request for reconsideration of our determination in *Webb II* that lethal injection, as a method of execution, does not offend the eighth amendment to the United States constitution or article first, §§ 8 and 9, of the Connecticut constitution. Id. As we have indicated, however, the defendant has offered no reason why we should depart from that determination, and, therefore, we decline to do so.

[211] Section 53a-46b (b) provides two other grounds, in addition to disproportionality, for vacating a sentence of death. See General Statutes (Rev.

46b (b) (3). "Under § 53a-46b (b) (3), therefore, we must engage in what has come to be known as proportionality review[212] of the defendant's death sentence."[213] *Webb I,* supra, 238 Conn. 490–91.

As we previously have stated, "our function in undertaking [proportionality review] is to assure that upon consideration of both the crime and the defendant the aggravating and mitigating circumstances present in

to 1991) § 53a-46b (b) (1) and (2) ("[t]he supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; [or] (2) the evidence fails to support the finding of an aggravating factor specified in . . . section 53a-46a").

[212] In 1995, the legislature eliminated proportionality review by repealing § 53a-46b (b) (3). Public Acts 1995, No. 95-16, § 3 (P.A. 95-16). Prior to the filing of the briefs in the present case, the state moved to dismiss proportionality review, claiming that the repeal of § 53a-46b (b) (3) deprived this court of jurisdiction to undertake proportionality review in the present case even though the defendant had committed the capital felony in 1992, well before the passage of P.A. 95-16, § 3. We denied the state's motion, adhering to our previous determination in *Cobb II,* supra, 251 Conn. 502, and *Webb I,* supra, 238 Conn. 491 n.71, that proportionality review remains available in all capital felony cases pending on April 12, 1995, the date on which P.A. 95-16, § 3, became effective. P.A. 95-16, § 5.

[213] In *Webb I,* supra, 238 Conn. 389, we explained that comparative proportionality review can be performed in one of two ways: the frequency method, pursuant to which a reviewing court "uses a complicated method of statistical analysis that purports to quantify, with something like mathematical precision, the various factors leading to the imposition, or nonimposition, of the death penalty, and the frequency with which the death penalty is imposed in certain circumstances"; id., 511; and the precedent seeking approach, pursuant to which a reviewing court "compares the case before it to other cases in which defendants were convicted of the same or similar crimes, by examining the facts of the crimes, the defendants, and the aggravating and mitigating factors involved." Id., 511–12. We concluded in *Webb I* that "our statute contemplates the precedent seeking method of comparative proportionality review." Id., 513; see also *Cobb I,* supra, 234 Conn. 741 (proportionality review does not contemplate detailed statistical analysis of pool of comparable cases). Thereafter, in *Cobb II,* supra, 251 Conn. 506, we reaffirmed our adherence to the precedent seeking approach to comparative proportionality review. The defendant urges us to reconsider, once again, our use of the precedent seeking mode of analysis. We decline to do so because we are satisfied that that method is the correct one.

one capital case will lead to a result similar to that reached under similar circumstances in another capital case, thus identifying the aberrant sentence and avoiding its ultimate imposition. . . . The search, however, is not for a case involving a rough equivalence of moral blameworthiness; the search is, rather, for a gross disparity between the case on review and other cases within the selected pool of similar cases. . . . Thus, proportionality review requires a comparison of the decision to impose a death sentence, made by the fact finder in the case before us on the basis of the presence or absence of aggravating and mitigating factors, with decisions to impose sentences of death or life imprisonment, made by the fact finders in the other relevant cases on the basis of the presence or absence of aggravating and mitigating factors. That process requires us to determine whether, as compared to those cases, this case is an outlier." (Citations omitted; internal quotation marks omitted.) *Cobb II*, supra, 251 Conn. 509–10. In other words, because "[t]he process of proportionality review requires that we canvass a set of 'similar cases' to determine whether the death penalty in the case before us was, with respect to that set of cases, wantonly or freakishly imposed by the fact finder." *Webb I*, supra, 238 Conn. 516. We will not vacate a death sentence as disproportionate under § 53a-46b (b) (3) unless that sentence is truly aberrational with respect to similar cases. See id., 501.[214]

Our first task, therefore, is to determine "the universe of cases from which can be culled the pool of cases deemed to be 'similar cases' for purposes of proportionality review under § 53a-46b (b) (3)." Id., 513. "In accordance with the statutory mandate of § 53a-46b (a) that we review all sentences of death pursuant to [our] rules,

---

[214] We note that neither the state nor the defendant has the burden of persuasion on the ultimate issue of disproportionality under § 53a-46b (b) (3). See *Webb I*, supra, 238 Conn. 508.

we adopted [what is now] Practice Book § [67-6],[215] under which we defined the universe as follows: Only those capital felony cases that have been prosecuted in this state after October 1, 1973, and in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed,

[215] Practice Book § 67-6 provides: "(a) When a sentence of death has been imposed upon a defendant, following a conviction of a capital felony in violation of General Statutes § 53a-54b and the hearing upon imposition of the death penalty pursuant to General Statutes § 53a-46a, the briefs of the parties shall include a discussion of the issues set forth in General Statutes § 53a-46b (b), to wit, whether (1) the sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating circumstance specified in subsection (h) of § 53a-46a; and (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(b) For the purpose of reviewing the issue of disproportionality pursuant to General Statutes § 53a-46b (b), the briefs of the parties shall contain appendices setting forth the circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted and the characters and records of the defendants involved therein so far as these are ascertainable from the transcripts of those trials and hearings on the imposition of the death penalty or may be judicially noticed. Only those capital felony cases that have been prosecuted in this state after October 1, 1973, and in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed, shall be deemed eligible for consideration as 'similar cases,' unless the court, on application of a party claiming that the resulting pool of eligible cases is inadequate for disproportionality review, shall modify this limitation in a particular case. Any such application shall identify the additional case or cases claimed to be similar and set forth, in addition to the circumstances of the crime and the character and record of the defendant involved, the provisions of the applicable statutes pertaining to the imposition of the death penalty with citations of pertinent decisions interpreting such provisions.

"Any such application shall be filed within thirty days after the delivery date of the transcript ordered by the appellant, or, if no transcript is required or the transcript has been received by the appellant prior to the filing of the appeal, such application shall be filed within thirty days after filing the appeal."

The text of Practice Book § 67-6, with the exception of some technical alterations, was adopted in 1990, and appeared in Practice Book, 1978–97, § 4066A. Section 4066A effectively was transferred to Practice Book, 1978–97, § 4064E, in 1996. In 1998, § 4064E was transferred to Practice Book § 67-6.

shall be deemed eligible for consideration as similar cases. . . . We allowed for an expansion of this universe in a given case, however, on application of a party claiming that the resulting pool of eligible cases is inadequate for disproportionality review." (Internal quotation marks omitted.) Id. In the absence of such a showing, "the universe of cases from which we cull the ultimate pool of cases deemed similar cases consists only of capital felony convictions in which there was a penalty phase hearing." (Internal quotation marks omitted.) Id., 528. We have further refined the universe to include "cases currently on appeal and, absent exceptional circumstances wholly undermining the fundamental reliability of the fact-finding process, cases that have been reversed on appeal. . . . [I]n the absence of such exceptional circumstances, a reversed finding regarding an aggravating factor in the case on review will be included in the process of proportionality review." Id. Two exceptional circumstances that require the exclusion of an otherwise eligible case from the universe of cases involve: (1) cases in which the capital felony conviction has been reversed on the basis of insufficient evidence; id., 520 n.83, 522; and (2) cases in which the death sentence has been vacated on the basis of insufficient evidence with respect to the existence of the aggravating factor or factors that served as the basis for the imposition of the death penalty. Id., 520 n.83.[216]

[216] The defendant moved to expand the universe of cases to include "all cases prosecuted in Connecticut after October 1, 1973 in which a capital felony could have been charged . . . and which resulted in a homicide conviction, following a plea or trial." We consistently have rejected similar requests in the past; see Webb I, supra, 238 Conn. 513; Cobb I, supra, 234 Conn. 735; State v. Ross, 225 Conn. 559, 561, 624 A.2d 886 (1993); and we denied the defendant's motion as well. The defendant now seeks to have us reconsider our denial of his motion. Alternatively, the defendant maintains that, at a minimum, we should expand the universe to include "those cases that were charged as capital crimes, but for whatever reason did not proceed to a penalty [phase] hearing." As we previously have explained; see, e.g., Webb I, supra, 238 Conn. 514–18; the expansion of the universe of cases

Applying these principles, we conclude that the following cases comprise the universe of eligible cases from which the pool of similar cases must be selected for purposes of comparison: *State* v. *Ortiz*, 252 Conn. 533, 747 A.2d 487 (2000); *State* v. *Hafford*, supra, 252 Conn. 274; *State* v. *Griffin*, supra, 251 Conn. 671; *Cobb II*, supra, 251 Conn. 285; *State* v. *King*, 249 Conn. 645, 735 A.2d 267 (1999); *State* v. *Correa*, supra, 241 Conn. 322; *Webb I*, supra, 238 Conn. 389; *State* v. *Lapointe*, supra, 237 Conn. 694; *Breton II*, supra, 235 Conn. 206; *State* v. *Day*, 233 Conn. 813, 661 A.2d 539 (1995); *State* v. *Ross*, supra, 230 Conn. 183; *State* v. *Roseboro*, 221 Conn. 430, 604 A.2d 1286 (1992); *State* v. *Steiger*, 218 Conn. 349, 590 A.2d 408 (1991); *State* v. *Wood*, 208 Conn. 125, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988); *State* v. *Daniels*, 207 Conn. 374, 542 A.2d 306 (1988); *State* v. *Usry*, supra, 205 Conn. 298; *State* v. *Peeler*, Superior Court, judicial district of Fairfield, Docket No. CR 99-148396; *State* v. *Colon*, Superior Court, judicial district of Waterbury, Docket No. CR 98-270986; *State* v. *West*, Superior Court, judicial district of Hartford, Docket No. CR 98-109471; *State* v. *Rizzo*, Superior Court, judicial district of Waterbury, Docket No. CR 97-262883.[217] In addition, we pre-

sought by the defendant is fundamentally incompatible with proportionality review as it is contemplated under § 53a-46b (b) (3). We therefore decline the defendant's invitation to expand the universe of cases in the manner that he requests.

[217] We previously have included *State* v. *Johnson*, supra, 253 Conn. 1, a case that, like the present case, involved the murder of a law enforcement officer acting within the scope of his duties, in the universe of eligible cases. See *Webb I*, supra, 238 Conn. 539. Subsequent to the issuance of our opinion in *Webb I*, however, this court vacated the death sentence that had been imposed in *Johnson* on the ground that the evidence was insufficient to support the jury's finding of the existence of the aggravating factor that served as the basis for the imposition of the death penalty. *State* v. *Johnson*, supra, 56, 78, 81. *Johnson*, therefore, must be excluded from the universe of cases because "[t]he conclusion is inescapable . . . that a reversal that is based on insufficiency of the evidence to support the finding of an aggravant, which finding is the sine qua non of the imposition of the death penalty, will mandate the exclusion of the case from the universe of cases. In other

viously granted the defendant's motion to expand the universe of eligible cases to include *State* v. *Gonzalez*, supra, 206 Conn. 213, and *State* v. *Hoyeson*, Superior Court, judicial district of Ansonia-Milford, Docket No. CR 566329.[218]

We next turn "to the question of how to go about culling from the universe of eligible cases the ultimate pool of cases deemed to be similar cases for purposes of proportionality review. Having defined and limited the universe of cases, we must determine which particular cases within that universe are similar to th[e] [present] case for purposes of deciding whether the death sentence being reviewed is an outlier." (Internal quotation marks omitted.) *Webb I*, supra, 238 Conn. 523. "What the ultimate pool of 'similar cases' will consist of in any particular case will have to be developed on a case-by-case basis. . . . [The term] 'similar cases' means, in general, cases in which the underlying capital felonies were based on conduct of other defendants that is substantially similar, in its criminal characteristics, to that of the defendant in the case under review. We ask: in the general transaction that underlies the conviction for capital felony in the case under review, in what kind of criminal conduct, in general, did the defendant engage? We then seek to identify other cases in which the defendants engaged in substantially similar conduct." Id., 525–26. Thus, in ascertaining the pool of similar cases, we are not limited only to those cases involving the same subsections of the capital felony statute. Rather, we look to the characteristics of the

words, if it is authoritatively determined that the sentencing authority could not, as a matter of law, have imposed the death penalty based on the evidence before it, such a case cannot be deemed to be similar to the case under proportionality review." (Internal quotation marks omitted.) *Webb I*, supra, 238 Conn. 520 n.83.

[218] We denied the defendant's motion insofar as he sought to include *State* v. *Castonguay*, 218 Conn. 486, 590 A.2d 901 (1991), in the universe of cases eligible for consideration.

criminal conduct underlying the capital felony conviction to determine whether that conduct is sufficiently similar to the conduct underlying the case under review to provide a fair basis for comparison. See id., 526.

Finally, we do not "differentiate, for purposes of defining the pool of similar cases, between aggravating and mitigating factors, because both may implicate the circumstances of the crime, and both may also implicate the character and record of the defendant. . . . [T]herefore . . . both aggravants and mitigants must be viewed together, analytically, although not as part of the definition of similar cases. Rather, they must both be considered in the process of actually comparing the case before us on review with the predetermined pool of similar cases . . . ." (Internal quotation marks omitted.) Id., 525.

In the present case, the defendant was found guilty of capital felony in connection with the fatal shooting of a police officer who was acting in the performance of his official duties. The murder occurred while the defendant was engaged in a narcotics transaction, for which he was seeking to avoid detection and the purpose of which was pecuniary gain. We therefore conclude that the defendant's conduct generally may be characterized, for purposes of proportionality review, as involving a murder committed in the course of, or for the purpose of advancing, a criminal scheme, an object of which was pecuniary gain.[219] We also conclude

[219] The state suggests that the primary characteristic of the defendant's criminal conduct is the use of a gun in the commission of a capital felony and, consequently, that the ultimate pool of cases applicable to our proportionality review includes those cases in which the underlying murder was committed with a firearm. We do not believe that this group of cases is sufficiently well defined to allow for meaningful proportionality review. In other words, those capital cases in which a firearm had been used to commit the murder would not give rise to a pool of cases substantially similar to the present case.

The defendant, however, does not seek to define the pool by reference to any one particular set or combination of criminal characteristics. Rather,

that the pool of cases sufficiently similar in their criminal characteristics to permit meaningful proportionality review is comprised of six cases,[220] namely, *Hafford, Correa, Roseboro, Gonzalez,*[221] *Hoyeson*[222] and

he proposes a number of possible alternatives, each of which demonstrates, according to the defendant, that this case is an " 'outlier.' " *Cobb II,* supra, 251 Conn. 510. We are persuaded, however, that the pool we have identified is the appropriate one.

[220] We exclude *Cobb II, King, Webb I, Lapointe, Ross, Daniels* and *Usry* from the pool because those cases involve murders in connection with a kidnapping or sexual assault or both. *Cobb II,* supra, 251 Conn. 297–98, 300, 301–304 (kidnapping and sexual assault); *State v. King,* supra, 249 Conn. 647–49, 656 (kidnapping and sexual assault); *Webb I,* supra, 238 Conn. 398–99 (kidnapping); *State v. Lapointe,* supra, 237 Conn. 695–99 (kidnapping and sexual assault); *State v. Ross,* supra, 230 Conn. 191–92 (kidnapping and sexual assault); *State v. Daniels,* supra, 207 Conn. 377, 379 (sexual assault); *State v. Usry,* supra, 205 Conn. 301 (sexual assault). We eliminate *Griffin, Breton II, Day, Steiger* and *Wood* because the predominant criminal characteristic of those cases is the murder of multiple victims. *State v. Griffin,* supra, 251 Conn. 679–80; *Breton II,* supra, 235 Conn. 209; *State v. Day,* supra, 233 Conn. 817; *State v. Steiger,* supra, 218 Conn. 355; *State v. Wood,* supra, 208 Conn. 128. We exclude *Peeler, Colon, West* and *Rizzo* because those cases involve the murder of a person under the age of sixteen. See *State v. Peeler,* supra, Superior Court, Docket No. CR 99-148396; *State v. Colon,* supra, Superior Court, Docket No. CR 98-270986; *State v. West,* supra, Superior Court, Docket No. CR 98-109471; *State v. Rizzo,* supra, Superior Court, Docket No. CR 97-262883. None of the foregoing cases is substantially similar to the present case in its criminal characteristics to allow for the kind of comparative analysis necessary for meaningful proportionality review.

[221] The state contends that we should not include *Gonzalez* in the pool of cases for proportionality review because the trial court in that case dismissed the aggravating factors on the ground of evidentiary insufficiency prior to a penalty phase hearing and, therefore, the court did not conduct a penalty phase hearing. We acknowledge the limited utility of including *Gonzalez* in the pool. Because the state did not challenge on appeal the trial court's dismissal of the aggravating factors in *Gonzalez,* we never have reviewed that decision and, consequently, we also never have considered the sufficiency of the evidence that the state would have presented in support of its alleged aggravating factors. Moreover, we do not know what mitigating factors the jury might have found had they considered them. We nevertheless include *Gonzalez* for purposes of our proportionality review in light of the relatively small number of other cases in the pool of similar cases.

[222] Although the conduct of the defendant in *Hoyeson* apparently was not carried out for pecuniary gain and although the trial court in *Hoyeson* did not conduct a penalty phase hearing because the state stipulated to the

*Ortiz.*[223] In none of these cases was the death penalty imposed.

In *State* v. *Hafford,* supra, 252 Conn. 274, the defendant was convicted of capital felony in connection with a murder committed in the course of a sexual assault. Id., 276, 281. The murder and sexual assault occurred during the course of a gas station robbery. Id., 280–81. The defendant, Christopher Hafford, compelled the gas station attendant to hand over the cash from the cash register and, after she complied, Hafford forced her into a back room, where he sexually assaulted her and then killed her with a knife and a shovel. Id. At the conclusion of the penalty phase hearing, the three judge panel found the existence of an aggravating factor, namely, that Hafford had committed the murder in an especially cruel manner. Id., 277–79 and n.3. The panel also found, as a *nonstatutory* mitigating factor, that, "at the time of the offenses, [Hafford's] mental capacity was impaired" and that Hafford's "ability to conform

existence of a mitigating factor, the capital felony with which the defendant was charged in *Hoyeson* was the murder of a police officer acting within the scope of his duties. We include *Hoyeson* in the pool solely because it is the only case, other than the present one: (1) involving the murder of a law enforcement officer acting within the scope of his duties; *and* (2) in which there has been no authoritative rejection of the evidentiary sufficiency of the aggravating factor forming the basis for the imposition of the death penalty. Cf. *State* v. *Johnson,* supra, 253 Conn. 81 (death sentence in connection with murder of police officer reversed on appeal due to evidentiary insufficiency of aggravating factor forming basis for imposition of that sentence).

[223] We note that, in *Ortiz,* although a penalty phase hearing commenced following Ortiz' conviction of capital felony, the state reversed its decision to seek the death penalty prior to the conclusion of that hearing and, consequently, the hearing was discontinued before the jury could make any findings with respect to the alleged aggravating and mitigating factors. Ordinarily, therefore, we would not include *Ortiz* in the universe of cases to be considered in connection with our proportionality analysis. See *Webb I,* supra, 238 Conn. 528. In light of the relatively small size of the pool of similar cases, however, we include *Ortiz* in that pool notwithstanding its limited value for purposes of proportionality review.

his conduct to the requirements of the law [also] was impaired . . . ." (Internal quotation marks omitted.) Id., 279–80 n.4. The panel further found that Hafford "gave both oral and written statements to the police shortly after his arrest, fully admitting his guilt. He was remorseful, cooperative, and regretful." (Internal quotation marks omitted.) Id. The panel thereupon concluded that "these factors, when considered in combination with the other mitigating factors found, in fairness and in mercy, constitutes [sic] a mitigating factor." (Internal quotation marks omitted.) Id. The panel therefore imposed a sentence of life imprisonment without the possibility of release. Id., 279–80.

In the present case, the defendant also alleged, as mitigating factors, that his ability to conform his conduct to the requirements of law significantly was impaired, that he had expressed remorse for shooting Officer Williams and that he had confessed to the crime. The jury, however, rejected the defendant's claim that these factors, considered separately or together, were sufficiently mitigating to warrant a sentence of life imprisonment without the possibility of release. Moreover, there is nothing in the evidence adduced at the penalty phase hearing to suggest that the jury finding in this regard was unwarranted. With respect to the defendant's claim of an impairment, the jury was free to conclude that the defendant's alleged impairment, namely, antisocial personality disorder, did not affect his ability to conform his conduct to the requirements of law at the time of the shooting. Furthermore, the defendant's sole expression of remorse consisted of a purported statement to Karen Smith, immediately after the shooting, indicating that he was sorry about what had happened. That statement is hardly comparable to the expressions of remorse and regret that the panel found to have been proven by Hafford in his case. Finally, as the panel found in *Hafford*, Hafford thor-

oughly cooperated with the authorities and gave both oral and written confessions. In the present case, the defendant repeatedly lied about his true identity and about his involvement in the offense. Furthermore, the defendant confessed to the murder of Williams only after the officers confronted him with compelling evidence of his guilt. Moreover, apart from acknowledging that he shot Williams, the defendant did not cooperate with the police. In light of these significant differences between the two cases, the death sentence imposed in the present case cannot be characterized as disproportionate to the sentence of life imprisonment without the possibility of release imposed in *Hafford*.

In *State* v. *Gonzalez*, supra, 206 Conn. 213, the defendant, Hector Gonzalez, was convicted of capital felony for the fatal shooting of two men whose bodies were discovered in an apartment in Bridgeport. See id., 214–15. Gonzalez also was convicted of the attempted murder of a third victim. See id. After his arrest in connection with the shooting, Gonzalez admitted to being involved but claimed that the primary shooter was a man he identified only as the " 'Cuban man.' " Id., 216. According to Gonzalez, he and the " 'Cuban man' " shot the three victims in self-defense when those three men attempted to rob them. Id., 215–16 n.4. Although the record is unclear as to the actual reason for the killings, the defendant in the present case asserts that they were committed "in the course of the drug trade for pecuniary gain."[224]

Prior to the trial of the case, the court in *Gonzalez* dismissed the state's aggravating factors[225] on the basis

[224] We assume, for purposes of our proportionality review, that Gonzalez had a pecuniary motive for the killings.

[225] The state alleged two aggravating factors, namely, that: (1) during the commission of the offense, Gonzalez had created a grave risk of death to another person in addition to the victim of the offense; and (2) Gonzalez had committed the offense in an especially heinous, cruel or depraved manner.

of insufficient evidence[226] and, consequently, Gonzalez was sentenced to life imprisonment without the possibility of release. Thus, as we have indicated, *Gonzalez* is only marginally useful for comparison purposes because we do not know whether the state could have adduced evidence sufficient to establish an aggravating factor. If, in fact, the state could not have done so, then the case is of no value for purposes of proportionality review. See *Webb I*, supra, 238 Conn. 528 (capital cases that do not proceed to penalty phase hearing are not appropriate for inclusion in pool of similar cases). In any event, the present case involves the murder of a police officer, and "although all murders are repugnant and shock the conscience, the murder of a police officer in the performance of his duties is . . . *particularly* offensive." (Emphasis in original.) *State* v. *Johnson*, supra, 253 Conn. 68. We note, moreover, that, although the jury never was called upon to consider Gonzalez' alleged mitigating factors, he had only a third grade education, suffered from organic brain damage and experienced auditory hallucinations. Indeed, he initially was found incompetent to stand trial. Of course, inasmuch as the trial court in *Gonzalez* had no occasion to conduct a penalty phase hearing, we cannot say whether a fact finder would have found a mitigating factor in that case; in the present case, however, the defendant unsuccessfully attempted to convince the jury of the existence of a mitigating factor. Thus, notwithstanding the limited opportunity for a meaningful comparative evaluation of *Gonzalez* and the present

[226] Gonzalez' trial, which took place in 1985; see *State* v. *Gonzalez*, supra, 206 Conn. 214; occurred well before this court's decision in *State* v. *Solek*, supra, 242 Conn. 431–32, in which we indicated that a trial court does not have the authority to entertain a motion seeking a pretrial determination as to whether a defendant charged with the crime of capital felony is eligible to receive the death penalty. Indeed, we have rejected the defendant's claim that he was entitled to a preliminary hearing on the sufficiency of the evidence supporting the existence of the aggravating factor enumerated in § 53a-46a (h) (4). See part III N of this opinion.

case, we are satisfied that the imposition of different sentences in the two cases is attributable not to the action of an aberrant jury in the present case but, rather, to material differences in the facts and circumstances of the cases.

In *Hoyeson*, the defendant, Thomas Hoyeson, was the subject of a routine traffic stop by a uniformed Milford police officer. As the officer was approaching Hoyeson's vehicle, Hoyeson fired one shot into the officer's chest, fatally wounding him. Although both *Hoyeson* and the present case involve the murder of an on-duty police officer, in *Hoyeson*, the state stipulated to the existence of a mitigating factor, namely, that Hoyeson, who had been on a three day cocaine binge, "was substantially impaired . . . in a paranoid state, highly agitated, [and] highly fearful" at the time of the murder. Because the defendant in the present case suffered no such impairment—indeed, the jury rejected the defendant's claim that he suffered from a condition that impaired his ability to conform his conduct to the requirements of law—*Hoyeson* provides no support for the defendant's disproportionality claim.

The mitigating factor established by the defendant in *State* v. *Roseboro*, supra, 221 Conn. 430, distinguishes that case from the present case for purposes of proportionality review. In *Roseboro*, the defendant, Derek Roseboro, stabbed three people to death, including an eight year old child, during the course of a burglary. See id., 433. A three judge panel found Roseboro guilty of capital felony and burglary and, thereafter, determined that the state had established the existence of an aggravating factor, namely, that Roseboro had committed the capital felony in an especially heinous manner. Roseboro alleged the existence of several mitigating factors, including: (1) that he had graduated from college, where he was a successful student and athlete; (2) that he had a productive work history; (3)

that his "correctional institutional history demon-strate[d] that [he] responds very well to supervision, and that persons in positions of authority within the correctional system think highly of his trustworthiness and overall ability"; and (4) that "[i]t can be reasonably inferred from this prior history that [he] will respond very well to supervision and will show respect and demonstrate support to persons in authority while he is serving a sentence of life without [the possibility of release]."

At the conclusion of the sentencing hearing, the panel in *Roseboro* found that Roseboro had established a miti-gating factor. Specifically, the panel concluded that Roseboro "proved . . . that he adjusted well to incar-ceration between the time of arrest and the present. The [panel] also [found] that [Roseboro] had previously adjusted well to incarceration, and that it is probable that he will adjust well in the future in a highly struc-tured setting. This is supported by psychological testing and expert testimony, by evidence that he has been cooperative in the past and has gained the trust and confidence of many of those in authority around him in structured situations. . . . [A]lso . . . he turned over to the authorities a buried hacksaw blade that he found, which could have been used as a weapon or sold to other prisoners for monetary gain. The court finds that he will conform well in situations of institu-tional confinement . . . and adjust as needed to proper authority." By contrast, the defendant in the present case made no claim of an exceptional institutional record or a demonstrated likelihood that he would be a model prisoner in the future.

In *State* v. *Correa*, supra, 241 Conn. 322, the defen-dant, Jesus Alberto Correa, and an accomplice arranged to meet drug dealers to purchase a kilogram of cocaine for $20,000. Id., 325. At the designated time and place, Correa exited his car and approached the vehicle occu-

pied by the two dealers. Id., 326. Before the two dealers could exit their car, Correa shot and killed them. He then removed a metal box from the dealers' car containing approximately one kilogram of cocaine with a street value of $100,000. Id.

Following a jury trial, Correa was convicted of, inter alia, capital felony, murder and robbery. Id., 324 and n.1. After Correa's penalty phase hearing, the jury found that the state had established the existence of an aggravating factor, namely, that Correa had committed the murders for pecuniary gain. The jury, however, also found that Correa had proven one or more mitigating factors and, consequently, the court imposed a sentence of life imprisonment without the possibility of release. Id., 324.

The jury did not indicate on its special verdict form what mitigating factor or factors it found that Correa had proven the existence of. Among his proposed mitigating factors, however, Correa alleged that: (1) his formal education had ended in the fifth grade; (2) notwithstanding his low level of education, he had a history of steady employment; (3) he had worked hard to support his family and improve his family's economic situation; (4) he had been a good and loving husband and father to his two young children; (5) he had no criminal record in his native country, Colombia;[227] and (6) he had come from a poor and humble household, and had helped support his parents and family members since he was a young child. These factors, any or all of which the jury may have found to be sufficiently mitigating in nature to warrant a sentence of life imprisonment without the possibility of release, had no counterparts in the list of mitigating factors alleged by the defendant in the present case.

Finally, in *State* v. *Ortiz*, supra, 252 Conn. 533, the defendant, Angel Luis Ortiz, and a codefendant kid-

---

[227] Correa came to this country from Colombia in 1989, one year prior to the commission of the murders.

napped, robbed and murdered a rival drug dealer and his wife. Id., 537–41. Ortiz was found guilty of capital felony, murder, robbery and kidnapping. Id., 536–37. After the penalty phase hearing commenced, but prior to its completion, the state decided not to pursue the death penalty. In accordance with that decision, the court sentenced Ortiz to life imprisonment without the possibility of release.[228] Id., 537.

The defendant's disproportionality claim in regard to *Ortiz* is defeated by a review of the mitigating factors over which the jury in that case deadlocked. In particular, Ortiz alleged certain mitigating factors, including that he had no prior criminal record, that he was sixty years of age and that he was gainfully employed at the time his children were young and needed his financial support. As in the other cases included in the pool of similar cases for purposes of proportionality review, the mitigating factors that Ortiz had alleged were not alleged by the defendant in the present case. In such circumstances, the differences between the two cases are material, thereby vitiating any claim by the defendant that his sentence is disproportionate to the sentence imposed in *Ortiz*.

---

[228] Ortiz' codefendant, Julio Diaz-Marrero, also was convicted of, inter alia, capital felony. A penalty phase hearing was conducted and, as in Ortiz' case, the jury found the existence of an aggravating factor, namely, that Diaz-Marrero had committed the offense in an especially heinous, cruel and depraved manner. After the jury had indicated that it was deadlocked on the existence of a mitigating factor, the state informed the court that it would no longer seek the death penalty against Diaz-Marrero, and he, also, was sentenced to life in prison without the possibility of release.

Ordinarily, we would include Diaz-Marrero's case, as we have included Ortiz' case, in the pool of cases for purposes of proportionality review. Neither party has identified, however, what mitigating factors Diaz-Marrero had alleged, and the available record does not disclose them. In light of this factual lacuna, we are unable to engage in any meaningful comparative review of Diaz-Marrero's case and the present case. We therefore do not include it in our analysis of the defendant's claim of disproportionality under § 53a-46b (b) (3).

Ultimately, therefore, we arrive at the same conclusion that we previously have reached after engaging in proportionality review pursuant to § 53a-46b (b) (3): "On the basis of [the foregoing] analysis, of our scrupulous examination of all of the material presented to us regarding the imposition of the death penalty in the present case, and of our careful review of all of the material presented to us [concerning the universe of cases for proportionality review], we conclude that the death sentence in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant. . . . There is nothing freakish, arbitrary, wanton or aberrational about the sentence in th[e] [present] case. There is no pattern or trend evident in similar cases with respect to which this sentence is inconsistent. This case is not an outlier. . . . The sentence of death in th[e] [present] case, therefore, must be affirmed." (Citation omitted; internal quotation marks omitted.) *Webb I*, supra, 238 Conn. 550–51; accord *Cobb II*, supra, 251 Conn. 520.

The judgment is affirmed.

In this opinion BORDEN, VERTEFEUILLE, ZARELLA, LAVERY and FOTI, Js., concurred.

## ADDENDUM

Following the official release of this opinion on June 3, 2003, the defendant, on June 27, 2003, filed a motion for reconsideration. In his motion, the defendant claimed, inter alia, that, pursuant to *Ring* v. *Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), an opinion that was released after the parties' submission of briefs to this court and after oral arguments, he has a federal constitutional right to a jury determination of whether his prior felony conviction in New York for

the sale of a controlled substance is the "same felony," for purposes of § 53a-46a (h) (1), as the offense that he was attempting to commit when he shot and killed Officer Williams. We disagree.

In *Ring*, the United States Supreme Court concluded that *Apprendi* v. *New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), applied to the capital sentencing scheme at issue. See *Ring* v. *Arizona*, supra, 536 U.S. 609. In *Apprendi*, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi* v. *New Jersey*, supra, 490. The statute at issue in *Ring* directed that "[t]he court alone shall make all factual determinations" regarding the existence or nonexistence of certain aggravating circumstances for the purpose of determining the sentence to be imposed. Ariz. Rev. Stat. Ann. § 13-703 (C) (West Sup. 2001); see *Ring* v. *Arizona*, supra, 592. The court in *Ring* held that the statute was unconstitutional, explaining that, under the sixth and fourteenth amendments to the federal constitution, "[i]f a [s]tate makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the [s]tate labels it—must be found by a jury beyond a reasonable doubt. . . . A defendant may not be expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Ring* v. *Arizona*, supra, 602.

The central holding of *Ring*, namely, that a jury must determine the existence of aggravating circumstances necessary to impose a sentence of death, does not

require the submission of questions of *law* to a jury. By its plain terms, the principle announced in *Ring* applies only to issues that involve findings of *fact*. Id., 589 (under federal constitution, "defendants . . . are entitled to a jury determination of any *fact* on which the legislature conditions an increase in their maximum punishment" [emphasis added]); see also *United States* v. *Gaudin*, 515 U.S. 506, 512, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995) (materiality element of federal crime of making false statement is "peculiarly on[e] for the trier of fact" inasmuch as it "involv[es] . . . delicate assessments of the inferences a reasonable [decisionmaker] would draw from a given set of facts and the significance of those inferences to him" [internal quotation marks omitted]). Thus, the Missouri Supreme Court recently has concluded that a trial court's legal determination that a defendant's prior convictions qualified as "serious assaultive criminal convictions" within the meaning of the relevant statutory aggravating factor did not violate the constitutional principle enunciated in *Ring*. (Internal quotation marks omitted.) *State* v. *Williams*, 97 S.W.3d 462, 474 (Mo.), cert. denied, 539 U.S. 944, 123 S. Ct. 2607, 156 L. Ed. 2d 631 (2003). We see no reason to reach a different result in the present case.

As we have explained, the issues of whether the defendant previously had been convicted of the sale of a controlled substance and whether he was attempting to sell a narcotic substance during the commission of the capital felony are factual issues to be decided by the jury. The jury did determine those factual issues in this case. By contrast, the issue of whether the two felonies are the "same" within the meaning of § 53a-46a (h) (1) presents a pure question of law that in no way "implicate[s] the weighing of testimony, the assessment of credibility, the use of external facts, or

the like." *United States* v. *Weston*, 960 F.2d 212, 217 (1st Cir. 1992) (determination of whether offense constituted "crime of violence" within meaning of statute raised issue of law [internal quotation marks omitted]); accord *United States* v. *Amparo*, 68 F.3d 1222, 1226 (9th Cir. 1995). But cf. *United States* v. *Uchimura*, 125 F.3d 1282, 1285–86 (9th Cir. 1997) (that ultimate conclusion depends on particular facts militates in favor of finding that issue is one of fact). The question of whether the defendant's prior New York felony conviction is the "same felony" as the narcotics offense that the defendant was attempting to commit during the commission of the capital felony does not involve any disputed *factual* issues. Consequently, *Ring* does not require the submission of that question to the jury.

KATZ, J., dissenting. I maintain my belief that the death penalty fails to comport with contemporary standards of decency and thereby violates our state constitution's prohibition against cruel and unusual punishment. See Conn. Const., art. I, §§ 8 and 9. Accordingly, I would reverse the judgment of the trial court and remand the case with direction to vacate the penalty of death and to impose a sentence of life imprisonment without the possibility of release.

I am compelled, nevertheless, to address another issue in this case—the defendant Richard Reynolds' claims of prosecutorial misconduct, even though, by

resolving them, I undermine what would otherwise be my ultimate determination in the case. In other words, although I do not believe the death penalty has a place in our society, I am so troubled by the claims of prosecutorial misconduct in this case that I feel that justice demands that I address them. I do this despite the fact that the relief afforded the defendant, were he to prevail on these claims, merely would create yet another opportunity for the state to seek the imposition of the death penalty. Just as we, as judges, have a constitutional obligation to declare a penalty unconstitutional when it exceeds the bounds of contemporary and moral standards of decency, we also must, as long as the death penalty remains in place, never lose sight of our "responsibility to ensure that the ultimate criminal sanction is meted out only in accordance with constitutional principle." *Walton* v. *Arizona*, 497 U.S. 639, 674, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (Brennan, J., dissenting). The unique nature of the death penalty necessitates that all possible protections be brought to bear during the pretrial, guilt and sentencing phases of the prosecution of a capital crime. Accordingly, I turn my attention to the defendant's claims of prosecutorial misconduct in the present case, which I believe warrant this court to invoke its supervisory authority over the administration of justice to vacate the penalty imposed, both to protect the rights of defendants and to maintain reasonable standards among prosecutors throughout the judicial system.

The majority separates the defendant's claims of prosecutorial misconduct into three broad categories. In addressing the claims that fall under the first category, namely, the state's references to the family of the victim, Walter Williams, a Waterbury police officer, the majority scolds the state's attorney for his characterization of the victim's autopsy photographs as the Williams "family album," but, nevertheless, concludes that, while

the remarks constituted "an improper appeal to the emotions of the jury," they were not unduly prejudicial because they were "brief and isolated . . . ."

The second category of impropriety encompasses the defendant's claim that the state's attorney "invit[ed] the jury to ignore the legal principles that govern the question of whether death is the appropriate sentence." In addressing the defendant's claim of impropriety, the majority agrees with the defendant that some of the remarks were, indeed, improper,[1] but concludes that, because they were "fleeting," no new penalty phase is required. The majority also is troubled by several statements made by the state's attorney regarding the mitigating factors alleged by the defendant. In particular, the majority reprimands the state's attorney for using the term "emotional blackmail" to manipulate the jurors,[2] but ultimately excuses this inflammatory

[1] After telling the jury that it had the "awesome task" of "determining whether or not the death penalty should be imposed," the state's attorney remarked: "I took an oath to enforce the laws of the state of Connecticut. The judge took an oath and you as jurors took an oath to see that the laws of the state of Connecticut are upheld and I do this, I make this argument to you . . . because I, like you, have taken an oath to uphold and enforce the law. And, indeed, if the facts are there and the law calls for it, based on my oath and your oath and the court's oath, the death penalty must be imposed. . . . I know it's not easy. I don't take it lightly and I know nobody on this panel takes it lightly and [the judge] doesn't take it lightly, but it's asking—we've been sworn as citizens as part of our civic duty to do."

[2] In particular, the defendant challenges the following comments by the state's attorney: "Emotional blackmail. . . . [T]hat's what this mitigating evidence is. It's an attempt to promote emotional blackmail on the jury. And that's not what the death penalty is about. The death penalty is about a person being told by society you have to take responsibility for your conduct, that's what the death penalty is. Society as a community . . . [p]ointing to someone who has committed a terrible crime, who has committed the ultimate crime, and say[ing] to that person you have to take responsibility for your actions. Don't blame your father; don't blame the teacher in school; don't blame your grandparents in Jamaica; don't blame your sister; don't blame your brother; don't blame the courts; don't blame that you run around with the wrong crowd. Step up and take responsibility for your actions. . . . Take responsibility for that. For once in your life, don't hold everybody up to emotional blackmail."

characterization because it was used only a limited number of times.

The third category of alleged misconduct is classified by the majority as the "[e]xpression of [p]ersonal [b]eliefs" and includes a discussion of several improper remarks made by the state's attorney. In addressing these claims of prosecutorial misconduct, the majority castigates the state's attorney for the numerous times that he expressed his personal beliefs during closing argument,[3] but concludes, nonetheless, that while the comments were "clearly . . . inappropriate," they "represent the kind of lapse that sometimes occurs, without premeditation, in the heat of the moment and at the close of an emotional trial." With regard to the "utterly unsupported assertion that defense counsel, himself, lacked confidence in the viability of the mitigating factors alleged by the defendant,"[4] the majority rec-

---

[3] When addressing the aggravating factors in his closing argument, the state's attorney remarked: "Now is my chance to argue to you why *I feel that we have proven* each of these aggravants beyond a reasonable doubt. Again, we don't have to prove all three. . . . I—of course, *it's my belief* that the evidence in this case supports the finding that all three have been proven." (Emphasis added.)

[4] During his closing argument to the jury, the state's attorney stated: "I don't know how I can argue or rebut the mitigants. [Defense counsel] refused to argue to you when he had the opportunity what these mitigating factors were and what they all meant. He told you [the state's attorney] is going to stand up and he's going to wave the list and smile and laugh. I'm not laughing . . . . I take nothing about this case lightly. I ask you, *if [defense counsel] felt that his mitigating evidence was so strong and so convincing, why didn't he argue it to you when I would have the opportunity to come up and argue against it*? I can't argue against anything now. . . . So I'm left here kind of punching in the shadows.

"*If he felt the way I feel—I felt my aggravants are strong. I felt the evidence supported them* and I argued those aggravants to you and I said here they are. Now, [defense counsel] stand up and try to knock them down. *I have confidence in my case.* You can't knock them down. . . . His part of the case is mitigants. *Does he have confidence in his mitigants? No*, because he knows if he puts them up there, I'd have the opportunity to come up and knock them down. So you have to ask that. Where's his big argument for the mitigants? . . . Because this is my last opportunity and because I don't know what [defense counsel] is going to say about mitigants,

ognizes that the state's attorney's only purpose was "to undermine the legitimacy of those mitigating factors on the basis of a wholly irrelevant consideration, namely, the extent to which defense counsel personally believed in the merits of the defendant's case." Nonetheless, the majority concludes that, "[i]n light of the [trial] court's straightforward and timely instruction and defense counsel's informed decision regarding the most efficacious way to address the comments of the state's attorney," the defendant's due process rights were not violated.

The majority also points to the comments in the closing argument by the state's attorney vouching for the credibility of Anthony Crawford, a witness for the state.[5]

---

I am going to say something about them. Because *I do think the mitigants are weak.*" (Emphasis added.)

The state's attorney also made the following comments with regard to certain specific mitigating factors: "I'm saying just because they say it's a mitigant doesn't mean it is and I'm not going to point out the one about the middle child. *If you ask me if I thought that was a mitigant, I'd say no.*" (Emphasis added.) Later, he continued: "*If [defense counsel] did not have the courage to stand in front of you and argue the mitigants so I can come up and attack them, you have to ask yourselves how strong are those mitigants.*" (Emphasis added.)

[5] The state's attorney, anticipating that defense counsel would argue that Crawford's testimony was suspect because he had received special treatment from the state, commented as follows: "Crawford. He's no altar boy. He told you what he was, and *believe me*, they are going to say, well, don't believe . . . Crawford because he got a break from the state. *He didn't get a break from the state.* I prosecuted him for hindering prosecution in this case. *If I wanted to give Crawford a break in exchange for his testimony, the easiest thing for me to do was not to prosecute him . . . . We don't give a damn what happens to him later on. . . . If I wanted to give . . . Crawford a break in exchange for his testimony, common sense, would I have ever prosecuted him . . . ? So . . . Crawford has been given no break.* He came and he testified." (Emphasis added.)

Later, while arguing that Crawford's testimony as to the number of gunshots fired should be believed, the state's attorney remarked: "*You know why I believe . . . Crawford that there were seven shots? I'm going to tell you why I believe . . . Crawford . . . .*" (Emphasis added.) The state's attorney then proceeded to recite in detail the facts upon which Crawford's testimony had been based.

With regard to the comments by the state's attorney concerning the number of gunshots that the defendant allegedly had fired; see footnote 5 of this dissenting opinion; the majority concludes that the defendant did not demonstrate that the comments were harmful. That determination is predicated on the detailed explanation of the facts by the state's attorney supporting Crawford's testimony, along with the defendant's decision not to object, and, instead, to accept "a general instruction to the effect that the opinions or beliefs of counsel are not evidence and are not to be considered by the jury." With regard to the comments by the state's attorney that he had not made a deal with Crawford in exchange for his testimony, the majority concludes that, although the remarks "improperly injected [the state's attorney's] own credibility into the case," they did not prejudice the defendant. That conclusion is predicated on three things: defense counsel's closing argument disavowing any claim that Crawford had a secret deal; the defendant's express waiver of any remedy other than the general instruction that the expression by counsel of personal opinion or belief is irrelevant; and the defendant's challenge on cross-examination to Crawford's testimony that Crawford had no expectation of leniency.

The majority thereafter concludes that, although, on several occasions, the state's attorney engaged in conduct that clearly was improper, the improprieties did not render the penalty phase hearing fundamentally unfair.[6] The majority additionally concludes that this is

---

[6] We note that the majority has approached this issue by isolating each impropriety and then determining whether that isolated instance rendered the proceeding fundamentally unfair. The ultimate determination, however, is "whether the trial *as a whole* was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Emphasis added; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 723, 793 A.2d 226 (2002). Accordingly, it is the effect of the *totality* of the improprieties that determines whether the defendant's due process rights were violated. Id., 728 (*Borden, J.*, concurring

not a case warranting the exercise of our supervisory authority over the administration of justice because, in essence, the defendant expressly declined to seek any remedy for the state's improprieties other than requesting the court to give the standard instruction that opinions of counsel are not entitled to any evidentiary weight. I respectfully disagree with the latter conclusion and, pursuant to the court's supervisory authority, would reverse the judgment and order a new penalty phase hearing.

This court recently explained the role that our supervisory authority plays in the context of addressing claims of prosecutorial misconduct. In *State* v. *Payne*, 260 Conn. 446, 450–52, 797 A.2d 1088 (2002), we stated the following: "Although prosecutorial misconduct is often examined under the rubric of a defendant's due process protections, as in our recent decision in *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), our review in the present case is limited to whether reversal is required under our supervisory authority. As an appellate court, we possess an inherent supervisory authority over the administration of justice. . . . The standards that we set under this supervisory authority are not satisfied [merely] by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . *State* v. *Jones*, 234 Conn. 324, 346–47, 662 A.2d 1199 (1995). Of course, our supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Thus, [e]ven a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions. . . . *State* v. *Pouncey*, 241 Conn. 802, 813, 699 A.2d 901 (1997).

and dissenting) ("totality of the improprieties leads to the conclusion that the defendant was deprived of a fair trial").

"[W]hen prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. See, e.g., *State* v. *Ubaldi*, [190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983)]; see also *State* v. *Ruiz*, 202 Conn. 316, 330, 521 A.2d 1025 (1987). *State* v. *Pouncey*, supra, 241 Conn. 811–12. In *Pouncey*, we previously have recognized that reversal is appropriate when there has been a pattern of misconduct across trials, not just within an individual trial. [*State* v. *Pouncey*, supra], 815–16 (noting that the defendant does not claim either that the assistant state's attorney in this case previously has used racially charged rhetoric in her arguments to other juries and concluding that [i]f such a pattern or practice of misconduct were discernible . . . reversal of the defendant's conviction would serve the important purpose of demonstrating that such conduct cannot, and will not, be tolerated).

"Accordingly, we exercise our supervisory authority in this context to redress repeated and deliberate misconduct by a prosecutor seeking to increase the likelihood of conviction even though that conduct does not necessarily require reversal as a due process violation. In accordance with the cases cited previously, we pay particular attention to the fact that the prosecutor knew or should have known that the conduct was improper and was part of a pattern of similar misconduct in other cases. We exercise our supervisory authority in order to protect the rights of defendants and to maintain standards among prosecutors throughout the judicial system rather than to redress the unfairness of a particular trial. We do so in order to send a strong message that

such conduct will not be tolerated. Id., 812." (Internal quotation marks omitted.)

The present case involves a state's attorney who engaged in such a pattern of deliberate misconduct. This particular state's attorney, personally, is not new to findings of prosecutorial misconduct committed at trial; see *State* v. *Satchwell*, 244 Conn. 547, 568–69, 710 A.2d 1348 (1998) (state's attorney improperly referred to facts not in evidence by citing to redacted portions of transcript); *State* v. *Watlington*, 216 Conn. 188, 193, 579 A.2d 490 (1990) (disapproving of state's attorney's comments in closing argument, but concluding that unpreserved claim did not rise to level of "egregious misconduct" requiring reversal); nor is the office over which he has supervisory authority. See *State* v. *Whipper*, 258 Conn. 229, 266–75, 780 A.2d 53 (2001) (state's attorney improperly expressed personal opinion about expert witness, violated trial court's order regarding consciousness of guilt instruction, expressed personal opinion about defendant's guilt, asked jury to consider matters not in evidence, and vouched for credibility of witnesses); *State* v. *Heredia*, 253 Conn. 543, 565, 754 A.2d 114 (2000) (state's attorney improperly appealed to jurors' passions and prejudices by invoking fear of defendant); *State* v. *Oliveras*, 210 Conn. 751, 763, 557 A.2d 534 (1989) (state's attorney improperly referred to facts not in evidence by referring in closing argument to stricken testimony); *State* v. *Moore*, 69 Conn. App. 117, 125, 795 A.2d 563, cert. denied, 260 Conn. 941, 835 A.2d 59 (2002) (state's attorney improperly referred to facts not in evidence); *State* v. *Conde*, 67 Conn. App. 474, 499, 787 A.2d 571 (2001), cert. denied, 259 Conn. 927, 793 A.2d 251 (2002) (state's attorney improperly referred to hearsay testimony not in evidence); *State* v. *Dillard*, 66 Conn. App. 238, 246–58, 784 A.2d 387, cert. denied, 258 Conn. 943, 786 A.2d 431 (2001) (state's attorney improperly suggested facts not in evidence,

suggested defense counsel acted improperly, and vouched for witness' credibility); *State* v. *Mills*, 57 Conn. App. 202, 208–12, 748 A.2d 318, cert. denied, 253 Conn. 914, 754 A.2d 163 (2000) (reversing case due to state's attorney's argument improperly appealing to passions and prejudices of jury, expressing personal opinions about defendant's guilt and referring to extraneous matters).

Rather than reconsider his tactics, however, the state's attorney in the present case grows emboldened, buoyed by the mere slap on the wrist he has received or the harmless error curtain he has been able to hide behind. The case at hand is a prime example. When his objection to the court regarding defense counsel's failure to address the mitigating factors in any detail failed to achieve the desired result, the state's attorney took matters into his own hands, "demonstrat[ing] a complete disregard for the [court's] rulings." *State* v. *Ubaldi*, supra, 190 Conn. 567. The defendant's seeming acquiescence to this misconduct does not, however, relieve this court of its responsibility to maintain the integrity of the judicial system and to put an end to the prosecutorial misconduct that has been allowed to " 'reign unchecked' . . . ." *Smith* v. *Phillips*, 455 U.S. 209, 221, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).

I recognize that the issue of whether reversal is warranted requires weighing society's interest in maintaining a justice system that, both in appearance and in practice, treats all defendants fairly against some of the difficulties that might arise during a new trial, including: "the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." *State* v. *Ruiz*, supra, 202 Conn. 330.

The state's attorney's behavior in this case was calculated to undermine the legitimacy of the defendant's mitigating factors on the basis of a wholly irrelevant consideration, namely, the extent to which defense counsel personally believed in the merits of the defendant's case. Additionally, the conduct of the state's attorney improperly was " 'directed to passion and prejudice' " and "calculated to incite an unreasonable and retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence." *Lesko* v. *Lehman*, 925 F.2d 1527, 1545 (3d Cir. 1991). By injecting inflammatory emotional considerations, expressing his personal opinions about the merits of the defendant's case, vouching for the credibility of the state's witnesses and injecting his oath into the jury's deliberative process, the state's attorney invited the jury to reach a verdict, in a capital case, based on factors outside of the evidence. This invitation allowed an improper and, indeed, unconscionable diminishment of the jury's responsibility.

I am mindful of the emotional trauma to the family of Officer Williams that will likely result from having to go through a new penalty phase hearing. "Any time those affected by a violent crime are forced to relive their experiences in a new trial, the emotional trauma is significant. . . . [This] highly unfortunate [consequence], however, [does] not outweigh the compelling reasons that exist for reversing the conviction in light of the multiple, extraordinary instances of prosecutorial misconduct." *State* v. *Payne*, supra, 260 Conn. 464–65. Nor can I state that the possibility of memory loss by some witnesses and concerns about the unavailability of other witnesses are significant enough in this case to outweigh my reasons for reversing the imposition of the death sentence. The witnesses at the penalty hearing were, for the most part, the same witnesses who testified at the guilt phase of the trial. Their testimony has

been memorialized and, if necessary, can be introduced into evidence through a transcript.

Finally, I have considered the availability of other sanctions. This court has stated that reversal of a conviction under our supervisory authority "generally is appropriate . . . only when the '[prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal.' *State* v. *Ubaldi*, supra, [190 Conn.] 575." *State* v. *Pouncey*, supra, 241 Conn. 812. "Some tribunals have declined to use such supervisory power on the theory that society should not bear the burden of a new trial because of prosecutorial misconduct where a new trial is not constitutionally mandated. . . . According to some authorities, the evil of overzealous prosecutors is more appropriately combatted through contempt sanctions, disciplinary boards or other means. . . . This court, however, has long been of the view that it is ultimately responsible for the enforcement of court rules in prosecutorial misconduct cases. . . . Upsetting a criminal conviction is a drastic step, but it is the only feasible deterrent to flagrant prosecutorial misconduct in defiance of a trial court ruling. We are mindful of the sage admonition that appellate rebuke without reversal ignores the reality of the adversary system of justice. The deprecatory words we use in our opinions . . . are purely ceremonial. Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice [of verbal criticism without judicial action]—recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary." (Citations omitted; internal quotation marks omitted.) *State* v. *Ubaldi*, supra, 571.

Past experience has demonstrated that merely to reprimand, *once again*, a state's attorney who engages in

deliberate misconduct that undermines the fairness of a trial does not sufficiently convey disapproval of those tactics. I would conclude, therefore, that nothing short of reversal will deter similar misconduct in the future. Accordingly, mindful of all of the circumstances involved in this case, I would reverse the judgment imposing the death sentence and order a new penalty phase hearing.

Accordingly, I respectfully dissent.